# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 2:10-cv-13515-AC

ROBIN ALDRICH,

Plaintiff, Honorable

vs. Avern Cohn

BOYSVILLE OF MICHIGAN, INC., a Michigan corporation, doing business as HOLY CROSS CHILDREN'S SERVICES,

Defendant.
_______________________________/

The Videotape Deposition of ROBIN ALDRICH, the Plaintiff herein, taken pursuant to Notice of Taking Deposition before Linda McMullen Morelli, CSR-3349, Certified Shorthand Reporter and Notary Public for the County of Wayne, acting in the County of Washtenaw, State of Michigan, at 201 South Division Street, Suite 400, Ann Arbor, Michigan, on Wednesday, January 19, 2011, commencing at about 9:40 a.m.

APPEARANCES:

RICHARD N. LAFLAMME, ESQ. P32641
LaFlamme & Mauldin, P.C.
2540 Spring Arbor Road
Jackson, Michigan 49203
(517)784-9122

Appearing on behalf of the Plaintiff.

KAREN L. PIPER, ESQ. P31706
Bodman, LLP
201 W. Big Beaver Road, Suite 500
Troy, Michigan 48084
(248)743-6000

Appearing on behalf of the Defendant.

Also present: Alyson Beck
Joe Roche, Video Technician

- - -

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 2:10-cv-13515-AC

ROBIN ALDRICH,

Plaintiff, Honorable

vs. Avern Cohn

BOYSVILLE OF MICHIGAN, INC., a Michigan corporation, doing business as HOLY CROSS CHILDREN'S SERVICES,

Defendant.
________________________________________/

The Continuation of the Videotape Deposition of ROBIN ALDRICH, the Plaintiff herein, taken pursuant to Notice of Taking Deposition before Linda McMullen Morelli, CSR-3349, Certified Shorthand Reporter and Notary Public for the County of Wayne, acting in the County of Washtenaw , State of Michigan, at 201 South Division Street, Suite 400, Ann Arbor, Michigan, on Wednesday, June 8, 2011, commencing at about 9:45 a.m.

APPEARANCES:

RICHARD N. LAFLAMME, ESQ. P32641
LaFlamme & Mauldin, P.C.
2540 Spring Arbor Road
Jackson, Michigan 49203
(517)784-9122

Appearing on behalf of the Plaintiff.

KAREN L. PIPER, ESQ. P31706
Bodman, LLP
201 W. Big Beaver Road, Suite 500
Troy, Michigan 48084
(248)743-6000

Appearing on behalf of the Defendant.

Also present: Alyson Beck
Brian Kelly, Video Technician

\- - -

INDEX


| WITNESS: ROBIN ALDRICH | PAGE |
|---|---|
| Examination By Ms. Piper | 5 |


- - -

EXHIBITS
(Attached)

| Deposition Exhibit | Description | Page Marked |
|---|---|---|
| 1 | Page 69 and 70 from Aldrich notes | 34 |
| 2 | Holy Cross Children's Services Co-Worker Statement | 77 |
| 3 | Memo dated November 2008 | 87 |
| 4 | Email stream from September 17 to September 30, 2009 | 114 |
| 5 | Summary of email and follow-up statement | 116 |
| 6 | Aldrich application from Holy Cross personnel file | 118 |
| 7 | Holy Cross Co-Worker Hire-In/Status Change Form | 123 |
| 8 | Receipt of Job Description Acknowledgment | 123 |
| 9 | Holy Cross Accident - Incident Report | 127 |
| 10 | Charge of Discrimination | 134 |
| 11 | Michigan Department of Civil Rights Intake Interview | 137 |
| 12 | Email stream from January 3 to March 25, 2008 | 193 |

(Exhibits continued on page 3.)



EXHIBITS
(Attached)
(Continued)

| Deposition Exhibit | Description | Page Marked |
|---|---|---|
| 13 | Emails of September 24, 2008 | 208 |
| 14 | Pages 8 and 9 from Aldrich notes | 240 |
| 15 | Page 73 from Aldrich notes | 251 |

- - -



Ann Arbor, Michigan
Wednesday, January 19, 2011
At or about 9:40 a.m.

- - -

THE VIDEO TECHNICIAN: On the record, this is the videotape deposition of Robin Aldrich in the matter of Robin Aldrich versus Boysville of Michigan, Case Number 2:10-cv-13515-AC, taken at 201 South Division Street, Suite 400, Ann Arbor, Michigan. Today is Wednesday, January 19, 2011. The time is 9:40 a.m.

My name is Joe Roche, Video Technician.

Would the attorneys please introduce themselves and the court reporter please swear in the witness?

MR. LAFLAMME: Richard LaFlamme representing Robin Aldrich.

MS. PIPER: Karen Piper. I represent Boysville of Michigan, doing business as Holy Cross Children's Services.

- - -

ROBIN ALDRICH,

the Plaintiff herein, having been first duly sworn, testified as follows:

MS. PIPER: Ms. Aldrich, as you heard a minute ago when I introduced myself, my name is Karen Piper and I'm representing Holy Cross Children's Services in this



lawsuit your filed against them. I'm going to be asking you some questions to day to which I will need an oral response, so the court reporter can take that down.

If at any time you don't hear or understand a question, please let me know and I'll try to repeat or rephrase it. Okay?

THE WITNESS: Yes.

- - -

EXAMINATION

BY MS. PIPER:
Q Are you taking any medication today that would interfere with your ability to understand a question or remember an answer or something that happened some time ago?
A No.
Q Would you state your name for the record, please?
A My legal name is Emma Robin Aldrich.
Q But you go by something different?
A Robin Aldrich.
Q Why is that?
A Because Emma was my grandmother's name. So, to distinguish the difference, I am Robin, she was Emma.
Q Your grandmother's name was Emma --
A Correct.
Q -- Aldrich?
A No, Emma. She had a different last name.

Q Do you have a copy of the previous deposition?
A No.
Q Any other depositions?
A No.
Q Did you review any documents in preparation for your deposition today?
A Yes.
Q What did you review?
A My personnel file and prepared documents.
Q And what?
A Prepared documents with my attorney.
Q I don't know what "prepared documents" means.
A Documents that we provided to you.
Q Okay. Any other documents?
A No.
Q Did you keep a diary or journal or calendar while you were working at Holy Cross?
A Yes.
Q Where did you keep that?
A On my computer at home.
Q When did you start keeping that?
A I kept it throughout my tenure there.
Q When did you start there?
A 1997.
Q So, beginning in 1997, you kept a journal on your home



computer?
A Yes.
Q Where is that today?
A On my home computer.
Q Does it contain information about things you're complaining of in the lawsuit?
A Yes.
Q Does it contain information other than what was provided to your counsel that you believe was provided to me?
A I'm not sure I understand the question.
Q Your attorney provided some notes of some things that happened in 2008 and 2009, I believe.
Are there other notations on your journal at home regarding things that happened that you think are relevant to the lawsuit or your claims in this lawsuit?
A No.
Q You've provided everything that pertains to your lawsuit? There are no other notes at home?
A Yes.
Q When did you make the journal entries?
A Immediately following the events.
Q If something happened at work at 8:15 in the morning, for example, when would you record that?
A I would have recorded it when I was at work on note paper and taken it home and typed it up.



Q Okay. Some of the notes, as I recall, indicate that they were documented on a day different than they occurred.
So, the notes would be more accurate -- the journal would be more accurate in terms of when you recorded that stuff?
A The journal entries would have been the date that they were typed.
MS. PIPER: Counsel, if you want to look at page 73 of the documents that you provided to me?
BY MS. PIPER:
Q I'm going to show this to you now but not mark it, since Counsel has a copy, as do I. The second entry says:
"10/8/2008, John Lemmer - Documented on 10/9/2008."
Does this mean that you -- well, what does this mean? What does "documented on 10/9/2008" mean?
A That means it was typed on 10/9/2008.
Q But is your testimony that you actually documented it in handwriting at work on 10/8/2008?
A No. I wasn't at work on 10/8.
Q Okay. So, why was this documented on 10/9/2008?
A I felt it was important information.
Q Why didn't you document it on 10/8/2008?
A I wrote it down on 10/8.
Q Where did you write it down?



A In my car on the side of the road.
Q Okay. What happened to those original handwritten notes?
A I shredded them.
Q When did you do that?
A On 10/8 -- or 10/9. I'm sorry. On 10/9, when I typed this.
Q Okay. Can we go to page 64? The one, two, third paragraph says:
"John Lemmer - February 2008."
That doesn't have a date that this occurred. Do you know when you recorded it and why you didn't record the date?
A It would have been in February 2008.
Q Was it on the day that it occurred?
A Probably not on the exact day it occurred, no.
Q Do you know when you recorded that?
A In February of 2008.
Q Okay. It wasn't something that you remembered, for example, after you got notice of your layoff that --
A No.
Q -- you recorded that?
A No.
Q And the original notes that you would have made this entry from, what happened to those?
A They were shredded after it was typed.

Q Do you have a shredder at home that you used?
A I do.
Q Did you ever edit the notes?
A No, only for typographical errors.
Q Did you ever take notes at work?
A Yes.
Q Typewritten notes?
A Yes.
Q Were they recorded on a computer at work?
A Yes.
Q And transferred to your home computer?
A Correct.
Q Why did you shred the handwritten notes?
A They were no longer needed.
Q Any other documents, like a calendar or a day journal or something like that, where you would jot down, you know, met with Mr. Lemmer at 8:15 this morning or anything like that?
A There may be a calendar. I typically kept a calendar.
Q Would that be on a computer?
A Yes.
Q So, would you still have those, as well?
A Holy Cross would have those.
Q Why is that?
A Because I kept them on the Holy Cross computer.



Q Okay. So, you didn't keep a calendar at home?
A No.
Q Would you give me your education, please, beginning with high school?
A Obtained a GED from Jackson Public Schools in 1978. I have a Bachelor's degree in Information Technology, with a specialty in Web-Based Applications from Poly University, December 2004; a Master's degree in Social Work, with a Specialty in Children and Families from Eastern Michigan, April 2009; a Master's a degree in Social Work, with a specialty in Gerontology from Eastern Michigan University, April 2009.
Q So, you got two Masters from Eastern in April 2009?
A Correct.
Q You say a Master in Children and Families?
A Um-hmm. Correct.
Q And a Master in Social work, with a specialty in Gerontology?
A Correct.
Q Do you recall what your level of education was when you applied at Holy Cross?
A I had a high school diploma, GED.
Q You had a GED or a high school diploma or both or what?
A A GED.
Q A GED.



Are you currently employed?
A Yes.
Q Where?
A Adrian Dominican Sisters.
Q At the motherhouse?
A Correct.
Q And what do you do there?
A I'm the help desk.
Q How long have you worked there?
A One year.
Q What was your start date?
A November 16, 2009.
Q How did you get the job there?
A I read an add in the newspaper and applied.
Q How did you apply?
A With a resume.
Q Was that online or in person or by mail or what?
A By mail.
Q Who is your supervisor?
A I'm unsure how to answer that.
Q Who do you report to?
A My director was let go last Tuesday, so I report to a general counselor.
Q "A general counselor"?
A That's what she's called.



Q Okay. What's her name?
A Corinne Sanders.
Q Is that a Sister?
A It's a Sister, yes.
Q So, would be Sister Corinne Sanders?
A Correct.
Q And before last Tuesday, to whom did you report?
A Mary Ellen McClellan.
Q Is that a Sister?
A No.
Q Have your job duties changed since last Tuesday?
A Yes.
Q How?
A I have assumed more responsibilities.
Q Have you had any change in pay?
A No.
Q What is your pay?
A 14.75 per hour.
Q How many hours a week?
A Forty.
Q Any other current employment?
A No.
Q Side business or anything like that?
A No.
Q What was your job before you were working for the Adrian

Dominican Sisters? Strike that.
Did you have employment concurrent with the Adrian Dominican Sisters?
A No.
Q What was your job before you started working for the Adrian Dominican Sisters?
A I had a temporary position at a credit union.
Q Where was that?
A Pardon me?
Q Which credit union?
A American 1 Federal Credit Union.
Q "American 1"?
A Correct.
Q And when did you work there?
A January 16, 2009 through March of 2009.
Q Do you know the date of termination?
A I believe it was March 25th but I'm not positive about that date.
Q And no employment in between March 25, 2009, or whatever date you left American and whatever date you started with Adrian Dominican --
A Correct.
Q Any other employment since you left Holy Cross?
A Yes. I worked for the Alzheimer's Association.
Q Where is that?



