# Exhibit

# 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBIN ALDRICH,

Plaintiff,

v File No. 1:10-cv-13515-MAG-MKM

BOYSVILLE OF MICHIGAN, INC. a Michigan corporation, d/b/a HOLY CROSS CHILDREN'S SERVICES,

Defendant.
____________________________/

D E P O S I T I O N

of

RICK KRUSE

8759 Clinton-Macon Road

Clinton, MI

June 22, 2011

1:28 P.M.

APPEARANCES:

Richard N. LaFlamme, P32641
Attorney for Plaintiff

Karen Piper, P31706
Attorney for Defendant

ALSO PRESENT:

Robin Aldrich
Alyson Beck

- - -

Roger D. Thome, CSR 2201

INDEX IS INSERTED AT THE END OF THE TRANSCRIPT



RICK KRUSE

Having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. LAFLAMME:

Q. Good afternoon.
A. Good afternoon.
Q. Would you state your full name for the record, please.
A. Rick Kruse.
Q. Have you ever given a deposition before?
A. No.
Q. Let me go over some basic ground rules. If you keep in mind that a court reporter is taking down everything that we say, it helps you remember the rules, which are, only one of us can talk at a time. In normal conversation we like to step on each others' sentences, and that works fine, except when a court reporter is trying to make sure he gets down everything that is said.

So today I'll ask you not to step on my sentences. Let me get my whole question out before you start to answer, and I'll do my best not to interrupt you.

Also make sure you answer audibly. Stay away from shakes, shrugs, nods, uh-huh and uh-uhs, and things that are hard to spell, again, so we have a clear record.

Finally, if I ask you a question that you don't



understand, please tell me. Don't guess at what I'm asking. If you don't understand the question, tell me that, and I'll try to fix it. Okay?
A. Okay.
Q. How old are you?
A. (Pause)
Q. This is the easiest question I'm going to ask you all day.
A. I was born in 1965. I think I'm 45.
Q. What's your date of birth?
A. October 4, 1965.
Q. I'll go with that. Where do you currently reside?
A. Ann Arbor.
Q. How long have you lived at your current residence?
A. Approximately 2000.
Q. You have any immediate plans on moving?
A. No.
Q. Are you married?
A. Yes.
Q. How long have you been married?
A. 5 years.
Q. You have children?
A. Yes.
Q. How many?
A. 3.
Q. How old are they?



A. 16, 14, and 4.
Q. Is this your second marriage?
A. Yes.
Q. What year and what school did you graduate from high school?
A. 1983 Central Lake High School.
Q. Where is that?
A. Northern Michigan.
Q. Lower peninsula or upper?
A. Lower.
Q. Do you have a college degree?
A. Yes.
Q. From where?
A. Grand Valley.
Q. And what year did you graduate?
A. 1987.
Q. And what was your major?
A. Psychology.
Q. Do you have any formal education beyond the psychology degree?
A. Yes.
Q. What else?
A. Master's in social work.
Q. And when did you get that?
A. 1995.

Q. What school?
A. Michigan.
Q. Have you had any other formal education?
A. No.
Q. Are you working toward an advanced degree currently?
A. No.
Q. And what was your first full-time job after graduating from Grand Valley?
A. Treatment specialist.
Q. Where?
A. Boysville.
Q. Where you're currently employed; correct?
A. Yes.
Q. So have you been employed by Boysville continuously since you graduated from Grand Valley?
A. Yes.
Q. What was your first position?
A. Treatment specialist.
Q. How long were you in that position?
A. 2 years.
Q. And what was your next position?
A. Treatment coordinator.
Q. And how long did you hold that position?
A. 5 years.
Q. And your next position after that?



A. Clinical supervisor.
Q. And how long did you hold that position?
A. A few months.
Q. And what was your next position?
A. Division -- program manager.
Q. How long were you program manager?
A. 15 years.
Q. And what was your next position?
A. School social worker.
Q. When did you move to the school social worker position?
A. April, 2010.
Q. And why did you move from the program manager position?
A. To work directly with the clients again.
Q. Was that your choice?
A. Yes.
Q. Who took your position?
A. Tim Lankerd, L-a-n-k-e-r-d.
Q. The school social worker position is that the Clinton Campus?
A. Currently, yes.
Q. Okay. That hasn't always been the case?
A. I also worked in Detroit in that position this past year.
Q. Do you go back and forth?
A. I did.
Q. Now you're full time at Clinton Campus?



