# Exhibit

# 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

- - - - -

Robin Aldrich, :
Plaintiff, :
vs. : Case No. 2:10-cv-13515-MAG-MKM
Judge Mark A. Goldsmith
Boysville of Michigan, Inc., a Michigan Corporation, doing business as Holy Cross Children's Services, :
Defendant. :

- - - - -

DEPOSITION OF LOREN BROWN

- - - - -

Taken at Eastman & Smith, Ltd.
100 East Broad Street, Ste. 2100
Columbus, OH 43215-3659
June 14, 2011, 9:05 a.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Laflamme & Mauldin, P.C.
2540 Spring Arbor Road
Jackson, MI 49203
By Richard N. LaFlamme, Esq. (Via telephone)

ON BEHALF OF DEFENDANT:

Bodman LLP
201 West Big Beaver Road, Ste. 500
Troy, MI 48084
By Karen Piper, Esq. (Via telephone)

and

Bellanca, Beattie & DeLisle
20480 Vernier
Harper Woods, MI 48225
By James Zeman, Esq. (Via telephone)

ALSO PRESENT:

Robin Aldrich (Via telephone)
John Lemmer (Via telephone)

Page 3

Tuesday Morning Session
June 14, 2011, 9:05 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Loren Brown, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

Page 4

I N D E X


| Examination By | Page |
|---|---|
| Mr. LaFlamme - Cross | 5 |
| Ms. Piper - Direct | 36 |

| Plaintiff's Exhibits | Page |
|---|---|
| Exhibit 1 - Typed Notes | 25 |
| Exhibit 3 - Typed Notes | 31 |
| Exhibit 26 - Record of Non-Punitive Disciplinary Process | 26 |
| Exhibit 27 - Letter from Brown, 10/21/08 | 22 |


(Exhibits attached to original transcript.)

Page 9

A. 1989.
Q. What was your major?
A. Business administration.
Q. Do you hold any higher degrees?
A. Yes.
Q. Do you hold a master's degree?
A. Yes.
Q. What school?
A. The University of Notre Dame.
Q. What year?
A. 2005.
Q. And in what field?
A. Master of business administration.
Q. Do you hold any other degrees?
A. No.
Q. Do you hold any professional licenses or certifications?
A. No.
Q. Have you ever been terminated from a job?
A. No.
Q. What were the circumstances of you leaving Holy Cross?
A. I received an offer from another

Page 10

company.
Q. And is that the position you referred to earlier that you've accepted in Columbus?
A. No.
Q. So what happened to that other offer?
A. I accepted that offer with The Leona Group in February of 2011.
Q. So did you actually work for that employer for a period of time?
A. I did up until, let's see here, up until June the 3rd, 2011.
Q. Tell me about that position. What was your title and what kind of operation was that?
A. Title was vice president for strategic initiatives, and The Leona Group is a national charter school management company.
Q. What was your reason for leaving The Leona Group?
A. I received an offer from The Catholic Foundation of Columbus.
Q. Did your -- was your departure from The Leona Group entirely your decision?
A. Yes.
Q. Was your departure from Holy Cross

Page 11

entirely your decision?
A. Yes.
Q. No one at the Holy Cross board of directors asked for your resignation?
A. Correct.
Q. What was your last day of employment with Holy Cross?
A. February 11, 2011.
Q. Where exactly is The Leona Group located? And I guess specifically where were you assigned?
A. Phoenix, Arizona.
Q. Why was it that you were seeking another position after so recently accepting the position with The Leona Group?
MS. PIPER: Objection. Foundation.
Q. You can answer.
A. I was not seeking another position.
Q. I see. Your current employer came to you with an offer; is that correct?
A. Correct.
Q. Had you, prior to accepting a position with The Leona Group, sought employment with your current employer?

Page 12

A. No.
Q. Did the offer from your current employer come directly from the employer or did they utilize the services of an executive search entity?
MS. PIPER: Objection. Relevance. You can answer.
A. They used a search firm.
Q. What was your position at Holy Cross?
A. When I left was executive director.
Q. And was that the highest executive position at Holy Cross?
A. Yes.
Q. You reported directly to the board of directors?
A. Yes.
Q. Who was the chairman of the board of directors at the time that you left Holy Cross?
A. Salvatore Samoni.
Q. Could you spell that last name, please?
A. I believe it is S-A-M-O-N-I.
Q. And do you recall how long Mr. Samoni had been the chairman of the board?
A. Less than a year.

