# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBIN ALDRICH,

Plaintiff,

v File No. 1:10-cv-13515-MAG-MKM

BOYSVILLE OF MICHIGAN, INC. a
Michigan corporation, d/b/a
HOLY CROSS CHILDREN'S SERVICES,

Defendant.
_______________________________/

DEPOSITION

of

WILLIAM GEDDES

8759 Clinton-Macon Road

Clinton, MI

July 6, 2011

9:05 a.m.

APPEARANCES:

Richard N. LaFlamme, P32641
Attorney for Plaintiff

Karen Piper, P31706
Attorney for Defendant

ALSO PRESENT:

Robin Aldrich
Alyson Beck

- - -

Roger D. Thome, CSR 2201

INDEX IS INSERTED AT THE END OF THE TRANSCRIPT

Page 2

WILLIAM GEDDES

Having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. LAFLAMME:

Q. Good morning. Could you state your full name for the record, please.
A. William John Geddes.
Q. Have you ever given a deposition before?
A. No.
Q. The ground rules are pretty straight forward. If you keep in mind that the court reporter is taking down everything that we say, it will help you remember the rules, the first of which is only one person speaking at a time. In normal conversation, we tend to step on each others' sentences a lot. It works in normal conversation, but it doesn't work here.
So, please, even though you know where I'm headed, let me get the whole question out before you start the answer, and I'll do my best not to interrupt your answers; okay?
A. Uh-huh.
Q. Second rule is make sure you answer audibly. Stay away from things like shakes, shrugs, nods, uh-huh and uh-uhs, and things that are hard to spell because we want to have

Page 3

a clear transcript when we're done; okay?
A. Uh-huh.
Q. Finally, make sure you understand the question before you answer. If you're unsure about what I'm asking, don't guess. Tell me and we'll try and straighten it out.
How old are you?
A. 50.
Q. What's your date of birth?
A. 7/16/60.
Q. And where do you currently reside?
A. 6762 Lockmill Temperance, Michigan.
Q. How long have you lived at that address?
A. About 10 years.
Q. Do you have any plans to move in the immediate future?
A. No.
Q. What's your marital status?
A. Married.
Q. How long have you been married?
A. 24 years.
Q. Do you have children?
A. 2.
Q. How old are they?
A. 22 and 16.
Q. And what year did you graduate from high school?
A. 1978.

Page 4

Q. What school?
A. Garden City West High School.
Q. And did you attend college?
A. Yes.
Q. Where did you go first?
A. Michigan State University.
Q. Did you graduate?
A. Yes.
Q. What year did you graduate?
A. 1982.
Q. What was your degree in?
A. Psychology.
Q. And did you get any education beyond your bachelor's degree?
A. No.
Q. What was your first full-time job after you got your degree from Michigan State?
A. I worked for the Eckerd Foundation in Brooksville, Florida.
Q. Could you spell that?
A. E-c-k-e-r-d.
Q. And what does the Eckerd Foundation do?
A. They serve pre-delinquent youth in a wilderness camp setting.
Q. What was your position there?

Page 5

A. I started as a counselor and ended up as a supervisor.
Q. How long were you there?
A. 2 and a half years.
Q. And what were the years?
A. 1982 to approximately January first, 1985.
Q. Why did you leave?
A. I moved back home.
Q. Back home being --
A. Garden City, Michigan.
Q. What was your next full-time job?
A. Holy Cross.
Q. When did you start with Holy Cross?
A. June 1985.
Q. And what position?
A. Treatment specialist 3.
Q. Is that an entry level position?
A. Yes.
Q. So as the number gets lower the position rises, so treatment specialist 2 would be the next highest level?
A. Correct.
Q. How long were you a treatment specialist 3?
A. Approximately 2 months.
Q. And then what position did you get?
A. Treatment specialist 2.
Q. How long were you a TS-2?