A Chelsea.
Q When did you work there?
A December 3, 2008 through January 15, 2009.
Q Any other employment after Holy Cross?
A No.
Q Why did you leave Alzheimer's Association in Chelsea?
A For the temporary position. It paid better.
Q What were you earning at the Alzheimer's Association?
A Fourteen dollars per hour.
Q How many hours a week?
A Forty.
Q And the temporary job, were you actually employed by American or was that through a temp agency?
A By American.
Q And you say it was a temporary job?
A Um-hmm.
Q Yes?
A Yes.
Q You knew going in it was going to be a temporary position?
A I was not assured a permanent position until after ninety days had been completed.
Q Okay. Looks like you didn't make the ninety days.
A No.
Q Did something happen?



A Yes.
Q What was that?
A I sprained my ankle in my foot falling down a flight of stairs at a field placement for Holy Cross Children's Services and I was not able to do the temp work.
Q So, you were let go because you were unable to work?
A Correct.
Q Do you have litigation against American Federal Credit Union?
A No.
Q Have you filed a charge of discrimination against them?
A No.
Q You said you had a field placement at Holy Cross?
A Correct.
Q What does that mean?
A For part of my Master's degree, you are required to complete internships, and I was completing an internship in supervised independent living at Holy Cross Children's Services.
Q You were required by Eastern?
A Correct.
Q To work in the field somewhere?
A Correct.
Q And you were working at Holy Cross?
A Correct.



Q You said in the supervised independent living program?
A Yes.
Q And you were supervised by someone while you were doing that?
A Yes.
Q Who was that?
A Marcia Rodakowski.
Q When did that internship end?
A July of 2009.
Q And was that a requirement to get one of your Master's degrees?
A Correct.
Q Which one?
A That would have been for Children and Families.
Q Was there -- strike that.
What other efforts, if any, have you made to obtain employment since leaving Holy Cross?
Did you apply for any jobs that you didn't get?
A Yes.
Q What else did you apply for?
A Family worker position.
Q Where was that?
A Holy Cross Children's Services.
Q When was that?
A That would have been beginning with my layoff notice.

Q How did you apply?
A Resume.
Q To whom?
A I believe I sent it to the human resources department.
Q Do you recall when that was?
A No. There were several resumes.
Q For family worker position?
A And other positions.
Q Okay. So, you applied for the family worker position at Holy Cross around the time of the layoff?
A Correct.
Q Can we establish that date is October 21, 2008?
A Or November; October, November 2008.
Q Okay. You got the notice of layoff because it's dated October 21, 2008 --
A Correct.
Q -- right?
A Correct.
Q Okay. What other positions did you apply for?
A Treatment Specialist.
Q Was that at Holy Cross?
A Correct.
Q And when was that?
A November 2008.
Q And how did you apply for that?



A I spoke to Rick Kruse.
Q Did you submit a resume?
A No.
Q Was there an opening posted that you applied for?
A No.
Q Had you talked to Rick Kruse about the family worker position, as well?
A Correct, yes.
Q But you also submitted a resume to H.R.?
A No.
Q "No," what?
A "No," I didn't submit a resume for the Treatment Specialist position to H.R.
Q If I misspoke, I apologize. I meant for the family worker position that you spoke to Mr. Kruse about.
A No, I did not submit a resume.
Q "Did not."
What other positions did you apply for?
A Temporary on-call.
Q Temporary on-call what?
A They just refer to it as temporary on-call. It would be a treatment specialist position, I believe.
Q And how did you apply for that?
A I believe I spoke to Bill Geddes.
Q And when was that?



A November of 2008.
Q What else did you apply for?
A No other positions with Holy Cross.
Q Well, I wasn't limiting it to Holy Cross. I meant other jobs you applied for.
A I applied for social worker positions, information technology positions.
Q Where?
A Numerous places. I sent out over 400 resumes.
Q Do you have records of that?
A Some records, probably. I might have cover letters for some of those.
Q Were you applying for jobs that were listed as available or they were seeking people or --
A Correct.
Q Okay. So, there were 400 places looking for workers?
A Correct.
Q Do you have a list of those?
A No.
Q Did you interview for any positions?
A No.
Q Did you interview for any positions other than the position that you got?
A No.
Q What did you do at the Alzheimer's Association?



A I was a program coordinator.
Q What does that mean?
A You coordinate programs, training programs.
Q Was this an I.T. position?
A No.
Q It was a --
A Social work position.
Q And you said you worked there for six weeks, from December 2008 to January 2009?
A Correct.
Q And you continued to look during that period?
A Correct.
Q And you voluntarily resigned to take a position at American Credit Union?
A Yes.
Q And why was that?
A It was a two-dollar increase in pay.
Q Okay. Perhaps you misunderstood.
Why did you continue to look? I mean, you didn't know you were going to get an offer for a two-dollar increase in pay. Why did you continue to look after you had the Alzheimer's Association position?
A Because $14 an hour does not us sustain my family budget.
Q Okay. What were you making at American Credit Union?
A Sixteen dollars per hour.

Q And that was forty hours a week?
A Correct.
Q And where is it you're making 14.75 an hour?
A Adrian Dominican Sisters.
Q Were you on unemployment between the time you left the credit union and the time you went to Adrian Dominican Sisters?
A Yes.
Q You said you talked to Mr. Kruse about a family worker position at Holy Cross in October, November 2008?
A Yes.
Q When did you talk to Mr. Kruse?
A In October or so of 2008.
Q What does "October or so" mean?
A I'm not sure of the date.
Q Do you have information on your journal about that?
A No, probably not.
Q Why not?
A I didn't feel it was important to note the date.
Q Do you even have a note that you talked to him about the job or what he said or what you said?
A I don't believe so.
Q Okay. And you didn't think it was important?
A No.
Q What did Mr. Kruse say, if you recall?



A He seemed very excited about the possibility of me joining the team.
Q Do you recall what he said?
A Not verbatim, no.
Q Okay. You said "he seemed excited."
I had asked what he had said, so I'm making a distinction. Do you recall what he said?
A I believe we spoke about the fact that I was very close to graduation and he would write regarding a variance until I obtained my degree.
Q Did he know that you had been laid off or were going to be laid off?
A Yes, he did.
Q How did he know that, do you know?
A I told him.
Q What did you tell him, that you had been laid off or were going to be laid off or --
A I told him that I had been informed that my position had been targeted for layoff.
MS. PIPER: Again, I'm going to remind you, if I could, to wait until I finish my question. Okay?
THE WITNESS: Thank you.
BY MS. PIPER:
Q When did you learn that your position had been targeted for layoff?



A In September of 2008.
Q How did you learn that?
A My supervisor informed me.
Q Who was that?
A Eileen Parker.
Q What were the circumstances?
A She called me into the conference room and informed me.
Q Was anybody else present?
A Kathy Pixley.
Q And what did Ms. Parker say?
A I believe she told me that they were looking at my position for layoff.
Q Is that all you recall?
A Yes.
Q Did you say anything?
A Yes.
Q What did you say?
A I said that I believed that I was being discriminated against, that I was singled out and discriminated against.
Q What else did you say, if anything?
A I believe I mentioned I felt it was unfair.
Q Anything else you recall?
A No.
Q Anything else you recall Ms. Parker saying?



A I believe that she stated that she was very upset and she referred to the current climate at Holy Cross as "poisonous."
Q Anything else?
A I don't recall Eileen saying anything else.
Q Do you recall Ms. Pixley saying anything?
A Yes.
Q What did Ms. Pixley say?
A She had quite a few negative things to say about Loren Brown.
Q What did Ms. Pixley say?
A She didn't like his rigidity. She didn't appreciate his attitude, among other things.
Q What else?
A They were all very negative things.
Q Okay. What did she say?
A She didn't like his leadership style, the way he managed people.
Q Anything else you recall?
A I believe that she stated that she felt that if she laid off Steve Meyer instead of me they wouldn't have a hardware tech, and if she laid off Mike Grulke, who was the newest employee in the department, she would have to do his work.
Q What did he do?

A He was the hardware manager, I.T. manager.
Q You said "hardware manager"?
A Hardware, I.T. manager.
Q And Steve, also, was the hardware tech?
A Hardware technician, correct.
Q And did you have those skills?
A Yes.
Q Had you done those jobs?
A Yes.
Q Where?
A At Holy Cross Children's Services.
Q When did you do them?
A Throughout my tenure in the I.T. department.
Q How long did you work in I.T.?
A I believe I moved there in '99, 1999, March of 1999, I believe.
Q And what was your first position in I.T.?
A I was a word processing specialist in the human resources department.
Q And maybe you call it I.S., Information Systems?
A Correct.
Q As opposed to I.T., which I just referred to.
It was called I.S. at Holy Cross?
A Correct, Information Systems.
Q What was your first job in Information Systems?



A I.S. trainer.
Q And that was the job you had when you left?
A No.
Q You were Senior I.S. Trainer when you left?
A Correct, slash, system analyst.
Q What does a system analyst do?
A Administers the Client Information System, database administration, reporting, system administration.
Q Which of those positions are hardware management?
A None of those are.
Q Which of those are hardware technician positions?
A None of those are.
Q Well -- strike that.
Which of those involve hardware technician duties, then?
A When we were in the field or if a staff member came to the department, you were supposed to help. And if that was a hardware issue, that was taken care of.
And it was silly for Steve to take care of a hardware issue if I was going to be on-site training, and I was capable of doing it. So, there was a lot of cross jobs in that department.
Q You said you did training?
A Correct.
Q What kind of training did you do?



A Any type of computer training.
Q Would this be new hire training?
A No, not just new hire training.
Q Did it include new hire training?
A Correct.
Q Okay. What else?
A Training on the state of Michigan JJOLT system.
Q JJOLT?
A Correct. It's J-J-O-L-T, is the acronym.
Q And who did you train on that?
A Any staff that had to enter data into the Client Information System or JJOLT.
Q So, did you hold classes on that or were they individual trainings or not?
A Held classes on it. Sometimes it was individual training, depending on the scheduling.
Q And the new hire training, was that when someone just came to the agency and needed to learn how to use the computer?
A Correct.
Q What other training did you do?
A Wayne County JAIS training.
Q J-A-I --
A J-A-I-S.
Q Thank you.



And what kind of training was that?
A That was the Client Information System we were required to use by Wayne County.
Q And did that require all program people to input data into a database?
A Correct, an information system.
Q But it was the matter of the direct care workers or supervisors inputting data --
A Correct.
Q -- into the JAIS system?
A Correct.
Q Would that be the same as the JJOLT system, that you had direct care workers or supervisors that were inputting data?
A It's very similar but many differences.
JAIS is Wayne County's system, JJOLT is the State's, and CIS is Holy Cross's system.
Q And was it all data input or no?
A It was reporting, mandated reporting.
Q Okay. And it was just different systems that it was put into, you're saying?
A Correct.
Q Do you recall anything else that was said at the meeting with Ms. Parker and Ms. Pixley on the 29th?
A No.

Q You said you used the word "discrimination" in that meeting?
A Correct.
Q Did you record that?
A I made note of that.
Q Did you put it in your journal?
A I believe I did.
Q When did you put it in your journal?
A It would have been the evening of that meeting or close to it.
Q Have you edited the journal since you would have recorded it?
A For typographical errors.
Q Other than that?
A I don't believe so, no.
Q When did you edit it for typographical errors?
A As it happened, as I found the typos.
MS. PIPER: Can you get page 69 and 70, please?
And for the record, these are document numbers on documents submitted to me by Counsel as part of initial disclosures.
And I'm going to ask you to mark that.
(Aldrich Deposition Exhibit 1 was marked for identification; attached hereto.)