A. Yes.
Q. When you were program manager, who did you report to?
A. It changed.
Q. Right at the end, who was it?
A. Bill Geddes.
Q. And how long -- for how long did you report to Bill Geddes?
A. A year.
Q. And who was the program -- I'm sorry, who was your direct report before Bill Geddes?
A. George Birkham.
Q. B-i-r-k --
A. B-i-r-k-h-a-m, I think.
(Correct spelling is B-i-r-k-a-m)
Q. What was their position, Geddes and Birkam?
A. Regional director.
Q. Did you report to a regional director throughout the time that you were a program manager?
A. Yes.
Q. How long was Mr. Birkam the program manager?
A. 2 years.
Q. Who do you report to now?
A. The principal.
Q. And who is that?
A. Jim Chludzinski.



Q. Spell that, please.
A. I can't.
MR. LAFLAMME: We can get it off the record.
(Short off-the-record discussion)
MR. LAFLAMME: Okay, back on.
Q. (BY MR. LAFLAMME) As program manager, did you supervise social workers?
A. Yes.
Q. I take it the school social workers are in a different arm of the Boysville enterprise than the ones you supervise?
A. Yes.
Q. Is the school social worker position a lower position than the program manager position?
A. Can you further explain?
Q. Well, in the program manager position you supervise social workers, which would mean the social workers would be at least one step below you as program manager.
A. Okay.
Q. What I'm trying to get at is, is the school social worker on that same level as the social workers who you supervise?
A. Yes.
Q. Did you get a cut in pay when you moved to the school social worker position?
A. No.

Page 9

Q. You maintained the same salary or did you get an increase?
A. Increase.
Q. So are school social workers generally compensated at a higher level than the social workers who you supervise?
A. Yes.
Q. Do you know why that is?
A. Funding.
Q. The source of funding for school social workers is different than the ones you supervise?
A. Yes.
Q. What is the source of funding?
A. The department of education.
Q. Yet you're still considered a Boysville employee?
A. Yes.
Q. Do you -- strike that.
Is the principal a Boysville employee?
A. Yes.
Q. What's the name of the school?
A. Thomas Moore.
Q. When you were the program manager, did you have occasion to interact with Robin Aldrich?
A. Yes.
Q. What would be those occasions in your respective responsibilities that would cause you to interact?
A. As I recall, computer training.

Page 10

Q. Robin did computer training for people who worked for you?
A. Yes.
Q. Did you have interaction with her in any other context?
A. When she was an intern.
Q. And what would have been your interaction then?
A. I think she was working with one of the groups in my division.
Q. Your division meaning the division you were responsible for managing?
A. Yes.
Q. Were you responsible for evaluating or reviewing her work as an intern?
A. No.
Q. Do you know who was?
A. Jere Beltrame, B-e-l-t-r-a-m-e.
Q. And his first name Jere isn't spelled the normal way, is it?
A. J-e-r-e.
Q. When you were put in the position as school social worker for the Thomas Moore School, did you hold a school social worker certificate?
A. Yes.
Q. Was that a requirement of the position?
A. Yes.
Q. Do you recall when you got that certificate?

Page 11

A. No.
Q. Well, was it within the year or 2 before you got the position?
A. Yes.
Q. Did you get the certificate specifically so you could seek that position?
A. No.
Q. Did you become aware at some point that Robin was interested in seeking a social worker position?
A. Yes.
Q. Do you recall how you became aware of that?
A. Yes.
Q. How?
A. Robin talked to me about it.
Q. What do you remember about that conversation?
A. That her interests were to use her degree to work in the field of social work.
Q. Do you remember having a response to that interest?
A. Yes.
Q. What was your response?
A. That we had family worker positions that required a social work degree.
Q. Do you recall having a specific response to Robin's interest in obtaining such a position?
A. Yes.