Page 17

Q. Do you recall how many times you reviewed Robin Aldrich's performance evaluation?
A. No.
Q. Was it more than once?
A. I don't recall.
Q. Do you recall ever providing any direction to Robin's superiors concerning the contents of her performance evaluations?
A. No, I do not.
Q. Would you leave room for the possibility that you may have provided such direction?
A. I do not recall.
Q. Do you recall ever having any issues with Robin's weight?
A. I do not recall having issues with Robin's weight.
Q. Do you leave room for the possibility that you may have had issues with Robin's weight?
A. I do not leave room for the possibility.
Q. Do you recall ever having issues with Robin's absences from work under the Family Medical Leave Act?

Page 18

A. I do not recall having issues with Robin's absences from work under the Family Medical Leave Act.
Q. Do you recall her absences putting a strain on the IT department?
MS. PIPER: Objection. Foundation.
Q. It's an open question. You understood that Robin worked in the IT department, correct?
A. Correct.
Q. And do you recall whether or not Robin's absences under FMLA ever created a strain upon the department based on getting work done?
A. No, I do not recall.
Q. What do you recall was Robin's job?
A. Trainer for the agency.
Q. And can you explain to me what that entailed?
A. She would -- her position was responsible for providing training to co-workers on various software applications or other procedures.
Q. Do you recall whether she had any other responsibilities besides being the trainer?
A. I do not recall other responsibilities

Page 19

that she had.
Q. The record reflects that Robin was laid off from her employment with Holy Cross in 2008. What, if any, involvement did you have in the decision to lay her off?
A. I approved the financial plan.
Q. And what financial plan was that?
A. It would be a budget plan.
Q. And when was that budget plan prepared?
A. I don't recall specifically.
Q. Who prepared that budget plan?
A. It would have been a combination of the director's team, which would be the leadership team.
Q. And who was on the leadership team?
A. The leadership team would be the region directors, the CFO, the human resources director, the government relations and advocacy director, the marketing director, and myself. Oh, and the clinical services director.
Q. Who were the regional directors at the time?
A. We made some downsizing changes to the regional directors from five to three, so I'm

Page 20

going to go with the three that were there would have been Sharon Berkobien.
Q. Can you spell that?
A. B-E-R-K-O-B-I-E-N. Bill Geddes, G-E-D-D-E-S, and Lynne Alexander.
Q. The CFO at the time was who?
A. John Lemmer. Can I clarify a question here?
Q. Sure.
A. What time are you referring to?
Q. At the time of this budget plan that resulted in Robin Aldrich being laid off.
A. There were -- at this time in our history, there were frequent budget plans, so I need you to be more specific what date are you talking about.
Q. I believe the record reflects that Robin's layoff was first mentioned to her in September of '08 and was ultimately effective sometime in November '08.
A. Okay. Thank you.
MS. PIPER: Objection. Mischaracterization, but you can go ahead. Time frame.

Page 21

A. The reason I asked for that time frame was your question was who was the CFO, correct?
Q. Yes.
A. The CFO in September of 2008 was John Lemmer.
Q. And who was the CFO in November of 2008?
A. John Lemmer.
Q. Who was the HR director in that same time period?
A. Alyson Beck.
Q. The government relations director?
A. Gary Tester.
Q. The marketing director?
A. John Meszaros.
Q. The clinical services director?
A. I'm not exactly sure if he was hired yet, but it would have been Tom Weston.
Q. In the financial plan or budget plan that resulted in Robin Aldrich being laid off, were there other individuals identified for layoff?
MS. PIPER: Objection. Foundation.
Q. Go ahead.

Page 22

A. Yes.
Q. Do you recall who else?
A. No.
Q. I understand that what I marked as Exhibit 27 is now in the room. I ask that that be given to the witness, please.
A. Okay. I have it.
Q. This is a letter dated October 21, 2008, three pages bearing your signature, correct?
A. Correct.
Q. What was the purpose for this letter?
A. The letter was an update to co-workers in the agency.
Q. And by co-workers do you mean all employees of the agency?
A. Correct.
Q. I would like to direct your attention to the third page, next-to-last paragraph, and the sentence three sentences up from the end of that paragraph it reads, "Therefore, the senior leadership team has identified a number of budget reductions or implementation with a large focus on non-coworker specific changes."
Do you see that?