Page 6

A. Approximately 6 months.
Q. And after that what was your next position?
A. It was called a treatment director at that time. Now we call them program coordinators.
Q. Where were you physically working during this time period that we just covered?
A. Clinton.
Q. The facility across the street from us?
A. Yes.
Q. And have you been at that facility your entire time with Holy Cross?
A. No.
Q. So how long did you serve as a treatment director?
A. Approximately a year and a half.
Q. And what was your next position?
A. It was called program manager at that time.
Q. Is that the next level up from treatment director?
A. Yes.
Q. And how long were you a program manager?
A. Approximately 19 years.
Q. What's your current position?
A. Regional director.
Q. Did you move from program manager to regional director?
A. Yes, but then I went to -- well, yes.
Q. So what was your next position after program manager?

Page 7

A. Regional director.
Q. During your 19 years as program manager, where were you located?
A. Monroe.
Q. What's the facility at Monroe? Tell me a little bit about it. What do they do there?
A. It's the same as Clinton, only we had approximately anywhere between 45 and 60 kids instead of the bigger -- it's smaller than Clinton.
Q. But it's a residential facility?
A. Correct.
Q. So you were at the Monroe Facility the entire 19 years?
A. Yes.
Q. What was your next -- you said regional director. What year did you first become a regional director?
A. Oh, 2008.
Q. And at that time where were you located?
A. Monroe Center.
Q. And how long were you a regional director?
A. I still am.
Q. Did you have a break in that position between 2008 and the present?
A. I was temporarily called the chief operating officer.
Q. What were the dates of that?
A. Approximately June, 2010, until December, 2010.

Page 8

Q. When you had the title chief operating officer, was that of the entire operation or of a segment?
A. It was for the day-to-day operations of Holy Cross.
Q. Did you replace someone else when you became COO?
A. No, it was a new position.
Q. And why did that -- why did you cease holding that title in December of 2010?
A. The upper management was reorganized.
Q. At that point you were reclassified as regional director?
A. Correct.
Q. As regional director in your current role, where do you work?
A. The Clinton Campus.
Q. What is the region that you are a regional director of?
A. The Clinton Campus.
Q. Is the Monroe Facility considered a region?
A. It is closed.
Q. When did that close?
A. The summer of 2009.
Q. So when the Monroe Campus closed, that's when you moved back -- moved to Clinton, rather?
A. It was before that. I had Monroe and Clinton for a period of time.
Q. Is there another -- strike that. Was there another regional director at the point that the Monroe Campus

Page 9

closed?
A. For the agency?
Q. Yes.
A. Yes.
Q. How many?
A. 3 total; 2 others besides myself.
Q. And what are the 3 regions?
A. At that time?
Q. At that time.
A. It was Clinton, Monroe, Detroit, and the Northern Region.
Q. During that time period how many residential facilities were there?
MS. PIPER: Are we talking about the summer of 2009 time frame?
MR. LAFLAMME: Right, just before Monroe closed.
A. Including group homes?
Q. (BY MR. LAFLAMME) Well, you tell me. What kind of operations does Holy Cross operate? Let's tackle it that way.
A. Group homes, secure treatment, day treatment, supervised independent living, foster care, in-home detention, detention. That's it.
Q. What type of facility is Clinton considered?
A. Open secure -- excuse me -- non-secure treatment facility.
Q. Non-secure?

Page 10

A. Correct.
Q. So of the various parts of the business that you have identified, as regional director which did you supervise?
MS. PIPER: Can we get a time frame again?
MR. LAFLAMME: Yes, let's begin summer of '09, just before Monroe closed.
A. 2, Monroe and Clinton.
Q. (BY MR. LAFLAMME) But were you over group homes, treatment facility, day treatment, supervised independent living?
A. No, Monroe and Clinton were both -- what would you call it -- non-secure residential treatment.
Q. And someone else was responsible for the other --
A. Correct.
Q. -- aspects of the business that you identified?
A. Correct.
Q. At the time that there were 3 regional directors, what were the other regional directors responsible for? Tell me who they were and then their respective responsibilities.
A. Lynn Alexander, Detroit region. She had secure treatment, group home -- group homes, day treatment, supervised independent living, and foster care.
Then Sharon Berkobien.
Q. Can you spell that?