BY MS. PIPER:
Q Ms. Aldrich, I'm going to hand you what's been marked Exhibit 1, and I just want to tell you, there are page numbers in the bottom right-hand corner. It's a 69 and a 70. That's how I got it from your attorney.
Can you take a look at the entry at the bottom of page 69 that says "9/29/2008"?
A Okay.
Q Take a look at the top of page 70, as well, up through the entry that says "10/2/2008."
A (Examining document.) I'm sorry. Through what?
Q There is a journal entry on page 70 that says "10/2/2008."
A Okay.
Q So, there's two paragraphs above that.
A Okay. (Examining document.) Okay.
Q Do you see the word discriminate or discrimination?
A No.
Q But it's your recollection you said that?
A Correct.
Q Why didn't you record it?
A It's a mistake.
Q What do you mean, "it's a mistake"?
A I should have.
Q Your note says you documented this on 9/29/2008, correct?



A Correct.
Q And did you make handwritten notes of this?
A Yes.
Q And this would have been at home or at work?
A This would have been at home.
Q Okay. That evening?
A Correct.
Q And then you put it on the computer?
A Correct.
Q Why didn't you just put it directly on the computer?
A I'm not sure what you're asking.
Q You said you made handwritten notes --
A Correct.
Q -- and I wondered why you didn't just put it on your computer, if you were going to do that, anyway.
A I didn't trust Holy Cross Children's Services, so I preferred handwritten notes as to anything I would have put on their computer.
Q Right, but you said you made handwritten notes at home and then put it on your computer.
A I made handwritten notes when I got into the car after this meeting, before I left the parking lot.
Q Okay. Then I misunderstood before when you said you made them at home.
A I typed it at home.



Q I think you said before that you made handwritten notes at home.
A No. I usually made handwritten notes immediately after the meeting, and I typed at home.
Q When did you leave the meeting?
A After the meeting concluded.
Q Do you know what time of day that was?
A I have no idea what time of day that was.
Q Would you have gone out to your car in the middle of the day to record these?
A No.
Q Did you record them at your desk?
A No.
Q And then you shred the notes at home --
A Correct.
Q -- after you put them in the computer?
A Correct.
Q Oh, I'm sorry. If you want to look at the second paragraph on the second page of that exhibit, it says:
"This is unfair targeting, but that isn't anything new with this agency."
A Correct.
Q That was your opinion at that time?
A Yes.
Q That they targeted people?

A Yes.
Q And you thought they were targeting you?
A Absolutely.
Q Based on what?
A The fact that I was being laid off.
Q Okay. Did you think it was based on your job performance?
A No.
Q What did you think it was based on?
A I felt it was based on John Lemmer's feelings about me.
Q And what were those?
A Negative, in my opinion. He did not like me.
Q Anything else?
A No.
Q Okay. So, you thought John Lemmer didn't like you?
A Yes.
Q Did you express to Ms. Parker or Ms. Pixley that you thought you were being targeted by Mr. Lemmer because he didn't like you?
A Yes.
Q Did either of them respond?
A I'm sure that they responded.
Q Do you recall if they responded?
A Yes.
Q What do you recall they responded?



A That they weren't aware of that.
Q They were not aware that you thought Mr. Lemmer didn't like you?
A Correct.
Q Did you give them any examples or any reason for your statement?
A Yes.
Q What did you tell them?
A On this date I had had a meeting with John, on September 25, that was very unpleasant.
Q You're referring to something on the document in front of you?
A I'm just referring to the date. This date of this meeting was 9/29. My meeting with John Lemmer was 9/25.
Q Okay. So, you told them about that?
A The meeting?
Q Yes.
A Yes.
Q Hadn't you already told Ms. Parker about that meeting?
A She was aware of the meeting, yes.
Q Hadn't you already told her about it?
A I reiterated it.
Q At the time, right?
A Correct.
Q Did you tell her at that time you thought it was



discrimination?
A Yes.
Q On 9/25, after the meeting with Mr. Lemmer, you told Ms. Parker you thought that Mr. Lemmer was discriminating against you?
A No, not on that date; on 9/29.
Q On 9/29, was the first time you used the term "discrimination"?
A I believe so, yes.
Q What did you tell Ms. Parker on 9/25, after your meeting with Mr. Lemmer?
A Our meeting consisted of a performance review and I told her that it had been a very unpleasant meeting.
Q Did you tell her anything else about the meeting with Mr. Lemmer?
A I probably told her what took place in the meeting.
Q Do you recall?
You said, "I probably." I don't know --
A Correct. I probably did.
Q But you don't recall whether you did or you didn't?
A I'm sure that I said it was an unpleasant meeting and maybe stated some facts about the meeting.
Q Do you recall that you stated some facts about the meeting?
A No.



Q Were you on medication at that time that might interfere with your ability to recall things?
A At that time, yeah.
Q What medication?
A An anti-depressant.
Q What was that?
A Paxil.
Q What were you on Paxil for?
A Depression and anxiety.
Q How long were you on Paxil?
A Maybe a month.
Q And when was that?
A It started the end of August, beginning of September.
Q And you stopped in September?
A I stopped probably in January of 2009.
Q Did you go on something different than Paxil then?
A No. I just had been relieved of my stress.
Q Sorry. I'm confused. I think you said you were on Paxil for about a month.
A From September -- late August, early September on until January of 2009.
Q So, you were on Paxil from -- during that entire period?
A Correct.
Q Were you on something else for depression and anxiety for a month during that period?

A I was taking an herbal supplement.
Q What was that?
A It's a combination of various herbs called Calm Tabs.
Q Spell, please.
A C-a-l-m T-a-b-s.
Q And how long were you on that?
A Same time frame.
Q Okay. And that is also for depression and anxiety?
A Correct.
Q During the period of August 2008 until January 2009, that you were on Paxil, were you also on Calm Tabs?
A Correct.
Q So, you were on that for that entire period, as well?
A Correct.
Q Were you on any other medication or prescription for depression or anxiety during that time period?
A No.
Q Who prescribed Paxil?
A Dr. Naugit.
Q Is that Dr. Cordoba-Naugit?
A Yes.
Q When did you see her?
A I believe I called her. I believe I called her in August or beginning of September.
Q Do you recall why you called her?



A I was very stressed and anxious.
Q Had something happened?
A Work was very stressful.
Q Had something happened at work?
A Every day was very stressful.
Q Okay. Beginning when?
A Beginning with returning from my FMLA leave.
Q Do you recall when that was?
A August 4, 2008.
Q Okay. And you believe you called Dr. Naugit. And what did you tell her?
A That I was very stressed.
Q Okay.
A Feeling a great deal of anxiety. I was having a great deal of problems sleeping.
Q Did she prescribe something for sleep?
A No.
Q Okay. You said that she prescribed Paxil?
A An anti-depressant, correct.
Q And around the same time you started taking Calm Tabs?
A Correct.
Q Was there anything particular that happened on the day that you called her?
A Just stress.
Q Could it have been later than August of 2008?



A It could have been September of 2008.
Q Could it have been October of 2008?
A No.
Q You think it was before then?
A Correct.
Q Okay. And you stopped in January of 2009?
A Correct.
Q And was that based -- well, why was that?
A I was no longer employed at Holy Cross Children's Services.
Q Your employment ended -- actually, last day worked would have been in October, correct, other than the training?
A Correct.
Q And you say Paxil affects your memory?
A It can, yes.
Q Did it?
A Yes, I believe it did.
Q And you went off in, you said, January 2009?
A Correct.
Q Did you go off before you got your job at the Alzheimer's Association?
A No.
Q You stayed on while you were working there?
A Yes.
Q Did you go off before you ended your employment there?



A Yes.
Q Did you have insurance at the Alzheimer's Association?
A No.
Q Did you have insurance at the credit union?
A No.
Q Do you have insurance with the sisters?
A Yes.
Q Health insurance?
A Correct.
Q And you went off because -- I'm sorry if I asked you this and you answered it.
Again, you went off because why?
A I no longer felt stressed or anxious.
Q Anything else you recall about the meeting that you had with Ms. Pixley and Ms. Parker on the 29th of September 2008?
A No.
Q Did you express to them anything other than you thought that Mr. Lemmer didn't like you?
A I believe I told them that I had been back from my FMLA leave since August 4th of 2008, and my first words from John Lemmer were on September 25th of 2008. He had not spoken to me at all, not to say hi in the hallway.
Q And you think you told Ms. Pixley and Ms. Parker that?
A I did tell them that, yes.

Q Did you record that?
A No.
Q Why not?
A I didn't know that it was important.
Q Do you think it's important now?
A No.
Q Okay. Anything else you recall?
A No.
Q The meeting with Mr. Lemmer on the 25th took place in the morning?
A Correct.
Q First thing in the morning?
A 8:15 in the morning.
Q And what was first thing in the morning?
A First thing in the morning was getting coffee and ice for the kitchen because no one else had done it.
Q That wasn't part of your job, though, was it?
A Well, it was part of whoever's job found the ice empty. And I found the ice empty, so I went to get the ice.
Q Okay. And that was before you started work that day?
A Correct.
Q Do you recall anything else Ms. Parker or Ms. Pixley may have said at the meeting on the 29th?
A No.
Q And you said it was after this meeting that you contacted



Mr. Kruse?
A I contacted Rick sometime in October. I cannot give you an exact date.
Q Was it before you got the letter of your layoff?
A Correct, yes.
Q And what was your reason for contacting Mr. Kruse?
A I believed I was going to be laid off.
Q Based on this conversation on the 29th?
A Correct, and John Lemmer's conversation with me on the 25th.
Q So, you believed on the 25th you were going to be laid off?
A Yes. I believed John Lemmer was looking for a way to get rid of me.
Q When did you believe that?
A I believed that prior to going off on my FMLA leave.
Q You believed that Mr. Lemmer was looking to lay you off?
A Dismiss me one way or another.
Q Why is that? What was your belief based on?
A His attitude towards me.
Q What was that?
A Negative, degrading.
Q Anything else?
A No.
Q Did you discuss that with anybody?



A I believe I mentioned that to both Eileen and Kathy in that meeting on the 29th.
Q How about before then?
A I may have mentioned it. I'm not positive.
Q You may have mentioned it to whom?
A My supervisor.
Q Ms. Parker?
A Correct.
Q You don't recall?
A No.
Q Would you have made a note of that?
A No.
Q Wouldn't you think that would be important?
A I guess I didn't believe it was at the time.
Q Do you recall how long before your FMLA leave that you believed Mr. Lemmer was looking to dismiss you?
A I believe it was right prior to that.
I had a field placement that I was attempting to do for the gerontology degree, and Kathy Pixley attributed the non-flex time to John. John would not allow me to flex time to complete that field placement for the agency.
Q You mean with the agency, for your degree?
A Correct.
Q And the field placement, when did that come about?



A That would have been, I believe, April through August of 2008.
Q And where did you do that, then?
A Catholic Charities of Monroe, with Paul Neitman.
Q Do you not understand that that's part of Holy Cross?
A Yes, it is part of Holy Cross. Holy Cross was managing Catholic Charities of Monroe County.
Q So, you did do your field placement through Catholic Charities of Monroe?
A Correct.
Q But you were not allowed to use flex time for that?
A Correct.
Q Were there others in the department that used flex time for educational pursuits?
A I don't believe we had anyone else attending school at that time.
Q So, is that a "no," that nobody else in the department was using flex time for education?
A Correct.
Q Were there other people in the department using flex time for other reasons?
A Yes.
Q Who?
A Everyone used flex time for other reasons.
Q So, they weren't working a forty-hour week?

opinion, of all people, a comment such as that should not come from someone in a professional position.
Q Did you talk to one of the agencies that's charged with investigating --
A No.
Q -- discrimination?
No?
A No.
Q Why not?
A I was too afraid for my job.
Q Why?
A Well, I thought I would be dismissed.
Q Why?
A Because she had the power to do that.
Q And had you seen her exercise it with somebody?
A No.
Q So, what made you think that she would do that?
A Because she was my supervisor.
Q So, you think that all supervisors would do something like that?
A They can.
Q That doesn't mean they do.
Is there a reason you thought Ms. Hudgins would?
A I took from the comment that she didn't like me.



Q Okay.
A So I was in fear for my job.
Q So, you thought because she didn't like you she would dismiss you?
A She could. I felt she could.
Q Right. I'm not asking whether she had the authority or the power to do that. I'm asking why you thought this individual would exercise that power.
A Because she was in a position above me.
Q And that's the only reason?
A Correct.
Q Did you fear Ms. Parker would dismiss you?
A No.
Q Why not?
A We got along very well.
Q But she could, right?
A She could.
Q But you didn't think that about her?
A She never made rude comments to me.
Q Okay. How about Ms. Pixley?
A Ms. Pixley I was intimidated by, yes.
Q So, you were in fear that she was going to fire you?
A Correct.
Q For the entire time you worked for her?
A It's a fear, yes.