Page 12

Q. What was that?
A. That I was interested in her pursuing those jobs.
Q. Robin would say that you seemed excited about the prospect of her joining the team as a social worker. Would that be fair?
A. Yes.
(Exb 28, Bates Stamped Aldrich 00345-00348, Marked)
Q. Okay. Let me ask you first of all, starting with the second page of this exhibit which has the designation Aldrich 346 in the lower-right-hand corner, do you see that?
A. Yes.
Q. Can you identify this document for me, please?
A. Yes.
Q. Just -- it seems obvious but we're trying to make a record. Just tell me what this document is, please.
A. It's a letter I wrote to our licensing consultant regarding an exemption for Robin as a social service worker.
Q. Why was an exemption needed?
A. She had not finished her master's degree.
Q. Was that a requirement for serving as a social worker, that you had to have the master's degree completed?
A. Yes.

Page 13

Q. Were you successful in obtaining an exemption for Robin?
A. Yes.
Q. At the time you obtained -- strike that.
Do you remember when you obtained the exception?
A. Only from the date on this letter.
Q. And you're referring to the first page of Exhibit 28?
A. Yes.
Q. Which indicates you received notice with a letter dated November 19, 2008?
A. Yes.
Q. When you received that notice, was there an open social worker position at Holy Cross?
A. I think so.
Q. Did you offer that position to Robin?
A. No.
Q. Why not?
A. Someone else was placed into that position.
Q. At the time that you received notice of the exemption, had someone else been placed in that position?
A. No.
MR. LAFLAMME: Could you show the witness Exhibit 25, please?
Q. (BY MR. LAFLAMME) Exhibit 25 is an e-mail exchange between you and Robin Aldrich; correct?
A. Yes.

Page 14

Q. And the last message is the one that is at the top of the first page of Exhibit 25; correct?
A. Yes.
Q. And in that e-mail you are responding to the e-mail from Robin immediately below that on the page; correct?
A. Yes.
MS. PIPER: Are you looking at "Bill Geddes has asked to see you."
MR. LAFLAMME: Well, that's his e-mail, and that e-mail is responding to the one immediately below it, I believe.
Q. (BY MR. LAFLAMME) Is that correct, the one from Robin to you?
A. Yes.
Q. So in her e-mail dated November 18 at 9:31 p.m., would it be fair to say that Robin is expressing her availability to work; correct?
A. Yes.
Q. And your response to that is to tell her Bill Geddes has asked to see you; correct?
A. Yes.
Q. What do you remember of your conversation with Bill Geddes that led to your response?
A. I don't remember.
Q. Did Bill Geddes tell you that he did not want you to give

Page 15

any work to Robin?
A. Not that I remember.
Q. Did anyone at Holy Cross ever direct you not to give any work to Robin?
A. No.
Q. Robin has documented that she in fact had a conversation with Mr. Geddes after your e-mail, in which Mr. Geddes told her "I can't use you," in response to her seeking work. Did Mr. Geddes ever express to you why he couldn't use Robin?
MS. PIPER: Objection. Foundation.
Q. (BY MR. LAFLAMME) Go ahead.
A. Could you say it again?
Q. Did Bill Geddes ever express to you why he could not use Robin?
A. No.
Q. Do you have any memory from any source of why Robin wouldn't or couldn't be given any work at this time?
A. No.
Q. Do you remember how it was that Bill Geddes asked you to have Robin see him? Did he do that in a phone call, face to face, in an e-mail, in a letter?
A. I don't remember.
Q. Did Bill Geddes ever express to you any reservation of his concerning employment of Robin Aldrich in any capacity?

Page 16

A. No.
Q. Did anyone from Holy Cross ever express to you any reservation of employing Robin Aldrich in any capacity?
A. No.
Q. Were open social worker positions posted in any manner at Holy Cross back in this time frame?
A. Yes.
Q. In what manner?
A. They were posted through human resources.
Q. In what format?
A. What do you mean?
Q. You could post a memo on a bulletin board. You can put an ad in the newspaper. You can post it on some kind of electronic bulletin board. I don't know. I'm just asking. You tell me.
A. I would send a requisition for a position to human resources, and then they would post the position in different ways: sometimes newspaper ads, sometimes not; always internally.
Q. What did this internal listing look like?
A. It would be on the Holy Cross web page, and there would be a posting sheet that open positions would be listed on.
Q. How often was that posting sheet updated?
A. Once or twice a week.
Q. Is that something that you saved?