Page 23

A. Yes.
Q. Explain what you meant by that.
A. Just a minute, please, I'm just reading this again.
Q. Take your time.
A. I believe what I meant by that is the sentence that follows, so they would be non-personnel line item costs.
Q. I mean, did -- doesn't that mean that the budget reductions would not result in employees losing their jobs?
A. No, it does not mean that.
Q. Would you agree that this letter doesn't anywhere mention layoffs as being one of the means to reduce costs in the difficult economy that's referenced in the letter?
A. Let me go back and look at the letter here to see if there's anywhere else that mentions anything. Can you repeat the question, please?
Q. Are employee layoffs identified anywhere in Exhibit 27 as a step or measure to be taken to address the economic conditions that existed at the time that the letter was authored?
A. They are not mentioned directly.

Page 24

Q. During the process of forming and approving the financial plan that resulted in Robin being laid off, do you recall having specific discussions with the other members of the team regarding Robin in particular?
A. Yes.
Q. What do you remember of those discussions?
A. I remember Kathy Pixley and John Lemmer presenting some options for reviewing for staff layoffs.
Q. What options did they present?
A. They would have included different positions in the administrative services operations, including IT.
Q. Do you have any recollection of the specifics of those options?
A. I do not recall the specifics.
Q. As those options were presented, do you remember any discussions that addressed Robin specifically as opposed to her position as a person that you wanted to eliminate?
A. I don't recall them as a discussion of a position we wanted to eliminate. I recall them

Page 25

as discussions of where coverage needed to be in the operations.
Q. In those discussions, was Robin's performance or attendance part of the discussion?
A. No.
Q. Was there anything about Robin's behavior that was a part of the discussion?
A. No.
Q. So is it your position that the decision to lay off Robin Aldrich was purely an economic decision?
MS. PIPER: Can I have the question again, please? I didn't hear the beginning.
MR. LaFLAMME: Could you read it back, please?
(The record is read as requested.)
MS. PIPER: I'm sorry. I still didn't hear it.
(The record is read as requested.)
MS. PIPER: Thank you.
A. Yes, it was an economic decision.
Q. I would like you to look at what has previously been marked as Exhibit 1. Do you have that in front of you?

Page 26

A. Yes.
Q. In the paragraph that's at the bottom of the page that starts with the date 9/29/08, do you see that?
A. Yes.
Q. The second sentence says, "However, what was presented to me is the fact that Loren Brown and John Lemmer have targeted my position as one they can afford to 'layoff' or eliminate."
Do you see that?
A. Yes.
Q. Do you agree with the statement that you and John Lemmer targeted Robin's position as one that you could afford to layoff or eliminate?
MS. PIPER: Objection. Foundation.
Q. You can answer.
A. I do not agree.
Q. What -- with what do you disagree?
A. I disagree that there was a target and I disagree that that was something we could afford.
Q. What is it about the word "target" that you disagree with?
A. It has a negative connotation that

Page 27

we're specifically looking at someone.
Q. You do agree that her position was identified as one that you could layoff or eliminate?
A. Yes.
Q. And what is it about the phrase one they can afford to layoff or eliminate that you disagreed with?
A. I don't believe we could afford to layoff anyone. We had to given economic downturn. And when you downsize an organization, it's very difficult to determine positions that you can, quote, afford to eliminate. So it's a very difficult task. And I just don't like the way it's worded as afford. It's more of a strategic downsizing that we did and not something that we looked to afford.
Q. If we change the word targeted to identified, is it a fair statement that Loren Brown and John Lemmer have identified Robin's position for layoff?
A. I don't believe so.
Q. And what's incorrect about that?
A. It doesn't present the full picture of

Page 28

the layoffs. This looks like it's just her, when, in fact, this was part of a bigger plan.
Q. In the financial plan in which Robin's position was identified for elimination, do you recall how many other positions were identified for elimination?
MS. PIPER: Objection. Foundation.
Q. Go ahead.
A. I don't recall specifically, but we laid off over 200 people.
Q. Over what time period?
A. I don't recall specifically the time period.
Q. Do you recall how many people other than Robin were laid off in 2008?
A. I do not recall specifically.
Q. Do you know if there was anyone other than Robin that was laid off in 2008?
A. Yes.
Q. Do you know who performed co-worker training after Robin was laid off?
A. Not specifically.
Q. Do you know if that function was carried on within the agency?