Page 11

A. I can try. B-e-r-k-o-b-e-i-n (sic).
Q. We'll take care of that off the record. That's fine.
A. And she was in charge of residential, then non-secure residential, group homes, foster care, supervised independent living, non-secure treatment -- non-secure detention, I'm sorry, non-secure detention, and detention.
Q. And during this time period when there were 3 regional directors, who did the regional directors report to?
A. Loren Brown.
Q. How many regional directors are there now?
A. 3.
Q. Still the same 3 people?
A. Valerie Duffin is the Detroit Regional Director.
Q. And to whom do you currently report?
A. Paul Neitman.
Q. Since the summer of 2009, when the Monroe Campus was closed, either contemporaneously with that, or since then, have other units of Holy Cross been closed?
A. I'm sorry, I don't know what contemporaneously means.
Q. At the same time.
A. Since 2009 -- is the question since 2009, have other places of Holy Cross closed, other programs?
Q. Right, other than Monroe.
A. Yes.
Q. What else is closed?

Page 12

A. Several group homes. We have closed units at Clinton Campus. That's it.
Q. Were all of the closings due to economic conditions: finances?
A. I'm not sure how to answer. By finances -- it's more than finances. It's low enrollment.
Q. And that leads to inadequate finances?
A. Correct. We get paid on a per diem basis, so if there is no kids, we don't get paid.
Q. And what are the reasons for low enrollment if you know?
A. Lack of referrals, the number of children in the State of Michigan being placed has been reduced significantly.
Q. Are these -- is this decline in enrollment due to these children being placed with other agencies, or is it simply due to the total number available for placement being reduced?
MS. PIPER: Or something else.
MR. LAFLAMME: Or something else.
A. There is no one answer.
Q. (BY MR. LAFLAMME) Okay. Do you know if other agencies who do what Holy Cross does have experienced a decline in enrollment?
A. Yes.
Q. Do you know if they all have?
A. I do not know that.

Page 13

Q. Do you know if Holy Cross has been hit hard with low enrollment than other agencies who do the same thing?
A. I do not know that.
Q. Do you know any of the reasons for a decline in referrals to Holy Cross?
A. Yes.
Q. Could you give me them?
A. Not all of them.
Q. Give me what you can.
A. Lack of funding. A shift in treatment modality, meaning a trend to try and treat children in their home rather than place them outside the home; a lawsuit against the State of Michigan that significantly changed how children could be placed, and how they were to be -- the oversight of their cases.
Q. Do you know who were the parties to that lawsuit?
A. No.
Q. Was Holy Cross a party?
A. No.
Q. Any other reasons that you can think of?
A. No.
Q. Has any facet of Holy Cross's business not experienced this decline in referrals?
A. Our detention unit in Grand Rapids and our secure treatment facility in Detroit.

Page 14

Q. And what has their experience been?
A. They have remained consistent.
Q. Has any other facet of Holy Cross's business not seen a decline in referrals or decline in enrollment other than the 2 you have identified?
A. No.
Q. One of the reasons you gave for the decline in enrollment was a shift in the treatment modality.
A. Uh-huh.
Q. As you have described it to me it sounded like Holy Cross was involved in every treatment modality, including supervising kids that are placed in homes. Did I get that right?
A. We do have surprised independent living and foster care.
Q. So with a shift -- the shift that you described in treatment modality, did it result in more children being placed in supervised detention than previously?
A. I don't know the total numbers. It resulted in a decline in our supervision of children in the homes.
Q. Have you ever been convicted of a crime? I mean other than a traffic violation.
A. No.
Q. Do you remember when you first met Robin Aldrich?
A. No.
Q. Do you remember the context?