Q Right. And you had it during the entire time you worked for her?
A Not the entire time, no.
Q When did you have it?
A Probably throughout 2008.
Q Why 2008?
A Many circumstances. The FMLA leave was a good example.
Q Okay. What does that mean?
A It means that I don't feel that she was happy that I took an FMLA leave.
Q Didn't it leave the department short-staffed?
A Yes.
Q Did they replace you while you were gone?
A No.
Q Did someone fill in?
A I'm assuming so.
Q You don't know?
A No, I don't.
Q Okay. Wouldn't it be logical that a manager, you know, would not like someone being on leave because they were short-staffed?
A I believe that a manager should understand that employees have things, medical issues, that need to be taken care of.
Q Okay. What about the manager's feelings about trying to



get along without staff? Aren't they entitled to have feelings about that?
A Absolutely.
Q And so, you thought that she was going to fire you?
A I knew that she wasn't happy. I was aware that at any point she could let me go.
Q But you were aware of that the entire time she was your supervisor, right?
A Yes.
Q But you thought, beginning in 2008, she might act on it?
A Correct.
Q With the FMLA leave?
A Correct.
Q Any other reason?
A No.
Q Did you ever talk to Ms. Beck about your concerns that you might be fired?
A No.
Q You know who Ms. Beck is?
A I do.
Q She's the Director of Human Resources?
A Correct.
Q And there's a policy that Holy Cross has about reporting concerns about discrimination to Ms. Beck?
A I'm not aware of their policy, no.

Q It wasn't in your employee handbook?
A I never had the time to read the employee handbook from cover to cover.
Q Okay. You did have an employee handbook, right?
A Yes. They provide one to everyone.
Q And you had concerns that you might be fired and you never looked into talking to somebody about that?
A No.
Q Did you talk to a counselor about that?
A No.
Q Have you ever had counseling through a social worker or a marriage therapist or a family counselor, something like that?
A Yes.
Q Who did you treat with?
A I saw -- I went to Catholic Social Services.
Q Which one?
A Jackson.
Q When was that?
A That would have been prior to my divorce.
Q You said that was 1999?
A Correct.
Q Anybody else?
A I saw Marcia Rodakowski.
Q Was she your field placement supervisor?



A Correct.
Q But you were seeing her privately, as well?
A Correct.
Q For what?
A Just counseling after my divorce.
Q And that was in 1999?
A And probably 2000.
Q And the counseling with Catholic Social Services in Jackson, was that related to the divorce?
A Correct.
Q Were there any other issues?
A We were in family and marriage counseling at that time.
Q Did you discuss with anybody at Catholic Social Services any issues on your job?
A No.
Q How about with Ms. Rodakowski?
A No.
Q Any other counseling you've had?
A No.
Q Do you attend church?
A No.
Q Do you have a spiritual director?
A No.
Q So, you've not talked to a priest or minister or anything like that?



A No.
Q You mention in your notes that you have a nutritionist.
A I did.
Q Who is that?
A Pat Kramer.
Q And you no longer see her?
A No.
Q Why not?
A I don't feel the need to.
Q When did you stop seeing her?
A January 2009.
Q When did you start seeing her?
A December 2008.
Q Is she the one who recommended the Calm Tabs?
A No.
Q Who was that?
A I found that on my own.
Q Did Ms. Kramer prescribe anything to you?
A No.
Q Did she recommend you take any drugs or herbal supplements?
A Herbal teas.
Q What did she recommend that for?
A Stress.
Q Did it help?



A No.
Q Any other health care professional you may have consulted consult in 2007, 2008?
A I saw someone for a knee injury.
Q And was that in October of 2008?
A Correct.
Q Was that Dr. Naugit?
A I saw Dr. Naugit. Holy Cross also sent me to a place called OccuHealth.
Q That's because it was an on-the-job injury?
A Correct.
Q Any other health care professionals?
A No.

MR. LAFLAMME: Can we take a break sometime soon?

MS. PIPER: That's fine. Now is fine.

VIDEO TECHNICIAN: Going off the record at 10:57 a.m.

(Recess from 10:57 to 11:14.)

VIDEO TECHNICIAN: We're back on the record at 11:14 a.m.

BY MS. PIPER:
Q Ms. Aldrich, do you recall when you applied for the job at Holy Cross?
A I believe it was late 1997 -- I'm sorry, late 1996.

A I don't recall that, no.
Q Did you have any questions about it?
A No.
Q When were you offered the job?
A Early January of 1997.
Q So, it would be after a subsequent meeting after the day that you had the testing?
A Correct.
Q And was that after an interview with the other person you mentioned?
A Correct.
Q Was that after an interview with Ms. Hudgins?
A I didn't have an interview with Ms. Hudgins.
Q Did you have an interview with anybody else?
A Kyle Seale and Carrie Galdis were the only people that were there.
Q And you think that was in early January?
A Correct.
Q Did you fill out any documents that day?
A Not that I recall.
Q Did you have any questions about the job that you asked of Ms. Galdis and Ms. Seale?
A No.
Q Did you have any concerns about the job?
A No.



Q Did you say you did not fill out documents when you were interviewed by Ms. Galdis and Ms. Seale?
A I don't recall that I did.
Q Do you recall filling out documents the first day on the job?
A Yes.
Q And that would have been a W-4 form?
A Correct.
Q And some other forms?
A Correct.
Q Do you recall what the other forms may have been?
A Perhaps like an I-9 for immigration or whatever necessary human resource forms there were.
Q Do you recall or no?
A I recall filling out forms.
Q But you don't recall what they were?
A Besides the W-4, no.
Actually, may I correct that?
Q Please.
A I believe there were also insurance, medical benefit forms that I did complete that same day.
Q And would that have been the day you interviewed or the day you started?
A That would have been the day I started.
Q Which was different than the day you interviewed?



A Correct.
Q And how long after the day you interviewed did you actually start?
A I don't recall that.
Q Was it like two weeks or you just don't recall?
A Probably within two weeks, yes.
Q Did you get an employee handbook when you started at Holy Cross?
A Yes.
Q Was the handbook subsequently undated?
A Yes.
Q From time to time?
A Yes.
Q And when it was updated, you would get a new copy?
A Or you would get inserts.
Q Okay. Were you ever involved in doing any of the typing of the updated handbooks?
A No.
Q Okay. Your first job was in Human Resources, right?
A Correct.
Q You were a word processor there?
A Yes.
Q What kind of jobs did you do there?
A Training manuals, tracked employee training.
Q Did they have an I.S. department at that time?



A Yes.
Q Do you recall getting a new employee handbook in 2005?
A Yes.
MS. PIPER: Why don't we go ahead and mark that?
(Aldrich Deposition Exhibit 2 was marked for identification; attached hereto.)
MS. PIPER: Counsel, it's from the personnel manual and it's Number 197, but you're right, it's the manual I gave you today.
BY MS. PIPER:
Q Can you take a look at Exhibit 2?
A (Examining document.)
Q Have you had a chance to look at Exhibit 2?
A Yes.
Q Is that your signature?
A It is.
Q And there's a date on there. What is the date?
A September 20, 2005.
Q And would that have been when you got the handbook that I'm holding up here that says "2005"?
A Yes.
Q And I've given your attorney a copy today but I didn't mark this copy.
Do you recall the circumstances of signing for

the handbook?
A No.
Q Was it in a meeting?
A I don't recall.
Q Did you have any questions about the new handbook?
A No.
Q Were you given direction about keeping the handbook or reading the handbook or referring to the handbook or if you had any questions you could ask a manager or anything at all like that?
A I believe, if we had questions, we could ask. That's all I'm recalling.
Q Who was your manager or supervisor at that time?
A In 2005, I believe that would have been Kathy Pixley.
Q And did you ask Ms. Pixley any questions about the handbook?
A No.
Q And you said you didn't actually look at the handbook?
A No.
Q Were you aware there was a procedure for reporting concerns about discrimination?
A No, I was not.
MS. PIPER: I don't know what page it is on the documents I gave you this morning because I have an unmarked copy here but it's page 3 of the actual



handbook.
BY MS. PIPER:
Q I'm just going to show it to you.
What's the document number, Mr. LaFlamme?
MR. LAFLAMME: The page number on this?
MS. PIPER: Yes, please.
MR. LAFLAMME: 359.
MS. PIPER: So, it would be Aldrich 359?
MR. LAFLAMME: Yes.
MS. PIPER: Okay.
BY MS. PIPER:
Q I want to show you at the top of what's marked page 3 of the handbook that Counsel has just identified.
Do you see where it says "Equal Employment Opportunity?"
A Yes.
Q Do you see where it says that if you have questions or issues of problems that you're to report it?
A (Examining document.) Okay.
Q Have I described that accurately?
A Yes.
Q And it says:
"If a coworker believes he/she has been discriminated against, the Human Resource Director should be notified immediately"?



A Yes.
Q And you had a copy of this handbook?
A I do.
Q And you didn't use this provision?
A No. I wasn't aware it was there.
Q Did you tell anybody else at Holy Cross that you think you were discriminated against?
A I can't recall that I did.
Q Okay. But you're very certain that you told Ms. Pixley and Ms. Parker?
A I absolutely did tell them, yes.
Q Did you tell them what the reason for the discrimination was, age or race or sex --
A No.
Q -- or national origin or --
MR. LAFLAMME: You need to let her finish her question before you answer.
THE WITNESS: Oh.
BY MS. PIPER:
Q Is your answer still "no"?
A "No."
Q So, you didn't tell anybody at Holy Cross that you thought you were discriminated on the basis of age or sex or race or national origin or any of those, correct?
A Correct.



Q You never told anybody at Holy Cross about that, correct?
A No.
Q Or disability or FMLA or height or weight or anything like that, right; you never told anybody at Holy Cross?
A I don't believe so, no.
Q Is there something that would refresh your recollection?
A No.
Q Okay. Did you tell anybody outside of Holy Cross that you thought you were discriminated against on the basis of age or sex or race or national origin or height or weight or disability or FMLA or --
A Yes.
Q Who did you tell?
A Cheryl Strachn.
Q Who's Cheryl Strachn?
A She is a former employee of Holy Cross.
Q What was her job?
A She was a secretary.
Q Who did she work for?
A I believe she reported to Julie Roehm.
Q Say again. Julie?
A Roehm.
Q Spell, please.
A I'm not positive how she spells her last name.
Q "R"?

A It's with an "R," yes.
Q And who's Julie Roehm?
A I believe she's the administrative assistant on the Clinton campus.
Q And who does she report to?
A The regional director.
Q Who was, at the time that you told Ms. Roehm about this alleged discrimination?
A I didn't tell Ms. Roehm.
Q No. You told Ms. Strachn, who worked for Ms. Roehm --
A Correct.
Q -- who worked for --
Who was the regional manager at that time?
A I believe, Bill Geddes.
Q Bill Geddes?
A Yes.
Q And when did you tell Ms. Strachn?
A It would have been after I was laid off.
Q And what is the date you're using for the layoff?
A November 4, 2008.
Q And the reason you're using that is because that was --
A That was the effective date.
Q Okay. So, you got a letter on October 21st that gave you a two-week notice, and the effective date was to be November 4, 2008?



A Yes.
Q But, in fact you were able to use your APL, All Purpose Leave, to continue employment for some period?
A I believe so, yes.
Q And that was through the end of November 2008?
A I believe the APL actually went through part of December 2008.
Q Okay. And during November of 2008, you started training for another job?
A At Holy Cross Children's Services, yes.
Q Yes. Thank you.
And that was for -- was that for the family worker position or the treatment specialist position?
A The training would have been required for either position.
Q Okay. And what were you training for?
A Position on the Clinton campus.
Q So, it was the same training?
A Yes.
Q Oh, okay.
So, you weren't training for a specific job as family worker or treatment specialist, you were training for either or both?
A We were gearing towards the family worker position.
Q Who's "we"?