Page 17

A. No.
Q. Is that a list that would be distributed to you each time it was updated?
A. No.
Q. How would you come to see such a sheet? How would that come to your attention?
A. I would see the sheet as it was posted somewhere on campus.
Q. Like on a bulletin board?
A. Yes.
Q. And your testimony is that sheet was prepared and posted by the human resources office?
A. Yes.
Q. Look at the first page of Exhibit 28, third paragraph. It says Robin was offered hours in November as a family worker and on-call treatment specialist, but declined to work due to other commitments and plans. And let's stop there.
Now treatment specialist is the first position you held at Boysville; correct?
A. Yes.
Q. That's an entry level position?
A. Yes.
Q. And that would have been a substantially lower rate of pay than a family worker position?

Page 18

A. Yes.
Q. And the family worker position that you reference in Exhibit 28 on the first page, is that a position that requires either a master's in social work or an exemption?
A. Yes.
Q. What record do you have of Robin ever being offered hours as a family worker?
A. My memory is all.
Q. Take a look back at Exhibit 25. At the time of these e-mails, Robin hadn't been offered any family worker hours, had she?
A. At the time of these?
Q. Yes, up to -- any time up to the time of these -- the last one being November 19, at 6:01 a.m.
A. As I read the e-mail, I believe she was offered before November 16.
Q. How could Robin have performed family worker hours if she didn't have an exemption?
A. We would have had her as a temporary on-call treatment specialist working -- fulfilling some of the case management responsibilities of a family worker.
Q. But that would have been work as a treatment specialist; correct? She would've been --
A. Paid as a treatment specialist.
Q. She wouldn't have been paid as a family worker?

Page 19

A. No.
Q. You couldn't have placed her in a position as a family worker yet; correct?
A. Correct.
Q. That's because you didn't have the exemption until sometime after this e-mail?
A. Correct.
Q. So if she was offered hours as a family worker, it would have had to have been after your e-mail of November 19, 2008, 6:01 a.m.; correct?
A. No.
Q. Explain how that is incorrect.
A. I would have offered hours, being paid as a temporary on-call treatment specialist, to perform some of the duties of a family worker.
Q. Just like any temporary on-call treatment specialist; correct?
A. No.
Q. What would have been different?
A. The task she was going to be given.
Q. So what you're saying is, Robin might have been offered social worker or family worker tasks to perform as a treatment specialist?
A. Yes.
Q. Is it correct that you never offered Robin hours as a

Page 20

family worker, meaning compensated as a family worker?
A. Yes.
Q. Do you have any record of communications with Robin concerning her availability to work after November 18 of 2008?
A. Not that I recall.
Q. Do you remember an employee by the name of Venus Lombrana?
A. Yes.
Q. Was she ever placed in a social worker position under your supervision?
A. Yes.
Q. Did you recall when that was?
A. December of that year.
Q. December, 2008?
A. Yes.
Q. Do you remember how it happened that she was placed in that position?
A. Yes.
Q. How did that come about?
A. She was a manager and the position was eliminated.
Q. Her manager position was eliminated?
A. Yes.
Q. Now did she come to move from there to a social worker position?
A. She was placed into the family worker opening.

Page 21

Q. The position that she was placed into, how long had it been open before she was placed into it?
A. A couple months.
Q. The family worker position in which she was placed, is that a position in which you could have placed Robin once you got the exemption?
A. I don't know.
Q. What is it that causes you to be uncertain about that?
A. Venus had been a family worker before, and so had that experience, and I don't know if it could have been done the same in Robin's circumstance.
Q. Well, let's back up a minute. As I understand it from what you have verified here today, you sought an exemption in order for Robin to be able to work as a family worker before obtaining her MSW; correct?
A. Partly.
Q. What's incorrect?
A. I wrote the exemption so she would be able to apply for the opening.
Q. Okay. And in fact, you were interested in having her apply for openings?
A. Yes.
Q. Once she obtained the exemption, or you obtained the exemption on her behalf, what, if anything, would have kept you from placing her in an open social worker

Page 22

position?
A. I don't know if I would be allowed to do that.
Q. Why wouldn't you be?
A. I don't know if somebody with an exemption would be able to be placed into the position. I had never done that before.
Q. Well, if you didn't know, who would know?
A. Human resources.
Q. Did you ever have a conversation with anyone from human resources as to whether or not you could place Robin in a social worker position after she got this exemption?
A. No.
Q. Do you remember when you informed Robin that you had obtained the variance for her?
A. No.
Q. Would you take a look at Exhibit 21, please.
So according to Exhibit 21, on March 22, 2009, Robin sent you an e-mail in which she stated, "did you ever receive an answer from Steve Garcia regarding a variance, or did you stop pursuing it because of the situation?" It says more, but that's what I want you to focus on.
And on March 23, there is a response from you that says, "we did receive the variance, but unfortunately have been downsizing ever since."