Page 15

A. No.
Q. During the period of time that she worked at Holy Cross, do you remember having occasion to interact with her?
A. Yes.
Q. In what types of circumstances did you interact with her?
A. Robin would come to Monroe Center to -- I know she did training for computer training, and I believe she -- I think that's what she did, but I remember her meeting with the secretaries and the people that were responsible for data input at Monroe Center.
Q. Is that something you were directly involved in: data entry?
A. I reviewed reports that were put into the computer.
Q. And did you ever participate in training conducted by Robin?
A. Yes.
Q. Do you remember what training that was?
A. No, it was computer training. I don't know specifically the topic, but it had to do with computer training.
Q. Do you have any recollection of that training? How did Robin do? Was she a good trainer? Do you have any memory of that?
A. I don't have any concerns, or there was no problems. It went fine if that's what you're asking. There were no issues.

Page 16

Q. Did you have reason to interact with Robin in any other context than the training that she would perform for staff that worked for you and for you?
A. Just to say hi when she was at Monroe Center, or eating lunch in the training room or something.
Q. Would you say you had a good working relationship with her?
A. Yes.
Q. Did you ever have any problems with her?
A. No.
Q. Do you remember a time, near or immediately after Robin's employment with Holy Cross ended, when she was interested in obtaining a position as a social worker?
MS. PIPER: Objection. Foundation. You can answer.
Q. (BY MR. LAFLAMME) Do you have any memory of that?
A. Yes.
Q. Tell me what you remember.
A. I remember we had an open family worker position, and I believe it was open for some time, and we needed somebody to -- we were having trouble finding a family worker, or hiring a family worker, and we wanted someone to make contact with the families and do some of the information sharing, and logistic things like setting up home visits, reporting back on home visits, things like that that were

Page 21

not sure if she testified or not.
Robin's notes indicate that she wasn't able to contact you on that date, November 18, and that she ended up leaving a message or 2 for you, and finally did speak with you 2 days later on November 20. Do you remember speaking with Robin?
A. No.
Q. Robin's notes indicate that when she did speak with you by telephone on November 20, that you said to her, "I can't use you." Do you remember that?
A. No.
Q. Her notes indicate that after you told her that, she asked you why, and at that point you just simply repeated, "I simply can't use you." Do you remember that?
A. No.
Q. Robin's notes indicate that she told you during that conversation that Rick Kruse was trying to get her on board with the family worker position, so I'll have 2 questions about that. First, do you remember Robin saying that during the conversation?
A. No.
Q. Do you remember Rick Kruse in that time frame trying to get her on board in a family worker position?
A. No.
Q. Robin's notes indicate that you told her in this telephone

Page 22

conversation on November 20, '08, that there was no family worker position. Do you remember that?
A. No.
Q. That's not -- that statement isn't consistent with what you told me earlier today, which was that there was a family worker position; correct?
A. I don't remember making that statement.
Q. I thought you testified earlier that --
A. No, I don't remember making the statement that there was not a family worker position (sic).
Q. Right. I'm sorry. Let me clarify the question. I understand you don't remember telling her on November 20, 2008, that there was no family worker position available. What I was getting at is, you testified earlier today totally separate from the context of a conversation with Robin, that at that time frame, when you were considering Robin for this treatment specialist on-call position, that there was also a family worker position available: at least one. Do you remember that?
A. Yes.
MS. PIPER: And I'm going to place a late objection to the characterization of Ms. Aldrich's notes. I think that was incomplete and/or mischaracterization.
Q. (BY MR. LAFLAMME) Robin's notes of the conversation of November 20, 2008, indicate that you told her there was no

Page 23

family worker position as that Holy Cross would be restructuring. Do you remember telling her that?
A. No.
Q. Robin's notes indicate that during this conversation, telephone conversation that we have been discussing, she told you -- she inquired about the treatment specialist position. Do you remember that?
A. During that conversation?
Q. Yes.
A. No.
Q. The notes indicate that she told you that she had completed the training for the treatment specialist position and you repeated what you had said earlier, that you cannot use her. Do you remember that?
A. No.
Q. Her notes indicate that she told you she would take any job, she just needs a job, and that you then told her that you could put her on the on-call list. Do you remember that?
A. No.
Q. Do you know if Robin was ever placed on an on-call list?
A. Yes.
Q. When was that?
A. I don't know the exact date.
Q. Do you have a copy of an on-call list that Robin was on at