A Rick Kruse and I.
Q And what does that mean, "we were gearing towards" that?
A That was what we were aiming for. That was the position that we were hoping to give to me.
Q And he actually applied for the variance for you from the State of Michigan, correct?
A Correct.
Q And do you know if he got that?
A Yes, he did.
Q When did it come through?
A I was informed in March of 2009.
Q Who informed you?
A I emailed Rick and asked the question, and he responded.
Q Do you know when he got the variance?
A He told me it was back in November.
Q He said he got the variance in November?
A Yes.
Q But he didn't tell you about it?
A Correct.
Q Did you ask him about that?
A No. I just assumed he would let me know whenever that came through.
Q So, you didn't have any further conversation other than he said, in March of 2009, I got it back in November?
A Correct.



Q You were also in training for a treatment specialist job?
A I would have accepted any position that was available at Holy Cross just to retain my employment there. I didn't care what it was.
Q Can you answer my question?
A Treatment specialist, family worker, temporary on-call.
Q Temporary on-call what? Treatment specialist?
A They refer to it as temporary on-call.
Q But it's a treatment specialist job, right?
A I assume that it is, yes. I'm not positive about that. They just refer to it as temporary on-call.
Q Do you have temporary on-call I.S. workers?
A Not to my knowledge, no.
It would be someone who -- direct care.
Q And did you complete the training?
A Yes.
Q How many days of training did you take?
A It would have been Monday and Tuesday training. That would have been November 17th and 18th.
I was not required to complete Wednesday, Thursday and Friday because I had already previously completed the therapeutic crisis intervention training.
Q And that was three days?
A Wednesday, Thursday and Friday, yes.
Q The TCI training took --

A Correct, yes.
Q -- three days?
When had you completed the TCI training?
A The previous summer, I believe, summer of 2007.
Q Summer of 2007, okay.
So, you were not at training on the Wednesday, Thursday, Friday?
A Correct.
Q Did you submit paperwork to somebody about that training?
A About what training?
Q The training that you did complete.
A There are sign-in sheets that you have to get signed off on.
Q Were you present for the training at the rest of the week, on Wednesday, Thursday, Friday?
A No. I had already completed that training. There was no need to take it again.
Q Did you have a discussion with someone about not having to take that again?
A Rick Kruse.
Q When did you have the discussion with Mr. Kruse?
A When we set up the training for Monday and Tuesday.
Q When was that?
A That would have been beginning of November.
Q Was there paperwork on that?



A No. These would have been verbal conversations.
Q Where did they take place?
A I believe, over the phone.
Q Where were you when you had the conversation?
A At home.
Q And where was Mr. Kruse, do you know?
A I don't know.
MS. PIPER: Do you want to refer to pages 77 and 78 that you provided me?
Do you want to mark that, please?
(Aldrich Deposition Exhibit 3 was marked for identification; attached hereto.)
BY MS. PIPER:
Q Do you want to take a look at what's been marked as Exhibit 3?
A (Examining document.)
Q Have you had a chance to look at Exhibit --
A Yes.
Q -- 3?
I'm confused because it seems like there was a notation here, on November 19, 2008, where it says:
"T.S. training full day. Left at 4:15 to attend class at DMU."
A That's an error.
Q You did not attend on the 19th?



A Correct.
Q When did you record this?
A It would have been at that time frame. November 19th just should have been removed.
Q Okay. So, you're saying the description, the "T.S. training full day, left at 4:15," occurred on the 18th?
A Yes. If you just remove the November 19th from the document, everything else would be correct.
Q What about the November 20, 2008?
A That is a correct date.
Q Okay. On the second page of Exhibit 3, you said you had a conversation with Bill Geddes that day?
A Correct.
Q And he said, "I can't use you"?
A That's verbatim.
Q When did you record that?
A That would have been written right after the phone conversation and then recorded later that evening.
Q Is this Exhibit 3 part of your journal that you have at home?
A Yes.
Q Okay. About significant events of --
A Yes.
Q -- discrimination?
A About significant events.



Q Well, you said before it was discrimination and upset, right?
A Anything I consider important.
Q Okay. Did you think Mr. Geddes was discriminating against you?
A I'm not sure.
Q Okay. You wrote down that:
"He acquiesces and says he can put me on the on-call list." And you write, "I agreed that that was a great idea. Told him how much I appreciated his efforts on my behalf."
A Yes.
Q And you have reason to think you were not on the on-call list?
A I've seen the on-call list. I was not on it.
Q Where do they keep the on-call list?
A In the administration building.
Q Okay. Is that Cracchiolo?
A No.
Q What's the administration building?
A It's the Clinton Administration Building.
Q Is that across the street?
A Yes.
Q And where do they keep that, on a bulletin board or --
A I don't know.

"According to a copy of the Clinton Campus on-call list, my name was never on to be contacted for a shift"?
A Correct.
Q And is the second part of that, "according to a copy of the campus on-call list," is that from your meeting or discussion with Ms. Strachn in February?
A Yes.
Q Okay. And you don't know when it was you saw Ms. Strachn; sometime in February?
A Correct.
Q So, you don't know if it was -- your name was never on, right? You just know it wasn't on that day?
A Correct.
Q You don't know if it had been on before?
A No.
Q Did Ms. Strachn say that it hadn't been on before?
A She had not noticed my name on it prior to that day, correct.
Q When did she tell you that?
A In February.
Q When you were at the office, at the administration building?
A Yes.
Q Was she at the dinner?



A Yes.
Q Who else was at the dinner?
A I believe in March 2009 it would have been myself, Robin Johnson, Cheryl Strachn and Debby Matthews.
Q Who's Debby Matthews?
A A former employee.
Q What did she do?
A She was in program evaluation.
Q When did she leave the agency?
A I don't know that.
Q Was it before you?
A Yes.
Q The next paragraph on this page says:
"Emailed Rick Kruse asking if an exception was ever received."
Did that happen before or after the dinner?
A I don't know that.
Q So, the sequence that we just talked about may not be accurate?
A I believe that's the way that it happened is the way that I've told you but I can't swear to that.
Q But you do have the email with Mr. Kruse?
A I do, yes, and it does have a date on it.
Q Did you give that to your attorney?
A I did.



MS. PIPER: I don't think I got that.
MR. LAFLAMME: I gave you what I have. So --
MS. PIPER: I just don't think I got that but we can take care of that later.
BY MS. PIPER:
Q When did you first contact an employer about -- strike that.
When did you first contact an employer after you were notified of your layoff?
I'm sorry. I may have said that wrong.
When did you first contact an attorney after you were notified of your layoff?
A Nearly immediately.
Q Meaning, the same day?
A I don't believe it was the same day.
Q Okay. Whom did you contact?
A Rick LaFlamme.
Q Was that contact oral, in person, by email, letter, what?
A It was via telephone.
Q Do you recall where you were when you called him?
A At home.
Q Do you know if it was during the two-week period between the date of notice and the date that it was effective?
A I do not know that.
Q Did you contact any other attorney after you were



notified of your layoff?
A Not that I recall, no.
Q You asked for a copy of your personnel file shortly after you were notified of your layoff, correct?
A Correct.
Q And you got it shortly after you were notified of your layoff, correct?
A Yes.
Q It was within a week or something, correct?
A Yes, I'm sure it was.
Q And who did you ask for that?
A I believe I requested that through Alyson Beck.
Q Do you know if your original application for employment was in the personnel file that you received from Ms. Beck?
A Yes, it was.
Q Was a copy of this Acknowledgment of Receipt of Employment Handbook, in 2005, was that in there, as well?
A I don't recall that.
Q But you have that at home?
A I do, yes.
Q And you could check that?
A Yes.
Q When was the last time you talked to Mr. Kruse?
A That would have been the email in March of 2009.

A No.
Q You're saying nobody ever called you to work?
A No.
Q And you never declined work?
A Correct.
MS. PIPER: Can you mark that?
(Aldrich Deposition Exhibit 6 was marked for identification; attached hereto.)
BY MS. PIPER:
Q Can you take a look at Exhibit 6, and it's from the employee file. It's in the first couple of pages. It's the application, I believe.
MR. LAFLAMME: Is there a number?
MS. PIPER: No, this one isn't numbered.
MR. LAFLAMME: Oh, okay.
MS. PIPER: I made a copy before I --
It looks like it might be --
MR. LAFLAMME: Starts with page, Aldrich page 3.
MS. PIPER: And is it two-sided, 3 and 4?
MR. LAFLAMME: Three and 4.
MS. PIPER: Thank you. I made this copy before I numbered it.
BY MS. PIPER:
Q Does this look like the application that you submitted



to --
A Yeah.
Q -- Boysville?
Is that your signature on the second page --
A Yes.
Q -- Robin E. Wells?
And it's dated December 30, 1996?
A Yes.
Q Do you believe that that's the date you probably filled this out?
A Yes.
Q Was the information that you provided on here true and accurate?
A Yes.
Q Did you have an opportunity when you filled this out to read the paragraphs above the signature?
A I did not.
Q Somebody said you couldn't read it?
A No.
Q Why do you say you didn't have an opportunity to read it?
A I didn't take the time to read it.
Q It's not that you didn't have the opportunity; you just didn't?
A Okay.
Q Is that right?



A Correct.
Q You could have but you didn't?
A I had another appointment to get to, so time was of the essence.
Q Who was the other appointment with?
A It was a personal appointment.
Q Who was it with?
A A friend.
Q Okay. What was your friend's name?
A Is that relevant?
Q It could be.
A Okay. Sandra.
Q Sandra?
A Osborn (phonetic spelling).
Q Do you have contact information for her?
A I don't.
Q No longer a friend?
A Correct. We've just lost touch.
Q What time was your appointment?
A I believe it was at 4:30.
Q Would you agree with me that paragraph 8 says:
"I agree that any claim or lawsuit relating to my service with Boysville of Michigan must be filed no more than six months after the date of the employment action that is



the subject of the claim or lawsuit. I waive any statue of limitations to the contrary"?
Have I read that correctly?
A Yes.
Q And you had the opportunity to read that but didn't?
A I didn't have time to read it.
Q Because of your personal appointment?
A Correct.
Q After the time that you were notified that you were going to be laid off, you were offered a severance agreement?
A Correct.
Q And you declined that?
A Correct.
Q And one of the -- strike that.
Had you asked them to change the severance agreement for you?
A I did.
Q And one of the things you asked for was a letter of recommendation?
A I don't recall asking for a letter of recommendation. I may have.
Q Okay. Did you get a letter of recommendation?
A I asked Eileen Parker for a letter of recommendation and she provided one.
Q Okay. In fact, it's among the documents you gave us,

Q And did you have the MRI?
A I did.
Q When was that?
Do you recall who that was?
A I don't recall the name of the place.
Q Do you recall when it was?
A No.
Q And I apologize for the compound question.
Do you recall if it was before or after your training?
A It would have been after, I'm quite certain.
Q Do you recall if it was before or after Christmas?
A I believe it would have been before Christmas.
Q And you don't have any issues with someone paying for that hospital visit or doctor visit in Ohio?
A I never received any bills for it, no.
Q But you're still having issues with your knee?
A I believe the meniscus is torn.
Q And have you seen a doctor about that other than the worker's comp people?
A No.
Q Why do you believe the meniscus is torn?
A Because that's what the person at the MRI said they thought they saw.
Q Did you ever get any result from the MRI?



A No.
Q Were you ever directed to go for any further treatment?
A No.
Q And you haven't seen any other doctor about it?
A No.
Q Any other ongoing issues from that on-the-job injury?
A I suffer with knee pain every day.
Q And you haven't seen anybody about it?
A No.
Q Why not?
A The worker's comp claim was disputed.
Q When was the last time you had any contact with someone from workers' comp?
A That would have been, I believe, in November or December of 2008.
Q Was this before you saw the person in Ohio?
A I think it was after.
Q And you haven't followed up with worker's comp on this?
A It was disputed.
Q Right. You didn't follow up on that or do anything about it?
A I didn't know there was anything I could do about it.
Q Did you talk to anybody at Holy Cross about the dispute?
A No.
Q Why not?