Page 23

Do you have any recollection of informing Robin of the variance any time before your e-mail in Exhibit 21?
A. No.
Q. Do you know why you didn't contact Robin, as soon as you got the exemption, to tell her that the exemption had been granted?
A. No.
Q. Can you think of any reason today why you wouldn't have called her and told her that?
A. I don't know.
Q. And just to be clear, when you got the notification in this letter dated November 19, 2008, there was in fact at least one open social worker position available; correct?
A. Yes.
Q. Did you ever contact Robin and tell her that that position was open, and that you had an exemption that would allow you to place her in that position?
A. Not that I recall.
Q. Did you contact anyone, on your receipt of notification from licensing, that the exemption request had been granted, anyone in Holy Cross, and say -- inform them of that. I've got an open social worker position. I've got an exemption for Robin. Can I put her in that position. Anything like that occur?
A. I don't remember.

Page 24

Q. You don't have any memory as you sit here today of doing that?
A. No.
Q. And you don't have any memory as you sit here today of anyone within Holy Cross telling you, no, you can't do that, you can't put Robin in that position?
A. No.
Q. I'm having a real disconnect here, so see if you can help me.
You have acknowledged that you expressed excitement to Robin about her coming to work as a social worker. You sought an exemption on her behalf so she could in fact serve as a social worker. You had an opening for a social worker, and you knew Robin didn't have a job anymore, and was looking for work. Knowing all of that, why wouldn't you have contacted Robin and told her we've got a position?
MS. PIPER: Asked and answered.
Go ahead.
A. I can only make guesses with my memory.
Q. (BY MR. LAFLAMME) Do your best guess.
A. Guessing, looking at these dates, I sent an e-mail to Robin on November 19 that Bill -- Bill Geddes wanted to see her. I'm guessing that when the exemption came I was uncertain if we had an opening still.

Page 25

Q. An opening for Robin or an opening in general?
A. A family worker opening.
Q. You told me that when Venus Lombrana was given the social worker position in December of '08, it had been open for a couple months?
A. Uh-huh.
Q. That couple months certainly would have included November, wouldn't it?
A. I'm guessing that at the end of November, I'm doing lots of guessing, that Venus was going to be laid off, and that that must have been told to me at the end of November.
Q. Do you have a memory of somebody telling you, you need to hold that open position for Venus?
A. No.
Q. Did Venus Lombrana have a master's in social work?
A. I don't know what her master's is in, if it's in social work.
Q. Did you seek a waiver or exemption on behalf of Venus Lombrana similar to what you did for Robin?
A. No.
Q. If she didn't have a master's in social work, and she didn't have an exemption, how is it that you could have placed her in a family social worker position?
A. Her degree might be in psychology. I can't remember if it was social work or psychology.

Page 26

Q. Was a master's in social work a requirement for the family worker position?
A. Yes.
Q. A master's in psychology is not a master's in social work, is it?
A. No.
Q. Was the placement of Venus Lombrana in the family worker position your decision or was it someone else's?
A. As I recall, I was asked. I'm guessing. I would have been asked if I was okay with that.
Q. And if you were asked, you would have said what?
A. Yes.
Q. Is there an on-call list maintained by the Clinton Campus for treatment specialists?
A. When?
Q. Let's talk back in the rough time frame end of 2008, first part of 2009.
A. Yes.
Q. Who's responsible for maintaining this on-call list?
A. I maintained it.
Q. Did you actually create the list, I mean type it up?
A. I would type up a -- yes.
Q. Okay. What did you do with the on-call list that you typed up?
A. I would keep it, and usually put out a copy for the