Page 24

any time after her employment ended?
A. Yes.
Q. Do you have that with you today?
A. No.
Q. Is that something you have given to the company's attorney?
A. Not directly. No. The answer is no.
Q. Is that something that you are willing to produce?
A. Yes.
Q. Rick Kruse sent Robin an e-mail on November 19, 2008, telling her "Bill Geddes has asked to see you." If you could contact him, that needs to be our next step." Do you remember directing Rick Kruse to have Robin speak to you around this time frame?
A. Yes.
Q. Tell me what you remember about that. What is it that you wanted to see her about?
A. I do not remember specifically.
Q. What do you remember about the request to Rick Kruse to have Robin see you?
A. That it would be -- that I would tell her directly about the restructuring, and that there was no longer a position of family worker.
Q. What restructuring were you referring to?
A. We had layoffs at that time, and one of the managers who

Page 25

had previously worked as a therapist, her position was going to be eliminated, and we were going to move -- assign her to be the family worker in the open position.
Q. Where was this open position? Where would the person who filled it work?
A. I believe it was Ford Hall.
Q. And where is Ford Hall located?
A. On Clinton Campus.
Q. What is Ford Hall?
A. A general population non-secure treatment group for boys ages 12 to 18.
Q. Is that a residence hall?
A. Correct.
Q. Back in that time frame how many boys would have normally been assigned to Ford Hall?
A. Approximately 13.
Q. How many social workers in that time frame would have been assigned to Ford Hall?
A. 2.
Q. And how would those social workers share responsibility?
A. One would have been primarily responsible for group therapy, and one primarily responsible for family therapy.
Q. Do you remember which position it was that was open?
A. Family therapy.
Q. Who was the employee that was ultimately placed in that

Page 26

position?
A. Venus Lombrana.
Q. Who placed her in that position?
A. I did.
Q. Were you directed to place her in that position by anyone?
A. No.
Q. When she had previously been employed as a family worker, do you remember what position she was in?
MS. PIPER: Objection. Foundation. Could I have the question again? Maybe I misheard it.
(Reporter read back)
MR. LAFLAMME: And we're talking about Venus Lombrana.
MS. PIPER: Yes, and I object to the foundation. You can answer.
A. Family worker is a position.
Q. (BY MR. LAFLAMME) I'm sorry?
A. You asked me a question with the answer already in it. You said when she was previously a family worker, what position was she in?
Q. Right. That's fine. I didn't mean to confuse you. Where was she? I mean, this family worker position was Ford Hall. Where was she previously?
A. I do not remember.
Q. Was she under your supervision?

Page 27

A. No.
Q. As a family worker at Ford Hall, would she be under your supervision?
A. I would not be her direct supervisor.
Q. Who would have been?
A. Rick Kruse.
Q. And Rick Kruse in turn reports to you?
A. Correct.
Q. What are the requirements to hold a family worker position? And let's say as of November, 2008.
A. Can you be more specific? By "who," whose requirements are you talking about?
Q. Whatever requirements there are, whether they're Holy Cross or whether they're the state's, whatever.
A. They're different. Holy Cross and the state are different.
Q. What are Holy Cross's requirements?
A. I believe it is an MSW, and I don't know how many years experience.
Q. So a combination of MSW and years of experience?
A. Correct.
Q. What are the state requirements?
A. A bachelor's degree and some form of -- a bachelor's in certain areas, and some -- I believe some experience requirements.