A I didn't see the point.
Q Do you know what Celexa is, C-e-l-e-x-a?
A I believe it's an anti-depressant.
Q Do you recall Dr. Cordoba prescribing that for you?
A Yes.
Q What did she prescribe it for?
A Depression and anxiety.
Q Was that in addition to the Paxil, you said?
A Actually, that may have been instead of the Paxil.
Q Okay. Do you recall how long you took that?
A The time frame that I gave you previously; so, August through January.
Q So, now you think everything you said this morning about Paxil applies to Celexa?
A I think it may have been Celexa instead of Paxil.
I think we discussed Paxil and I thought that's what she was writing the script for but it may be that I couldn't get a generic for that.
Q You filed a Charge of Discrimination with the Michigan Department of Civil Rights, correct?
A Yes.
Q When was that?
A I don't recall the exact date. It would have been spring of 2009.
Q Did you visit them in person?



A I went to sign paperwork in person, yes.
Q Why did you file a complaint with the Michigan Department of Civil Rights?
A Because I believe that I had been discriminated against.
Q When did you form that belief?
A I formed that belief in the fall of 2008.
Q Did you make any notes about it?
A In my journal.
Q In your journal?
A Correct.
Q Where?
A What you have would be any notes that I made regarding the circumstances and events that happened.
Q Okay. When you talked to Civil Rights, you told them you thought you were discriminated against on the basis of what?
A Height, weight, retaliation for taking an FMLA leave, the fact that I was a woman, the fact that I was not Catholic and the fact of my age.
Q The complaint didn't identify all those, did it?
A No.
Q Why not?
A I'm not sure.
Q You signed it?
A Correct.

Q Did you talk to them about why they didn't list these other issues?
A I trusted them to do their job.
Q Yes. Did you talk to them about why they didn't list these other issues?
A No.
MS. PIPER: The Complaint is your Number 94, Mr. LaFlamme.
Would you mark that, please?
(Aldrich Deposition Exhibit 10 was marked for identification; attached hereto.)
BY MS. PIPER:
Q I want to show you what's been marked Exhibit 10.
Is that your signature?
A Yes.
Q And you signed that at the Michigan Department of Civil Rights' office?
A Correct.
Q Would that have been on April 22nd?
A Yes.
Q 2009?
A Yes.
Q Do you see the paragraph in the box that's in the middle of the page that says: "I'm a woman who is 5 feet 7, 350 pounds who has a medical condition"?



A Yes.
Q It doesn't say anything there about FMLA, does it?
A No.
Q It doesn't say anything there about your not being Catholic, does it?
A No.
Q It doesn't say anything about your age, does it?
A No.
Q And you didn't raise this with the Michigan Department of Civil Rights?
A No.
Q But it was your belief in fall of 2008, that you were discriminated against on these bases?
A Yes.
Q Have you complained about height in the present lawsuit?
A Not height.
Q Why not?
A Because I don't think I was discriminated against because of my height. I believe it was my weight.
Q Okay. So, you did in the fall of 2009 but you no longer do?
A I think what may have happened is, you know, these are the issues that she listed and, yes, I signed that.
Q Well, and you told me a minute ago that height was one of the issues that you had raised.



A Well, height and weight would be proportionate to each other; in other words, if you're five foot seven and you weigh 120, I don't think anyone is going to discriminate against you. If you're five foot seven and you weigh 350, then you're considered overweight.
Q This says that you were discriminated against or that you were laid off on November 4, 2008 because of your sex or gender, because you're a woman, correct?
A Correct.
Q And you believed that in fall of 2009?
A Yes.
Q And you haven't asserted that in the litigation. Why is that?
A I'm resting on my attorney.
Q Okay. Do you believe that you were discriminated against on the basis of your gender?
A I do, yes.
Q Do you believe you were discriminated against on the basis of the fact that you were not Catholic?
A Yes.
Q You haven't alleged that in the lawsuit, either, but you still believe that?
A Yes.
Q And your civil rights complaint that you signed in April of 2009 doesn't mention age, either, but you believed



that in the fall of 2009?
A Yes.
Q And you didn't sue on that in this present lawsuit?
A Well, when I initialized the Complaint, I mentioned all of these things.
Q You're talking about the Complaint with Civil Rights?
A Correct. These were the things that she said could be included in it. I did not question that.
Q But you haven't included that in the lawsuit, either, the religion or age?
A Okay.
Q You're aware of that?
A Yes.
Q But you still believe that those were factors?
A Yes.
(Aldrich Deposition Exhibit 11 was marked for identification; attached hereto.)
BY MS. PIPER:
Q I hand you what's been marked Exhibit 11; ask you to take a look at that.
This was not numbered. I assume you have it because you've got stuff in the Civil Rights file but just in case.
A (Examining document.) Okay.
Q Have you seen this before?

I'll just make copies because I don't have an extra.
VIDEO TECHNICIAN: Going off the record at 2:00 p.m.
(Recess from 2:00 to 2:14.)
VIDEO TECHNICIAN: Back on the record at 2:14 p.m.
BY MS. PIPER:
Q I just want to make sure I have this right. The bases of discrimination, you think, are height, weight, FMLA leave, disability, gender, because you're a woman, because you're not Catholic and because of your age?
A Correct.
Q Anything else?
A No.
Q Those are all of them, correct?
A Yes.
Q Do you recall when you first met Mr. Lemmer?
A January of 2008.
Q Do you recall the circumstances?
A No.
Q Do you recall feeling after that first meeting that Mr. Lemmer didn't like you?
A No.
Q When did you first think he didn't like you?
A April 1, 2008.



Q Okay. In this lawsuit you're suing Holy Cross Children's Services because of discrimination based on disability, weight, retaliation and FMLA, correct?
A Correct.
Q And you feel that you were discriminated against on these bases because of what Mr. Lemmer did, correct?
A Among others.
Q Who's the "others"?
A Kathy Pixley.
Q What did she do?
A Treated me differently than the other coworkers in the department.
Q When did she do that?
A Probably the last year that I worked there.
Q Is that in your notes, too?
A No.
Q Why not?
A I didn't feel it was important.
Q Anybody else that you think discriminated against you?
A No. Actually, I guess I should mention Eileen Parker in one incident.
Q And with regard to Ms. Parker, do you think it was height?
A No.
Q Weight?



A No.
Q FMLA leave?
A No.
Q Disability?
A It may have been disability.
Q The fact that you're a woman?
A No.
Q The fact that you're not Catholic?
A No.
Q Based on age?
A No.
Q Did you say "it may have been disability"?
A "May have been," yes.
Q With regard to Ms. Pixley, do you think she discriminated against you because of your height?
A Yes.
Q Weight?
A Yes.
Q FMLA leave?
A Yes.
Q Disability?
A Yes.
Q Because you're a woman?
A No.
Q Because you're not Catholic?



A Yes.
Q Because of your age?
A Probably, yes.
Q And with regard to Mr. Lemmer, it was height?
A Yes.
Q Weight?
A Yes.
Q FMLA leave?
A Yes.
Q Disability?
A Yes.
Q Because you're a woman?
A Yes.
Q Because you're not Catholic?
A Yes.
Q And because of your age?
A Yes.
Q And retaliation?
A Yes.
Q And retaliation from Ms. Pixley?
A Yes.
Q And retaliation from Ms. Parker?
A No.
Q Anybody else at Holy Cross you think discriminated against you?

A I would suspect, Bill Geddes.
Q Did Mr. Geddes discriminate against you because of your height?
A Yes.
Q Weight?
A Yes.
Q FMLA leave?
A Yes.
Q Disability?
A Yes.
Q Because you're a woman?
A Yes.
Q Because you're not Catholic?
A Yes.
Q Because of your age?
A Yes.
Q Because of retaliation?
A Yes.
Q Anybody else?
A No.
Q Nobody else?
A No.
Q Okay. When you said to Civil Rights at your intake questionnaire that you thought you were discriminated against, was it because of Mr. Lemmer?



A Yes.
Q Was it because of Ms. Pixley?
A Yes.
Q Was it because of Ms. Parker?
A Yes.
Q Was it because of Mr. Geddes?
A Yes.
Q Did you describe for anybody at Civil Rights what you think Ms. Pixley did?
A Not directly, no.
Q Did you describe for anybody at Civil Rights what you think Ms. Parker did?
A No.
Q Did you describe what Mr. Geddes did?
A No.
Q Why not?
A They didn't ask questions about that.
Q You were trying to tell them you had been discriminated against?
A Correct.
Q And didn't mention those others?
A No, I don't believe I did.
Q Because they didn't ask you?
A Correct.
Q They didn't ask you why you felt discriminated against?



A They did.
Q But you didn't mention the others?
A I was concentrating on the time frame prior to my layoff.
Q And what did you mean by that time fame?
A The time frame between April of 2008 and my layoff notice.
Q Okay. Did the discrimination that you think you felt from Ms. Pixley, did that occur in that time frame?
A Yes.
Q How about Ms. Parker, in that time frame?
A Yes.
Q How about Mr. Geddes, in that time frame?
A No.
Q When did Mr. Geddes discriminate against you?
A In November of 2008.
Q After the layoff?
A Correct.
Q At any time before then?
A Not that I'm aware of, no.
Q And I believe you told me before with regard to Mr. Lemmer that you couldn't identify things that he said or he did or the way he treated you that were based on height versus weight versus FMLA, et cetera, correct?
A No. He made comments about what I felt was about my weight.



Q Okay. Did he make comments about height?
A No.
Q FMLA leave?
A No.
Q Disability?
A No.
Q Gender?
A No.
Q Religion?
A No.
Q Age?
A No.
Q Retaliation?
A No.
Q Okay. Did he act in any way that made you think that he was acting based on your height, FMLA leave, disability, gender, religion, age or retaliation?
A Yes.
Q Okay. Are those described in your notes?
A Yes.
Q Anything more than that?
A No.
Q And what was it he did that you thought he discriminated against you because of your height?
A Nothing specific.

Q How about FMLA leave?
A Nothing specific.
Q How about disability?
A Nothing specific.
Q How about gender?
A Nothing specific.
Q How about religion?
A Nothing specific.
Q How about age?
A Nothing specific.
Q How about retaliation?
A Nothing specific.
Q Any other specific conduct or communication by Mr. Lemmer that you think was based on any of these bases other than weight?
A I believe that he had issues with me as a woman, issues with me for my age, issues with me for my weight, issues with the fact that I had taken an FMLA leave.
Q And why do you think that?
A Because I no longer have a job.
Q Anything else?
A His attitude towards me.
Q Okay. And you say he didn't like you?
A I felt he did not like me.
Q Right. You thought he didn't like you.



Anything else?
A He was keeping track of when I was leaving the building and I don't see that he was doing that for anyone else.
Q Do you know if he was or he wasn't?
A He didn't call anyone else into his office during my tenure there asking why they had left the building at a certain time.
Q How do you know that?
A Because word travels.
Q You hadn't heard about it?
A Correct.
Q Okay. Anything else?
A Not speaking to me, ignoring me when I wished him a good morning or said -- asked, hi, how are you?
Q Anything else?
A That's what I recall.
Q And these are in your notes?
A No. Not all of that is in my notes.
Q Why not?
A Because I wasn't going to track every time he failed to say hi back.
Q And you think that he said hi back to the other coworkers but not you?
A I heard him, yes.
Q Anything else?



A There were other people to layoff. I was chosen.
Q Anything else?
A No.
Q Okay. Did Ms. Pixley engage in any conduct or have any communication with you that you think was based on height?
A No.
Q Weight?
A Yes.
Q FMLA?
A Yes.
Q Disability?
A Yes.
Q Not being Catholic?
A Yes.
Q Age?
A No.
Q Retaliation?
A Yes.
Q Okay. What conduct or communication was based on weight?
A She had made comments about overweight people.
Q She made comments generally?
A Generally, yes.
Q What did she say?
A Talked about fat people, people who were way overweight.



Q What did she say?
A Why do people who are way overweight eat like that, that type of thing.
And Kathy is not underweight. She would be considered a little overweight herself but not as much as I am.
Q What did she say?
A She made comments about fat people.
Q Right. What did she say? What were the words? What did she say?
A That she didn't understand why fat people were fat, why they didn't lose wait.
I don't know. It was over the course of some time.
Q Over the course of what time?
A The time that I worked with her.
Q Is that ten years?
A Yes.
Q Any other comments that you recall?
A No.
Q What about FMLA?
A She was quite upset that I took ten weeks off.
Q Right. What did she say or how did she act?
A She called me frequently to find out when I was returning.