Page 27

supervisor on duty to have access to.
Q. This on-call list, what was on it? What kind of information was on it?
A. A person's name, phone number, sometimes when they are or are not available.
Q. And this on-call list was prepared so that whoever was on duty at the time when someone called in sick or failed to show up for work, would have a way to get coverage for that person. Fair enough?
A. That was one of the uses of it, yes.
Q. So obviously you need the name of the person, and you need the phone number?
A. Yes.
Q. Or it wouldn't be much good to whoever is responsible for filling that shift; correct?
A. Yes.
Q. Could you take a look at Deposition Exhibit 19, please. Do you recognize Exhibit 19?
A. Yes.
Q. Is this your on-call list?
A. Not the one I created.
Q. This one doesn't have phone numbers on it, does it?
A. No.
Q. It wouldn't be of much use to whoever is responsible for filling shifts, if it doesn't have the phone numbers of

Page 28

the people you need to call to see if they're available; correct?
A. Correct.
Q. Do you still have copies of the on-call lists that you would have prepared between November of '08, and first half of 2009?
A. Maybe.
Q. Do you have any distinct recollection today of whether or not Robin Aldrich was ever on any of your on-call lists?
A. I don't recall.
Q. Do you have any knowledge today whether Robin was ever called to fill an open shift for the treatment specialist position?
A. Say it one more time.
Q. Do you have any knowledge today as to whether or not Robin was ever called to fill an open shift as a treatment specialist?
A. No.
MR. LAFLAMME: Give me a couple minutes with my client.
(Off the record at 2:27)
(Back on the record at 2:35)
MR. LAFLAMME: Okay. Back on the record.
Q. Look at Exhibit 28. What's the occasion of you writing this memo, this first page, do you remember?

Page 29

A. I don't remember why I wrote the first page.
Q. Do you remember who asked you for it?
A. I would I guess human resources.
Q. Did you maintain a file on Robin Aldrich?
A. I had papers of Robin's, and transcripts and stuff that I had together.
Q. And you kept those in a file?
A. I kept them in a tray on my desk.
Q. Was there anything else in that tray relating to Robin other than these 3 pages that are part of Exhibit 28, the last 3 pages?
A. I had transcripts, and that's all I recall in addition.
Q. Do you still have those?
A. No.
Q. Do you remember what you did with them?
A. No, but based on the e-mail I think I sent the transcripts back to Robin.
Q. Do you leave room for the possibility that you did not offer Robin the social worker position and did not offer her any other position because Bill Geddes told you that you couldn't?
A. No.
Q. You're certain that didn't happen?
A. I'm certain I would remember that.
Q. Do you recall ever having a concern about Robin's weight?

Page 30

A. No.
Q. Do you recall anyone within Holy Cross ever expressing to you a concern about her weight?
A. No.
Q. Do you recall ever having a concern about Robin's ability to do the social worker job?
A. No.
Q. Do you recall anyone at Holy Cross ever expressing to you any reservations about Robin's ability to perform the social worker job?
A. No.
Q. Did anyone at Holy Cross ever express concern or reservations to you about Robin's attendance?
A. No.
Q. The process of obtaining an exemption for Robin, that's not the first time you sought an exemption, is it?
A. No.
Q. Would it be fair to say that the process of seeking an exemption from the social worker degree requirement is something that you had done on many occasions before Robin?
A. No.
Q. A few occasions?
A. A few.
Q. Do you recall Holy Cross ever being criticized by

Page 31

licensing for having too many social workers placed under an exemption versus under a full degree?
A. No.
MR. LAFLAMME: I have no more questions. Thank you.
MS. PIPER: I have a couple of questions.
EXAMINATION BY MS. PIPER:
Q. With regard to Exhibit 28, in the second page, which is your letter to Mr. Garcia, in the second paragraph it says: "A social service worker, at the time of the appointment to the position, shall possess a bachelor's degree with a major in criminal justice, sociology, psychology, social work, or guidance and counseling. Do you see that?
A. Yes.
Q. I believe you testified earlier that the family worker position at Holy Cross required a master's degree. Is that correct? Do you know in that time frame?
A. Is it correct that I testified to that, or --
Q. Is it correct that Holy Cross required that?
A. I can't remember time frames. I know it was preferred to have a master's degree, and I think there were occasions when that was the requirement.
Q. In your October 6 letter to Mr. Garcia, are you seeking an exemption from a master's degree requirement, or a