Page 28

Q. Did Venus Lombrana in November of 2008, have an MSW?
A. No.
Q. So why was that requirement waived for her?
A. She qualified under the state guidelines.
Q. So is it your testimony that Holy Cross would waive the requirements whenever an applicant qualified under the state guidelines?
A. Not whenever. It is possible.
Q. Was there any other reason other than qualifying under the state guidelines that the Holy Cross requirements for the position were waived for Venus Lombrana?
A. Her experience in working with Holy Cross children and their families.
Q. What was your source of knowledge about her experience?
A. Personnel file, personal experience, knowledge from the -- my management team, Clinton management team; input, I guess, from the Clinton Management Team.
Q. Who was included -- who would you include in the Clinton Management Team?
A. Jim Chludzinski, Gary Coakley, Rick Kruse, David Kavolik. That's it.
Q. At the time Venus Lombrana was being considered for this position, were there other people also being considered?
A. It was an open position so we would have gotten ongoing resumes' from the HR department.

Page 29

Q. Do you remember reviewing any other resumes' for this position?
A. No.
Q. Do you remember considering Robin for that position?
A. No.
Q. So backing up: At the time that you said you told Rick Kruse that you wanted to talk to Robin -- strike that. I got that wrong.
At the time that Rick Kruse contacted Robin telling her that you wanted to speak with her, you recall being aware that the social worker position was going to be filled by Venus Lombrana and hence wouldn't be available. Roughly. Did I get that right?
A. Yes.
Q. What do you remember of the status of the temporary on-call treatment specialist who was going to do some family responsibilities at that same time frame?
A. I don't understand the question.
Q. You had identified a position for which you were considering Robin, for a treatment specialist on-call who would perform some family worker responsibilities. Do you remember that?
A. Yes.
Q. Okay. That's what I'm asking you about. At the time that Holy Cross had decided to give Venus Lombrana the open

Page 30

family worker position, what was the status of that treatment specialist on-call position?
A. A treatment specialist on-call can have several responsibilities, so the position that Rick was considering Robin for, and approached her for, was a treatment specialist on-call who would have been assigned to do some duties of that family worker.
When we hired a family worker or we assigned Venus to be the family worker, we no longer needed somebody to do those responsibilities because Venus was going to do them.
Treatment specialist on on-call would not be specific to doing those responsibilities. That would be some responsibilities that we could assign a treatment specialist on-call, or regular treatment specialist, or really anybody who we deemed had the ability to do it, to do those responsibilities, we could have assigned those people to that, so there was not a specific treatment specialist on-call to fill that position. There was no position there. The position that Rick was considering Robin for was a treatment specialist on-call, and part of her duties would have been to do those things that I mentioned earlier, to do that. So we constantly have treatment specialists on-call posted positions, so we wouldn't have -- I don't know the right word for it,

Page 31

delisted or unposted that position. It still would have been treatment specialist on-call positions. It's just that we wouldn't have assigned those duties to anybody but Venus, because those would have been Venus's responsibilities at that time.
Q. Do you remember how you became aware that Venus's administrative position was being terminated?
A. The question is not specific enough. Like the day, or the person, or --
Q. No, how the information came to you. That's what I'm asking.
A. I don't remember specifically, no.
Q. Do you remember if you got a memo, an e-mail, a phone call, a group meeting, any range of possibilities?
A. It would have either been on an individual meeting with Loren Brown, or in a meeting with a group of directors and senior leadership, but I don't know which one specifically.
Q. Did Loren Brown ever direct you not to place Robin in a position?
A. No.
Q. Did he ever direct you not to consider Robin for a position?
A. No.
Q. Did John Lemmer ever direct you not to put Robin in an

Page 32

open position?
A. No.
Q. Did he ever give you any direction with respect to the placement of Robin in an open position?
A. No.
Q. Robin would not have needed a waiver from the state to serve in a treatment specialist position, would she?
A. I believe not, because it would have been forwarded through the HR department. I'm not -- I don't know what degree Robin has, or experience, but I assumed that she met the qualifications because it was run through our HR department who screens for those things.
Q. Do you remember what position Venus Lombrana held that was eliminated before she moved into the family worker position?
A. Program manager.
Q. Do you remember if she ever had the title division manager?
A. Division manager, the same thing. The titles have changed but same responsibilities. So, yes, it would have been division manager.
Q. When she was division manager, do you know who she reported to?
A. On what date?
Q. On November 20, 2008.