Q Your return was delayed, correct?
A Yes.
Q What else did she say or what else did she do?
A Well, I had explained to her that there would be further surgeries needed, and she alluded that that was not going to go over very well.
Q What else did she say or do?
A She stated that she didn't like the time that I had taken off.
Q What else did she say or do?
A That's it.
Q Okay. What about disability?
A Comments about how slow I walked, you know. I needed to make --
Q What did she say?
A Are you wanting verbatim because I can't give you that.
Q I want to know what you remember about what she said. I don't want to know she made comments about how you walked. I want to know what she said.
She said you walked funny? You walked slow?
A I walked slow.
Q She said that?
A Yes.
Q Okay. What else did she say?
A That's it about walking.



Q What else did she say about disability?
A That I needed to do my job.
Q Okay. What else?
A And that if I had restrictions, I didn't have a job.
Q But you didn't have restrictions?
A Correct.
Q What else?
A That's it.
Q What about religion?
A She made a lot of comments about her being Catholic, and point blank asked us what religion we were. And I told her I was not Catholic.
Q Anything else?
A No.
Q And within that question I wanted to ask you, any conduct or communication by Ms. Pixley that you thought was based on your religion?
A She told us frequently in conversations that this was a Catholic-based organization.
Q Which it is, right?
A Correct.
Q Okay.
A And that's her comment.
Q And you felt that was singling you out because of your religion?



A When it's mentioned more than once, yes.
Q Anything else?
A No.
Q What about retaliation? What did she say or do that you thought was retaliatory?
A Well, she made comments that or stated that it would be very difficult for me to take another FMLA leave, whether it was required or not.
Q Okay. That was true, though, right?
A Well, I don't know that it would be difficult. I know that the law states that I could take another one within the next year.
Q Not within a year.
A Right. After one year had passed.
Q Right. Okay.
A And so, I told her that I would be doing that.
Q Okay.
A So, she was aware of that.
Q When did you tell her that?
A That would have been shortly after I returned form the FMLA leave; so, in August.
Q So, you told her in August you would be taking another leave when?
A As soon as it was possible.
Q And what did she say?



A That that would be very difficult to do.
Q Anything else?
A I believe she alluded to the fact that they may not hold my job for me.
Q What do you mean "alluded to"?
A Well, made comments that she wasn't sure that she could hold a job for me while I was on leave.
Q Is that what she said?
A Yes.
Q She said, "I'm not sure we can hold your job if you take another FMLA --"
A Correct.
Q "-- after you're eligible."
A Correct. Yes.
(Discussion held off the record.)
MS. PIPER: Can you read the entire question back, and your answer please?
(Whereupon the following was read, as requested, by the court reporter:
"Q She said, "I'm not sure we can hold your job if you take another FMLA after you're eligible."
BY MS. PIPER:
Q And your answer was "correct"?
A Correct.

Q Was there anybody else in your department that was certified in JAIS or JJOLT?
A No.
Q You think there were others that were capable of getting certified?
A No.
Q Because?
A They didn't understand the system. It wasn't their job.
Q Well, isn't that the purpose of the training?
A Yes.
Q Okay. You said the first time that you thought that Mr. Lemmer didn't like you was in April of 2008?
A Correct.
Q What happened?
A It's documented in the journal.
Q Do you remember what happened?
A I do remember what happened.
Q Why don't you tell me about that?
A We had conducted a Client Information System redevelopment meeting at Domino Farms here in Ann Arbor, and it was a day-long event.
And there were a lot of issues that were brought up by staff that attended regarding the Client Information System, JJOLT and JAIS. And I had, at each occasion that applied, mentioned that they should call me



and I could fix that for them or I could walk them through how to resolve that on their own. And John took exception with that.
When the majority of people had left -- and I do document who was still there -- at that time he instructed me to not tell people to call me because I would be inundated with phone calls.
Q And you said to him:
"I have done this job for a long time and know our coworkers well."
A Um-hmm.
Q "These are social workers and they will not call about the issue or or situation"?
A Yes.
Q And you think he didn't like that?
A I'm sure he didn't like that.
Q Ms. Pixley didn't like that, either, right?
A No.
Q Your note says:
"John's body language and facial features expressed outrage at my empowering myself and defending my position"?
A Yes.
Q Can you describe his body language?



A Very rigid, arms crossed, eyes glaring, tight-lipped.
Q And his facial features?
A Eyes were glaring, and very tight-lipped.
Q What do you mean "glaring"?
A Well, the cliche is, "if looks could kill" I'd be dead.
Q And I'm not sure what that looks like.
A It's a mean look. It's a furrow in the forehead and a frown and a -- it's a mean look.
Q And you thought that the mean look was based on your empowering yourself?
A My response.
Q Right. That you characterize as empowering yourself and defending your position?
A Correct.
Q Is that related to height, weight, FMLA, disability, gender, religion, age or retaliation?
A I believe it was due to gender and age.
Q Because?
A Because I was a woman and I was explaining to him that my job was to provide support to coworkers.
Q Would that have been the job of the help desk to respond to calls?
A The Computer Information Systems, JJOLT and JAIS calls, Mark typically referred directly to me.
Q Was Mark the help desk guy?



A Correct.
Q So, they belonged to him but he referred them to you?
A That's correct.
Q And you think that the reason that he was outraged was because you're a woman?
A And I said something to him instead of just letting it go and walking away. I explained why I felt the way I did.
Q And because of your age, you said?
A Yes.
Q Because you're so young?
A I'm younger than him.
Q I wouldn't know that.
Why do you think that he had an issue about your age?
A Because someone younger than him was commenting to him and he was in a position above me.
Q Okay. So, you thought that he thought that you were a young upstart or something?
A Possibly.
Q Okay. Do you know how old he is?
A I would have assumed, early fifties --
Q And how old are you?
A -- maybe mid-fifties.
At that time I was 48.
Q And how old are you now?

A I'm 51.
Q Did you just have a birthday last week?
A I did.
Q Okay. I was just thinking for a minute. Okay.
And so, he's older than you and you thought that he thought that you were inappropriate because you were young?
A I don't know that he --
I think he just took exception that I didn't agree with him.
Q Because of your age?
A And I'm a woman, yes.
Q But not the other categories, though, at that time?
A Not at that time.
Q Let me ask this. On page 67 -- and I don't know if it's in front of you or not but we can get it.
I'm not going to mark that because you have it, I have it.
On page 67 -- this is also part of your notes that your attorney gave me -- at the very top paragraph, the last line says:
"This is the third instance of John's discrimination towards me."
A Yes.
Q And I believe that that's the 9/25 meeting.



A I believe so, yes.
Q What was the first and what was the second?
A The first would have been on April 1st.
Q The one you just described?
A And the comment at that lunch break about the "big green shirt."
Q Can you -- when you said "April 1st," that's the thing that you just described, right?
A Correct.
Q Okay. So, that was discrimination.
And you said there was the "big green shirt"?
A Correct.
Q And that was part of one, as well?
A Then that would have been counted as two.
Q So, that was the second time?
A Correct.
Q And then the third time was in September?
A No, actually -- I'm sorry. April 1st would have counted as one. The second instance would have been his refusal to allow me to use All Purpose Leave time or flex a Friday, specifically, to complete my field placement. And then the third was described here.
Q Okay. When you said the second was refused to allow APL time or flex, for one Friday or Fridays generally?
A It would have been Fridays for, I believe, at the most,



16 weeks.
Q During what time frame?
A This would have been May.
And I wouldn't have needed that time while I was on FMLA leave in August and, possibly, September.
Q And did you submit a request in writing?
A For the All Purpose Leave time?
Q To use the Fridays.
A No. We typically just send an email to our supervisor.
Q And, so, did you send an email to Ms. Parker?
A I believe so, yes.
Q And Mr. Lemmer was the one who said no?
A Kathy Pixley was the one who informed me that Mr. Lemmer had said no.
Q So, you were asking for Fridays off from sometime in May until sometime in September?
A Correct.
Q But you already knew that you were going to be off for your surgery from May till July, right?
A Well, we anticipated -- we were hoping it would only be two to four weeks initially.
Q When did we anticipate this?
A That's what I had initially spoke with my doctor about and initially what I told Eileen Parker.
Q But when you submitted the FMLA paperwork, it said that



you would be off until sometime in July, right?
A That's probably what my doctor noted.
Q So, by the time the doctor submitted the note, it had become May to July, correct?
A Yes.
Q And then it extended into August?
A If that's what the paperwork said, yes.
Q Well, you returned on August 4th, right?
A Correct.
Q Did you save the email where you requested to use APL or flex a Friday?
A I doubt it. I don't think so.
Q Are those the same thing, "use APL or flex a Friday"?
A No.
Q That's what I thought.
APL is time that you get every pay period or every month?
A Correct.
Q It's All Purpose Leave, in lieu of vacation, sick and personal time?
A Correct.
Q And the flex, you said, is?
A Accumulated extra hours.
Q Okay. And when did you ask Mr. Lemmer about this?
A I didn't speak to Mr. Lemmer about it.

Q You're right.
When did you ask Ms. Parker about this?
A April or May.
Q You don't recall?
A No, I don't recall the date.
Q And you think that that was related to your height?
A It was related to --
Q Height?
A Yes, all the discriminatory factors.
Q All of them together?
A Yes.
Q Can you separate out why?
A No.
Q Because he didn't like you?
A I can't separate why. I strongly feel he did not like me.
Q You mentioned before the "big green shirt" comment that was on the MDCR paperwork. What happened?
A Everyone else had left for lunch. I was setting up equipment and documentation for the afternoon certification.
So, John and I were alone, and he came up to me and got very close, and he said, that's quite a big green shirt you have. I love your big green shirt.
Q Was there any markings or insignia or --



A No.
Q -- sayings or anything?
A No.
Q Was it the shirt you have on?
A No.
Q And when did this happen?
A This would have been April 1, 2008 at the noon break, at the lunch break.
Q And this is the day that you spoke up for yourself about, you know, that coworkers weren't going to call you?
A Yes.
Q You didn't write that down here?
A "The big green shirt"?
Q Correct. I don't see it.
Did you delete it?
A No, I didn't delete. I didn't document it.
Q Because?
A It made me very uncomfortable and I didn't really want to remember that incident.
Q Did you say anything to anybody about that?
A No.
Q Why not?
A Fear.
Q Did you tell any friends or family members or anyone outside of Holy Cross?



A Yes.
Q Who did you tell?
A I'm quite certain I told my sons.
Q All three?
A Yes.
Q Anybody else?
A Cheryl Strachn.
Q Was she at Holy Cross at the time?
A Yes.
Q But she was a secretary?
A Correct.
Q So, you weren't telling her because you expected her to do anything about it?
A No.
Q Anybody else?
A I don't believe so.
MS. PIPER: I'm going to take a break.
VIDEO TECHNICIAN: Going off the record at 3:16 p.m.
(Aldrich Deposition Exhibit 12 was marked for identification; attached hereto.)
(Recess from 3:16 to 3:28)
VIDEO TECHNICIAN: We're back on the record at 3:28 p.m.



BY MS. PIPER:
Q I want to hand you what's been marked Exhibit 12, and it is in your personnel file at 183 to 184.
A (Examining document.) Okay.
Q You've had a chance to take a look at Exhibit 12?
A Yes.
Q And do you recognize that as your request for a special schedule?
A Yes.
Q That was granted?
A Yes.
Q So, instead of working eight to four like everyone else, you were allowed to work from 7:30 to 3:30?
A Yes.
Q And that went through April 30th?
A Correct.
Q And it was after that that you were looking to take Fridays off?
A Yes.
Q And that was not approved?
A Correct.
Q So, does that mean you didn't do your field placement?
A No. I did do my field placement.
Q You just didn't do it on Fridays?
A Correct.

Q You say, about two-thirds of way down, "It is obvious that I am the first person to think of this issue," referring to the issue you raised about CARP mandates and what you're going to do about them vis-a-vis the JAIS case notes?
A Yes.
Q And you say that:
"John's facial expression and body language clearly reflect his anger toward my speaking up."
A Yes.
Q Can you describe that facial expression and body language?
A Rigid posture, arms crossed, angry look, tight lips.
Q What does "rigid" mean?
A Ramrod straight --
Q Okay.
A -- not relaxed --
Q Okay.
A -- stiff.
Q And you said "arms crossed"?
A Yes.
Q And "angry look." What does that mean?
A The same that it meant on April 1st. He was angry, frowned, glare.