Page 32

bachelor's degree requirement, or something else?
A. It's seeking an exemption for social services worker bachelor's degree.
Q. And you were seeking that from Ms. Aldrich who already had a bachelor's degree, but not a bachelor's degree in one of the specified fields; is that right?
A. As I read the letter and recall, yes, she had a bachelor's of science, which would not have qualified.
Q. She had a bachelor of science in information technology?
A. Right.
Q. And so it was your understanding that you needed to get an exemption from the bachelor's in criminal justice, sociology, psychology, social worker or guidance and counseling?
A. Yes, that's what I would have had to have done.
Q. And you said you did get that exemption?
A. I did.
Q. And ordinarily your next step would have been what, when you got the variance or the exemption?
A. I would have sent or contacted human resources with the ruling.
Q. Would that have -- how would that have come? Do you know what format that would have come in?
A. I would have received a letter from licensing, and I would have then called or sent a letter or copy of the letter.

Page 33

Somehow I would communicate to human resources.
Q. Do you still have that letter?
A. Not that I can find.
Q. Do you have any recollection of what you may have done with it?
Strike that.
Do you recall receiving that letter?
A. I don't recall receiving it. I know I did based on my e-mails. I can't say I recall getting it.
Q. Is it possible that they notified you by telephone and you didn't actually get a letter?
A. It's possible. I usually would get a letter though, so I'm assuming it was a letter.
Q. But you don't recall if you did or not?
A. I don't recall the actual getting of the letter, no.
Q. Do you recall giving a letter to human resources?
A. No.
Q. So it's possible you didn't get a letter?
A. Possible. He may have called me.
Q. Is it your testimony that the family worker position that was open at the end of November, 2008, that Venus Lombrana got?
A. Yes.
Q. Do you know why Venus Lombrana got that position?
A. Her management position had been eliminated. She had

Page 34

previously been a family worker, and so she was moved into that position.
Q. Were you involved in that decision?
A. I would have been asked for my opinion, yes.
Q. Do you recall what Ms. Lombrana's qualifications were?
A. I don't specifically recall what her bachelor's degree had been in. She had been a family worker before, so I believe it would have been in one of those. And I know Venus had a master's degree, I believe, in psychology.
Q. How long had Venus been a family worker?
A. I would be guessing, a year, 2 years.
Q. And what was her manager position that she had that was going away?
A. It was the same as what mine was at the time.
Q. What was that?
A. I forget what it was called because it changed names. It was a program -- division manager or quality manager, same job, different titles, different years.
Q. So are you telling me at the time that you had the family worker opening, that Ms. Lombrana was in the same job title that you were in?
A. When it initially opened, yes.
Q. The family worker position that Ms. Lombrana eventually got, do you know if there were any other applicants for that position?

Page 35

A. I believe there were other applicants, yes.
Q. Do you recall if you interviewed any other applicants?
A. I don't recall doing any interviews for that position.
Q. Did you interview Ms. Aldrich for that?
A. No.
Q. Did you interview Ms. Lombrana?
A. Not that I recall.
Q. Do you recall how many applicants you had for that position?
A. No.
Q. Did you ever tell Ms. Aldrich that the position was hers without going through the application process?
A. No.
Q. Was it your plan to put her in the position without her going through the application process?
A. No.
Q. From your past experience with getting an exemption, do you know what would have been the next step after you notified human resources after you had the exemption in terms of the application process?
A. Human resources would have then, I believe, in consultation with the director possibly -- human resources would have made a decision whether they would track me that applicant or not.
Q. And by "track," do you mean refer to you?

Page 36

A. Refer, or if they would accept the exemption and allow the person to be an applicant.
Q. You said you didn't recall how many other applications you had for that position?
A. I don't recall.
Q. Do you recall giving notice to anybody else about the results of their application for that position?
A. No.
Q. Did you have any contact with any of the applicants for that position other than Ms. Aldrich?
A. Not that I recall.
MS. PIPER: I have no further questions.
REEXAMINATION BY MR. LAFLAMME:
Q. Take a look at Exhibit 28 again, first page. Second sentence reads: "I have received written notice from licensing with a letter dated November 19, 2008, that the request was approved." You wrote that; correct?
A. Yes.
Q. Would you agree that at the time you wrote this, you wouldn't have written that if you didn't have a letter from licensing dated November 19, 2008?
A. Correct.
Q. So does this convince you that you did in fact receive a letter dated November 19, 2008, from licensing approving the variance?