Page 33

A. Myself.
Q. At that time frame, Rick Kruse was also a division manager?
A. Correct.
Q. Do you remember what division she was responsible for managing?
A. Not specifically. There was 3 division managers and the groups were split amongst the 3. I believe we had 10 groups at the time, but I can't remember what specifically what groups she was managing.
MR. LAFLAMME: Let me take a short break here.
(Off the record at 10:10)
(Back on the record at 10:22)
MR. LAFLAMME: Back on the record.
Q. (BY MR. LAFLAMME) Do you remember what degree or degrees Venus Lombrana held in November of 2008?
A. No.
Q. Do you remember how long Venus Lombrana remained in that family social worker position she was moved to in --
A. Approximately a year.
Q. Where did she go from there?
A. She was -- she applied for and got a quality manager job in Detroit.
Q. Still with Holy Cross?
A. Correct.

Page 34

Q. Would that have been under your supervision?
A. Yes.
Q. So are you the one that gave her that quality manager position? Was that your decision?
A. Correct.
Q. Is she still there?
A. No.
Q. Where is she now?
A. She left the agency.
Q. Do you remember when?
A. Approximately April of this year.
Q. Do you remember why?
A. She got another job.
Q. What happened to the family social worker position that she was in? Was that filled?
A. I cannot remember when Venus left if we filled that. Right now we currently don't have family worker positions on the Clinton Campus, but I can't recall when Venus left if we hired somebody to replace her, or if we had more consolidation, and we moved somebody into there, or we hired a program coordinator. I can't recall.
Q. You say there are no family social worker positions currently on the Clinton Campus?
A. Correct.
Q. And why is that?

Page 35

A. A change in our treatment modality.
Q. And what was that change?
A. The length of stay. Our referral sources asked us or required of us a much shorter length of stay, so we switched from family workers to adding another program coordinator to focus in on the kids on campus to keep things safer and help the kids move through the program in approximately 3 months, as before we had -- depends on when it was, but a much longer length of stay with the kids, and we work with the families much more.
Q. Are there any social worker positions open today?
A. No. Well, I take it back. Not at Clinton. If you are talking about Clinton, no. If you are talking about the agency, I don't know.
Q. Did you participate in the decision to eliminate Venus Lombrana's division or program manager position?
A. Yes.
Q. What was your involvement?
A. As the leadership group, we had discussions on what positions were needed, or we were asked to look at each of our regions and determine if there were positions that we could eliminate.
Q. Do you remember whose idea it was to eliminate Venus Lombrana's program manager position?
A. Mine.

Page 36

Q. What was the reason you decided or reasons you decided you were going to eliminate her program manager position?
A. The number of kids had decreased, and the experience level of the remaining 2 -- there was a lot of experience and skill in the remaining 2 quality managers.
Q. When you made that decision to eliminate Venus Lombrana's division or program manager position, how did you inform your superiors?
A. Just told them. And it's only one superior. It would have been Loren.
Q. Who was involved in the leadership group discussion?
A. I can't -- I don't know exactly. I can tell you who was on the leadership team at that time.
Q. Who was that?
A. Loren, John Lemmer, Alyson, John Lazarus (ph), Sharon Berkobien, Lynn Alexander, John Lemmer. Did I get him? Could you read back who I said?
Q. Loren Brown, John Lemmer, Alyson, John Lazarus, Berkobien, and Lynn Alexander, and yourself.
A. Gary Tester.
Q. Tester?
A. Yes, T-e-s-t-e-r.
Q. What was John Lazarus's position?
A. Admissions coordinator.
Q. Lynn Alexander?