Q So, you formed the belief that he didn't like you speaking up?
A Yes.
Q And you think that was related to your height and weight and disability and FMLA and religion and age and gender and retaliation?
I've lost my list.
A It wouldn't be retaliation.
Q It would or would not?
A Oh, yes, it would. At this time frame, yes, it would.
Q Why do you say, at this time it would be retaliation?
A Because they were upset about the FMLA leave.
Q So, the retaliation is retaliation about FMLA leave?
A Correct.
Q It's not about having reported to somebody about discrimination?
A That hadn't been done yet.
Q And when did that happen?
A My report to -- on discrimination was in spring of 2009.
Q You're talking about your report of discrimination to the Michigan Department of Civil Rights?
A Correct.
Q So, that's what you're talking about when you're talking about retaliation here?
A Retaliation against taking an FMLA leave.



Q It's what you mean in the lawsuit and that's what you mean when you're talking about retaliation by the people we talked about earlier?
A Yes.
Q The next note is about the conversation you had with Mr. Lemmer on the 25th, and you note that it was 8:15 a.m.
That's not when you recorded it, though? You recorded it later that day?
A Correct.
Q Is that in the car, at home or what?
A I recorded this at my desk immediately after the meeting.
Q Okay. Was that before or after your discussion with Ms. Pixley about it?
A It would have been --
The documentation, you mean?
Q Yeah, that you said you wrote it at your desk.
A That would have been before I discussed it with Ms. Pixley.
Q Because you had a discussion with Ms. Pixley about this when you were having your review, right?
A No. That was Eileen Parker.
Q I'm sorry. Okay.
Did you discuss it with Ms. Pixley then?
A I believe I told her pieces of this when she informed me



that my position was targeted for layoff, which was just a few days after this meeting with John.
Q Okay. So, going back to the documentation, was the documentation made before or after your meeting with Ms. Parker?
A It was made before.
Q So, you had this meeting with Mr. Lemmer, sat down and wrote this, and then met with Ms. Parker, correct?
A Correct.
Q And during the meeting with Ms. Parker, while you were discussing your evaluation you also discussed what Mr. Lemmer had said?
A Yes.
Q Okay. And you expressed some confusion about whether or not Mr. Lemmer wanted to see you on the 25th or 26th?
A Yes.
Q Why was that?
A I believe what his note said was, please see me "first thing in the morning." And it was dated 9/25, so I took that to mean he wanted to see me on 9/26, first thing in the morning.
Q I'm sorry. It was dated 9/25, and it says, see me "first thing in the morning," and you thought it meant the next day?
A Correct.

Q Because?
A It says "first thing in the morning."
Q As opposed to?
A "This morning."
Q But you went and saw him, anyway?
A Yes. I believe, actually, Kathy Pixley told me he wanted to see me.
Q So, you were working at your desk and Ms. Pixley said what?
A No. I had sat down at my desk and she said, John wants to see you.
Q So, where it says here "I thought it was probably best to check with John so I went to his office," that's because Ms. Pixley told you to?
A Yes.
Q So, it wasn't actually your thought; it was Ms. Pixley's thought?
A Yes. Even though the note said that, I wasn't really sure if Kathy was correct or not because of the note, so I just went to see John.
Q She told you to go see John and you still had doubts?
A She said, I think John is looking for you. I think John wants to see you, I believe is exactly what she said.
Q Is this the note? (Indicating.)
A Yes.



Q Is that your handwriting at the bottom?
A Yes.
MS. PIPER: For the record, that's your document Number 37, Mr. LaFlamme.
BY MS. PIPER:
Q Do you still have the note?
A I do.
Q Did you give it to Mr. LaFlamme?
A I gave him a copy.
Q Was the copy like this appears here, with your handwriting on the bottom?
A Yes.
Q When did you write this?
A That same day.
Q It says:
"Found email in the in box. It was, 'very disturbing'"?
A Yes.
Q And is that part of the documentation that you wrote?
A Yes.
Q Okay. Mr. Lemmer was pretty upset about the fact that you had not responded to Ms. Pixley's request for an explanation but responded back to her via email that he could ask you himself, right?
A Correct. I said, I would prefer to answer myself.



Q Your response to Ms. Pixley was, I prefer to answer myself?
A I would be happy to provide an answer myself, or words to that effect.
Q But you didn't actually answer her question?
A Correct.
Q And you didn't think that that was disrespectful?
A No.
Q Your supervisor asked you for an explanation and you didn't give it, and you didn't think that was disrespectful?
A Kathy wasn't my supervisor.
Q Actually, she was your supervisor's supervisor, right?
A Correct.
Q And so, that's why it wasn't disrespectful?
A No. I don't think the verbiage was disrespectful. If someone wanted to know why I had done something, I prefer to answer for myself.
Q Mr. Lemmer said he felt it was disrespectful?
A He did state that.
Q And you disagreed with him?
A I do.
(Aldrich Deposition Exhibit 13 was marked for identification; attached hereto.)



MS. PIPER: It's document 349 that you provided, and it's Exhibit 13.
BY MS. PIPER:
Q Do you see Exhibit 13?
A Yes.
Q Is that Ms. Pixley's request and your response?
A Correct.
Q So, you said:
"John is welcome to ask his question directly of me"?
A Correct.
Q And you didn't think it was disrespectful not to answer your supervisor's question?
A It didn't sound to me in the email that Kathy was asking.
Q She did ask. She said:
"I've been asked to find out."
A She's been asked by someone else.
Q "Would you mind giving me a short explanation?"
She asked you for an explanation, correct?
A That's what her wording says.
Q And you didn't give it?
A I did respond to the email, yes.
Q You didn't give an explanation, did you?
A No.

A We were on the same team when I was doing the family worker field placement in 2007, and I met her then. She was part of the Mooney team and I had met her in training in November of 2008. She conducted a portion of the training.
Q That you had on like the 17th and 18th, I think it was?
A Correct. Yes.
Q Do you know who her supervisor was?
A I don't, no.
Q Would it have been Mr. Kruse, do you know?
A I have no idea.
Q Do you know what Mr. Kruse's position was at that time?
A Division manager.
Q I believe the records indicate you got your job at the Alzheimer's Association on December 3, 2008.
A Correct.
Q When did you get the job offer?
A I don't recall. That would have been in November, late November.
Q Do you recall if it was before or after the training that you took in November 17th and 18th, I think it was?
A I may have had an interview, actually, before I started that training.
Q Just to be accurate, one of the exhibits was the payroll log sheet you had.



A Um-hmm. Yes.
Q And it indicated that you worked on Monday November 17, 2008 and Tuesday, November 18, 2008.
And those would be the training days?
A Yes.
Q And you don't recall whether it was before or after the training that you got the job offer for the Alzheimer's Association?
A No, I don't recall.
Q And you said that the phone calls that you did on Thursday the 20th, were related to your field placement?
A I think I said field placement but I think this was actually the day that I talked to Bill Geddes. So, that may be why the hour was put down there. I just put phone calls and emails. So, that's my explanation for the hour.
And they did pay me for it, so --
Q Do you recall the conversation with Bill Geddes?
A Yes.
Q Was that the one where he told you that he couldn't use you?
A Correct.
Q What else did he tell you, if anything?
A I asked him why that was and he said he simply couldn't use me.



Q Do you recall what else may have taken place during the phone call?
A I just asked -- I wanted an answer about why he didn't feel he could use me. Had I said something? Had I done something? And he just kept saying that he couldn't use me.
And I asked him if he had anything available, and he told me he could put me on the temporary on-call list.
Q And you had said, that would be great, correct?
A Correct.
(Discussion held off the record.)
BY MS. PIPER:
Q Did Mr. Geddes tell you that they had decided to move Venus Lombrana into the family worker job?
A No.
Q How did you find that out?
A Cheryl Strachn told me.
Q Who is Cheryl Strachn?
A She was a secretary on campus.
Q Who did she work for?
A I believe her supervisor was Julie Roehm.
Q Do you want to look at Exhibit 3? I think I handed it to you. We marked it and then unmarked it.
A (Examining document.)



Q I believe we talked last time that the training was only two days and not three days, although --
These are your handwritten notes from November 2008, correct?
A Correct.
Q That were transferred and typed up later on?
A Correct.
Q And it indicated, on November 19th, that you had a full day of training but you didn't?
A We discussed this last time.
November 19th shouldn't be there. That should be under November 18th.
Q Okay. In the third paragraph, under where it says November 19, it said you had a conversation with Loren Brown.
Do you see that?
A Is that "A co-worker came in asking for Venus Lombrana"?
Q Yes, in that paragraph.
A Yes.
Q And you say you told him that you had accepted a position on campus as a treatment specialist?
A Correct.
Q When was that arranged?
A That was arranged with Rick Kruse. Because I didn't have my MSW degree, they had to title me a Treatment

Specialist/Temporary On-Call because I couldn't actually have a title of family worker because I didn't have the required degree and they had not yet received variance.
Q And you're saying that at the time that you accepted the position as a treatment specialist that you didn't know what you were going to be making or when you were going to be assigned?
A I don't recall.
No. Rick had told me that I would be doing family work and he would do his best to give me forty hours a week.
I don't recall that we discussed a salary.
Q But you told Mr. Brown that you were going to be working as a treatment specialist?
A Because that was the job title that I was given.
Q By Mr. Kruse?
A Correct.
Q And I believe you told me before the break that you were not offered work as a family worker.
A I wasn't offered any work.
(Aldrich Deposition Exhibit 25 was marked for identification; attached hereto.)
BY MS. PIPER:
Q Can you take a look at Exhibit 25?
A (Examining document.) Okay.



Q On the second page you mention "SIL obligations."
Is that training?
A Those would have been anything that Marcia Rodakowski would have assigned to me.
Q So, that would have been field placements?
A Yes.
Q That, again, on the second page there, it says you were taking off the week of Thanksgiving to visit relatives?
A Correct.
Q Why are you telling him that?
A It must have been something from a phone call. I don't see another email.
I was, obviously, responding to Rick for some reason but I don't remember what the context was.
Q And then on the bottom of the first page he writes back to you and says:
"It is unfortunate you were not able to work Wednesday, Thursday, Friday."
A Correct.
Q Because Liz had a lot of work for you?
A Um-hmm.
Q Yes?
A I'm sorry?
Q You said "um-hmm" and I'm asking if that was a yes.
A Yes, I see that it says that here.



Q Are you saying that he didn't offer you this work?
A He may have but I also had obligations, it looks like, for SIL and it also doesn't look like I got very much notice for the Wednesday, Thursday and Friday.
Q You don't actually know how much notice you got, right?
A No, because it doesn't look like he emailed me to offer me the time. So, I said:
"I would be happy to spend evenings making family contacts. Would Liz be willing to give me a list?"
Q But you understood what he was offering you was family work, correct?
A That's what he says.
Q Do you have reason not to believe him?
A Well, he actually says:
"-- you are not able to work Wednesday, Thursday and Friday. Liz has allot (sic) of work -- "
Q "-- set aside for you"?
A Correct, "with the families and set up the visits."
I still would have been called a Treatment Specialist Temporary On-Call that would have been doing family work but under somebody else with a MSW.
Q I see.
A And this was prior to my orientation, his email.



Q Yes. The orientation was on the Monday and Tuesday and he was offering you work for Wednesday, Thursday and Friday that you were not available for?
A Correct.
So, all of this would have occurred before my conversation with Bill Geddes.
Q Well, the conversation with Bill Geddes was on the 19th or 20th, correct?
A I was told on the 19th to call Bill Geddes.
Q And then you spoke with him on the 20th?
A Correct.
Q Okay. So, you were offered family work before the 19th or 20th, correct?
A Correct, but working as a temporary on-call TS.
Q By way of title, you mean?
A Correct.
Q You list as potential witnesses your sons, Mark, Matt and Mike.
Do they know anything about the discrimination, what happened, what facts support your claims of discrimination based on weight or disability?
A Probably, yes. I've discussed it with them.
Q Do they have any first-hand information?
A I don't know that.
Q So, you don't have any reason to know that they have