# Exhibit
# 6

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBIN ALDRICH,

Plaintiff,

v File No. 1:10-cv-13515-MAG-MKM

BOYSVILLE OF MICHIGAN, INC. a Michigan corporation, d/b/a HOLY CROSS CHILDREN'S SERVICES,

Defendant.
_______________________________/

D E P O S I T I O N

of

JOHN LEMMER

8759 Clinton-Macon Road

Clinton, MI

June 28, 2011

9:15 a.m.

APPEARANCES:

Richard N. LaFlamme, P32641
Attorney for Plaintiff

Karen Piper, P31706
Attorney for Defendant

ALSO PRESENT:

Robin Aldrich
Alyson Beck

\- - -

Roger D. Thome, CSR 2201

INDEX IS INSERTED AT THE END OF THE TRANSCRIPT

Page 2

JOHN LEMMER

Having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. LAFLAMME:

Q. Could you state your full name for the record, please.
A. John William Lemmer.
Q. How old are you?
A. 48.
Q. Date of birth?
A. January 13, 1962. 49. Let me think about that for a minute. 49 I guess. I'll be 50 in January.
Q. I got a little ahead of myself. Have you ever given a deposition before?
A. No.
Q. The ground rules are pretty simple. If you keep in mind that the court reporter is taking down everything that we say, it kind of helps you remember the rules.
The end goal is that we have a clear transcript, so only one of us can speak at a time. In normal conversations we tend to step on each others' sentences, and that's fine in normal conversation, but it reeks havoc with the court reporter, so wait until I get my whole question out before you start to answer, and I'll do my best to try and avoid stepping on your answers. Okay?

Page 3

A. Okay.
Q. Please answer audibly, yes, no, or whatever the answer is. Try to stay away from shakes, and shrugs, and nods, and uh-huh and uh-uhs, and things that are hard to spell; okay?
A. Okay.
Q. If I ask you a question that you don't understand, please don't guess at what I'm asking. Tell me you don't understand, and I'll try to fix it.
Do you have any questions?
A. No.
Q. Where do you currently live?
A. Ypsilanti.
Q. How long have you lived at your current residence?
A. 10 years.
Q. Are you married?
A. Yes.
Q. How long?
A. 25 years.
Q. You have any children?
A. Yes.
Q. How many?
A. 4.
Q. How old are they?
A. 23, 22 -- I'm sorry, 24, 22, 17, and 10.

Page 4

Q. What year did you graduate from high school?
A. 1980.
Q. And what school?
A. St. Thomas.
Q. Where is that?
A. Ann Arbor.
Q. And do you have a bachelor's degree?
A. Yes.
Q. What school?
A. Villanova University.
Q. What year?
A. 1984.
Q. What was your major?
A. Bachelor of science in accountancy.
Q. You have a formal education beyond your bachelor's?
A. No.
Q. What was your first job after you got your degree from Villanova?
A. University of Michigan.
Q. And what did you do there?
A. I worked at the institute for social research.
Q. When did you start there?
A. 1985.
Q. What was your first position?
A. Accountant.

was called together for this meeting?
A. There were some secretaries and I believe some administrative type people that would have had use or needed use of that system. I think what we did was, we looked at the log, the log-in sheets, and then also looked at the positions within our organization of -- looked at job descriptions to determine who should be using the system that maybe wasn't, and tried to pick a balanced mix between the different parts of our organization.
Q. What purpose does this CIS system serve within Holy Cross's operations?
A. It's the backbone to what we do. It houses all the information about our youths. It's also used as a billing system for those youths. It keeps treatment plans in it, and the records about the kids.
Q. So are you the person who called this meeting?
A. Yes.
Q. At the time you called this meeting, were you of the belief that you were having problems with either the CIS system itself or the people that were using it?
A. Yes.
Q. What problems?
A. It wasn't being utilized. The data fields weren't being entered into. He didn't have complete records.
Q. So the people actually providing treatment, your social



workers, for instance, are they supposed to input data of what they're doing in the CIS system?
A. Either that or a secretary would, depending on which part of the organization you're talking about.
Q. When you say that some of the fields were not being utilized, were people going outside the system to enter data in a different way?
A. Some of that was going on.
Q. Now, prior to calling the meeting, did you have a belief as to why the system wasn't being fully or properly utilized?
A. I'm not sure why it wasn't being used. I didn't necessarily believe. I just knew there was a lot of missing data fields that we needed to use to manage the business.
Q. Do you recall relatively early in your tenure here at Holy Cross sending out an e-mail directing employees to provide you with a list of their daily activities?
A. Yes.
Q. What prompted you to write that e-mail?
A. I knew at that time we were going to be needing to go through some cost-cutting measures, and so I needed to make sure I understood the duties and responsibilities, and what people were doing before adjustments would need to be made.



Q. Why did you believe that there would have to be some cost-cutting measures implemented?
A. All you needed to do was look at our financial statements and that would have told anybody.
Q. Okay. You were operating in the red?
A. Yes.
Q. Do you know why that was? I mean, at least in your mind at that time what was causing the red?
A. We were spending more than we were taking in.
Q. Had you observed a decline in revenue?
A. Not at the beginning.
Q. Did there come a point in time when you noticed the decline in revenue?
A. Yes.
Q. Do you recall when that began?
A. Probably -- this is just a guess, but probably mid-2008, mid to 3rd quarter, 4th quarter, 2008.
Q. What are Holy Cross's sources of revenue: primary sources?
A. The State of Michigan and various counties throughout the State of Michigan.
Q. So when you were seeing a decline in revenue, was that both from the state and from the counties?
A. Yes.
Q. Do you know why those revenues were declining?



A. I presume the state was running out of funds, and -- that's it.
Q. Holy Cross's purpose is what?
A. To take care of neglected, abused, and delinquent kids that otherwise wouldn't have an opportunity for getting help.
Q. Just boys or boys and girls?
A. Boys and girls, and babies.
Q. So how did it work then that these children would come to Holy Cross for services?
A. They're all adjudicated through the court system.
Q. So when the revenue was declining, was the state sending fewer children to Holy Cross? Is that the reason for the decline, or were they paying less per child, or a combination?
A. Recently it's been a combination of both, but at that time it was just less kids. My understanding is they would choose to not put them into a residential placement right away. They would try to work with them in another fashion prior to putting them in residential care.
Q. Such as a foster home?
A. A foster home, which is less expensive for them.
Q. Do you know if other agencies that perform a similar service to Holy Cross were experiencing a similar decline in this same time frame?

Page 21

A. My understanding was that they were experiencing the same kind of decline.
Q. So as far as you know, the decline in available children for you to serve wasn't because the state or the county was choosing to send those children to your -- let's call them competitors?
A. I don't believe so.
Q. At any time from when you came to Holy Cross to the present was that the case?
A. Where they would choose to send the kids to other agencies?
Q. Right.
A. Rather than ours? I'm not sure. I don't think so. I think the agencies in our business have seen almost equal declines.
Q. Who would you see as -- you probably don't view them as competitors, but let's use that word. Who would you see as your major competitors?
A. Wolverine and Starr Commonwealth.
Q. Starr Commonwealth?
A. Yes, Starr Commonwealth, maybe.
Q. Do you interact with your counterparts at Wolverine or Starr Commonwealth?
A. No.
Q. So back in April of '08, approximately, what you were

Page 22

seeing that caused you to ask for a list of activities wasn't so much as a decline in revenues, but the fact that your expenses were exceeding your revenue?
A. At that time the expenses were exceeding revenues, and we could start to see some decline in revenues but not nearly as great as they are at this time.
Q. What portion of Holy Cross's revenues come from charitable donations?
A. What percent? We get about 1.2 million dollars or so. I don't know what percent of the total. I would have to do it on a calculator.
Q. Let's do raw numbers then. So currently it's annual charitable contributions of 1.2 million approximately?
A. Right. That's gross.
Q. Back in April of '08, was it the same?
A. It was a couple million, maybe 2 and a half million.
Q. So you have actually seen a significant decline in your charitable giving?
A. That's a fair statement.
Q. Do you know why that is?
A. I presume it's because of the stock market, and those that traditionally had extra money to be able to donate. It's as a result of the stock market, is my guess.
Q. The economy in general?
A. That's fair.

Page 23

Q. Does Holy Cross use charitable donations for operations?
A. It can.
Q. I mean, does it routinely?
A. It does, yes. Depends on the donor's wish, though, of course.
Q. In connection with your request that employees provide you with a list of their daily activities, do you remember questioning why Robin sent a spreadsheet out to all of the -- I'm not sure how to pronounce it. Is it Crack --
A. Cracchiolo.
Q. Do you remember around this time Robin sending out a spreadsheet by e-mail to Cracchiolo employees?
A. I don't remember that.
Q. You don't remember asking why she would do that?
A. I don't remember that she sent it out, so I can't remember why she would send it, no.
Q. Did you follow through and get a list of daily activities from all employees?
A. Yes.
Q. And who is in the universe of employees that you asked for such a list?
A. The ones that reported either directly or indirectly to me.
Q. So this would be IS, IT, and accounting?
A. Correct.

Page 24

Q. Do you know if any IS, IT, or accounting people were exempted from that requirement?
A. I don't recall.
Q. Do you remember if Mike Grulke was exempted?
A. I don't recall.
Q. Do you remember if Jack Perion, P-e-r-i-o-n, was exempted?
A. I don't recall.
Q. Do you remember if Kim Tiede, T-i-e-d-e, was exempted?
A. I don't. I think everybody was on the list to do it.
Q. Do you remember getting a list of daily activities from all people within your area of responsibility?
A. I do.
Q. What did you do with that information?
A. Read it.
Q. Besides that. Sorry, I interrupted you.
A. I read it.
Q. What else?
A. Learned about what people did in their jobs on a daily basis, where they spent their time, how much time they spent to do a task.
Q. Did you draw any conclusions?
A. Not at that time.
Q. Did you at a later time?
A. At a later time when we needed to make reductions in staff, I did. I used those to help determine where we

Page 25

might be able to make reductions.
Q. Do you recall a CIS meeting at Domino Farms occurring in September of 2008?
A. I can't remember exactly September, 2008, but I remember many CIS meetings at Domino Farms.
Q. Do you remember a specific CIS meeting at Domino Farms when there was a discussion of the CARF, C-A-R-F, mandates for client cases?
A. I don't specifically remember CARF, specific mandates or notes.
Q. What is that CARF? What's that acronym stand for?
A. It's an accreditation organization. I don't remember what -- I don't even know what the initials stand for. Counsel -- I don't know.
Q. Is CARF an organization that accredited Holy Cross?
A. Yes.
Q. So in order to maintain CARF accreditation you would need to comply with their mandates?
A. Correct. Counsel on Rehabilitation something Facilities.
Q. Do you remember a CIS meeting in which CARF mandates were discussed, and Robin asked the question about the interplay between the CARF mandates and the JAIS case notes?
A. I do not recall.
(Exb 29, Handwritten Note, Marked)

Page 26

MS. PIPER: Exhibit 29. Is this mine to keep, Rick?
MR. LAFLAMME: Yes.
Q. (BY MR. LAFLAMME) So do you recall this note that is identified as Deposition Exhibit 29?
A. It's my writing.
Q. Okay. Do you recall the circumstance that prompted you to write this note?
And to refresh your recollection, could you show the witness Deposition Exhibit 13.
MS. PIPER: Can we go off for a second?
MR. LAFLAMME: Certainly.
(Off the record at 9:56)
(Back on the record at 10:01)
Q. (BY MR. LAFLAMME) Do you recall that Deposition Exhibit 29 relates to Deposition Exhibit 13?
A. Yes.
Q. All right. Before I get into the subject that is raised by these 2 exhibits, between your interaction with Robin when you said she trained you on the CIS system, and the incident that prompted Exhibits 13 and 29, do you have any recollection of any significant interactions with Robin?
A. No.
Q. Do you have any recollection of having any significant issues with her, either in her performance or her

Page 27

attendance?
A. No.
Q. So let's start with Exhibit 13, then. Do you recall the incident that prompted this e-mail exchange?
A. Yes.
Q. You asked Kathy Pixley to find out why Robin was leaving with Marcus in a Holy Cross van?
A. Correct.
Q. You're the one that asked the question?
A. Yes.
Q. What did you observe that prompted you to ask the question?
A. I observed Robin getting in a Holy Cross van at the back of our building in the middle of the afternoon. I didn't know who was driving the van. She got in the passenger's seat.
Q. Was that unusual?
A. I'm not sure. I found it to be unusual. I'm not sure if it was a usual thing or unusual thing. I found it be unusual though. I'm not sure if it was a regular thing.
Q. What was your concern?
A. A co-worker getting in a Holy Cross van that is meant to take kids to doctors' appointments: in the middle of the afternoon; why one of our co-workers would be getting into an agency vehicle to go where I knew not.

Page 28

Q. So this is something you personally observed?
A. Yes.
Q. Where did it happen in relation to where we're sitting right now?
A. About a hundred yards east.
Q. And is your office located on the south side of the building?
A. No.
Q. Where were you when you saw this happen?
A. In our conference room in the back.
Q. Was anyone with you?
A. Yes.
Q. Who?
A. Kathy.
Q. Kathy Pixley?
A. Kathy Pixley.
Q. Anyone else?
A. I don't remember.
Q. So Kathy Pixley was able to see the same thing?
A. Yes.
Q. Do you recall what, if anything, she said?
A. "I'll check for you," after I said would you find out why Robin is getting into an agency vehicle in the middle of the afternoon.
Q. Was there any further discussion of that at that time?

Page 29

A. No.
Q. Did she tell you at the time that it was Robin's son who was driving the van?
A. I don't recall, but I don't believe so.
Q. So what prompted your note, Exhibit 29 specifically?
A. This note was prompted by Robin's response to Kathy Pixley.
Q. And that response was "John is welcome to ask his question directly to me?"
A. That's correct.
Q. Okay. So you wrote -- when did you write your note?
A. September 25th, 2008.
Q. Do you remember when you saw Robin's response to Kathy's e-mail that is at the top of Exhibit 13?
A. September 24th, 2008.
Q. So the next day you wrote Exhibit 29?
A. Correct.
Q. What did you do with the note?
A. Put it on Robin's desk.
Q. Do you remember when you put it on her desk?
A. Earlier in the morning, probably 6:30 a.m., 7:00 a.m. when I get to work.
Q. Did you in fact meet with Robin on September 25?
A. I think I did.
Q. Tell me what you remember of the meeting.

Page 30

A. I remember Robin coming at about 20 after 8:00. She brought the note in and said, "you wanted to see me?"
I said something like it's 20 after 8:00. What time do you start work? And she said 8 o'clock.
And I remember -- and I said it's 20 after 8:00 or 8:15, whatever. I just knew it wasn't 8 o'clock. And I said first thing. And I'm inquiring about this, apparently. I need to ask you directly. I found it not to be very professional if she's asked a question by either her supervisor or her supervisor's supervisor, she should have answered the question directly. I shouldn't have to ask her a question that somebody else has already asked for me.
And then she proceeded to say that she needed to get from the back of the building to the front of the building to get her lunch out of the car, and I told her we shouldn't be using agency vehicles to do that.
Q. Do you recall at the time if Robin was having any trouble walking?
A. I don't recall.
Q. Do you remember during the course of that year that she was out for foot surgery?
A. No.
Q. Do you recall that after she came back to work from the foot surgery that she was having difficulty walking?

Page 31

MS. PIPER: Objection. Foundation.
MR. LAFLAMME: You can answer.
MS. PIPER: You can answer.
A. Okay. No.
Q. (BY MR. LAFLAMME) So backing up, when you inquired of Robin what time do you come to work, and made a point of what exactly the first thing in the morning means, do you remember her response?
A. I don't remember exactly what she responded.
Q. Do you remember her telling you that when she arrives in the morning, she doesn't necessarily go to her desk first?
A. No.
Q. That she didn't see your note until she had been at work for some period of time?
A. No.
Q. How far away was your office from Robin's?
A. 50 yards.
Q. How far away was Robin's office from the break area where the coffee is kept?
A. 25 yards.
Q. How far is your office from the back conference room?
A. 50 yards.
Q. Did you see Robin walk past your office that morning when she arrived at work?
MS. PIPER: Objection. Foundation.

Page 32

You can answer.
A. No.
Q. (BY MR. LAFLAMME) Did you see her walk by your office at any time before she came in and asked what you wanted to see her about?
A. No.
Q. Did you make it a practice of tracking when employees under your area of responsibility arrived and when they departed from work?
A. No.
Q. Did Robin explain to you that she didn't think her response to Kathy was disrespectful?
A. Could you repeat the question?
(Reporter read back)
A. Yes.
Q. Do you remember your response?
A. No.
Q. Do you remember screaming at her: "I don't care what you think. Your opinion doesn't matter."?
A. Absolutely not.
Q. Absolutely not, you don't remember --
A. Absolutely not I didn't scream at Robin.
Q. Did you say the words: "I don't care what you think. Your opinion doesn't matter."?
A. No, I didn't say that.

Q. Do you remember Robin explaining to you that it didn't sound to her like Kathy was the one asking the question, but rather that Kathy was asking for someone else?
A. I don't recall.
Q. Do you remember shouting at her: "It doesn't matter who was asking. You disrespected your superior."?
A. No.
Q. No, you don't remember, or no, you didn't do it?
A. No, I didn't do it.
Q. Did you say those words?
A. No.
Q. Do you remember saying to her: "I don't have time to baby-sit you Robin."?
A. No.
Q. Is it possible you said that?
A. It's not possible.
Q. Do you remember telling her that she needed to follow her chain of command: during that meeting?
A. I don't recall.
Q. Do you remember her telling you that the chain of command failed because her immediate supervisor is not Kathy Pixley but Eileen Parker?
A. I do not recall.
Q. At any time during that meeting did you say to her that you don't care what she thinks?



A. I do not think I said that.
Q. You said your recollection was that her purpose in getting in the van was to go get her lunch out of her car at the other end of the building.
A. This is what she told me.
Q. Right. That's what -- I mean, it's not that you could verify that. That is what she told you?
A. That's what she told me.
Q. Are you sure she didn't tell she went to her car to retrieve some HCCS mail that Marcus was going to courier to the administrative building?
A. I don't recall that.
Q. Do you remember her telling you that at the time she got in the van with Marcus that she could see you and Jack Perion sitting in the conference room?
A. I don't recall that, because I don't believe I was sitting in the conference with Jake Perion.
Q. You were in the conference room with someone else?
A. I was in the conference room with Kathy Pixley.
Q. You remember questioning her why Marcus would drive all the way over here to pick up mail?
A. No, I don't recall.
Q. Do you remember questioning her why -- whether she normally takes a lunch break so late in the day?
A. Yes.



Q. Do you remember her response?
A. Yes.
Q. What was it?
A. Something like I take it whenever I can take it.
Q. Do you remember her telling you that she doesn't normally take time for a lunch break?
A. I don't recall that.
Q. Do you remember your response to her comments about taking a lunch whenever she can rather than at a set time?
A. I don't recall.
Q. Robin describes your tone during this meeting as extremely threatening, stern, condescending, demeaning, and in a loud voice. Do you disagree with any of that?
A. Yes.
Q. Which part?
A. All of them.
Q. Do you know whether or not others in the immediate area could hear your conversation with Robin on this occasion?
A. No.
Q. You don't know one way or the other, or no, they couldn't hear?
A. I'm not sure. It was a quiet conversation like we're having now.
Q. Would people have been able to hear if you were shouting at her?



A. Surely.
Q. Do you remember anything else you spoke to Robin about on the occasion of the meeting prompted by Exhibit 29?
A. I don't recall anything else.
Q. Did you ever have any role in the preparation or presentation of Robin Aldrich's performance evaluation?
A. No.
Q. Do you remember ever seeing Robin Aldrich's performance evaluations or any single one of them?
A. No.
Q. Do you recall ever providing any direction, either to Robin's immediate supervisor or her supervisor, as to the content of Robin's performance evaluation?
A. No.
Q. Do you leave room for the possibility that you did?
A. No.
Q. Robin recalls that her 2008 performance evaluation was given to her within a day or 2, or a few days of your meeting prompted by Exhibit 29. Do you know why that is?
A. Maybe that's when her performance evaluation was due. I would have to check the HR system to see when the due date was for her performance review.
Q. I mean, other than it coming up at that time, do you recall having any -- giving any directive, having any involvement in seeing that her evaluation was performed at

Page 37

that time?
A. No.
Q. Do you recall when you first considered the elimination of Robin's position?
A. No.
Q. Robin recalls a meeting on September 29 of 2008, in which she was told that Loren Brown and you had targeted her position as one they could afford to lay off or to eliminate. Did you tell either Eileen Parker are Kathy Pixley prior to September 29 that Robin's position is one that you could afford to layoff or eliminate?
A. I don't recall.
Q. Do you recall having conversations with Loren Brown about whether Robin's position is one that could be eliminated?
A. I don't recall.
Q. Is that the kind of subject that you would have discussed with Loren Brown?
A. We would have discussed anybody that would have been pending layoff.
Q. We know that Robin's position was in fact eliminated. How did that come about?
A. Through discussions with Kathy Pixley and her immediate supervisor Eileen Parker.
Q. Tell me about those discussions.
A. We were tasked with finding a certain dollar amount within

Page 38

the system, within the system being this building, and the rest of the agency, to be able to make a balanced budget, and so we were tasked with some dollar amount within this building to have to eliminate, and so we went through every single person one by one to determine whether it would be a position that we could continue to survive without.
Q. Who gave you this task?
A. Loren Brown.
Q. Do you recall what the dollar amount was?
A. I do not.
Q. Is it documented somewhere?
A. I don't recall.
Q. Do you remember being aware of the dollar amount at some point in the past?
A. We would have had a dollar amount. So at some point there was a dollar amount. I don't know what it is.
Q. And when you say this building, you mean the Cracchiolo Center?
A. That's correct.
Q. So we know -- strike that.
All the people you had responsibility for worked in this center, in this building?
A. Correct.
Q. What other departments were located in September of '08 in

Page 39

the Cracchiolo Center?
A. Human resources, and development, and the executive office.
Q. Were other departments in the Cracchiolo Center tasked with a dollar amount that they needed to eliminate in this same time frame?
A. It's possible.
Q. So when you went through this process with Kathy Pixley and Eileen Parker of going through each person one by one, do you remember any other names or positions that surfaced other than Robin's?
A. The whole department.
Q. Well, I think I understand. You went through and discussed each position in the whole department, but did you land on any positions other than Robin's that you distinctly remember at this same time frame?
A. I don't recall.
Q. Do you remember any position that was eliminated at the same time that Robin's was?
A. Not specifically, no.
Q. Do you remember there being a specific budget plan or other documents that identified Robin's position for elimination prior to her being informed of that?
MS. PIPER: Could I have that again?
(Reporter read back)

Page 40

MS. PIPER: Thank you.
A. Budget plan or document? There were budget plans all the time, and they continue to be. So do I remember exactly the budget plan itself? No. Do I know there was a budget plan and some documents? Absolutely.
But the details of them I just -- I don't recall.
Q. (BY MR. LAFLAMME) So there would have been a document at this time that would identify how much savings there would be by eliminating Robin's position?
A. Absolutely.
Q. When you were going through each position with Kathy and Eileen, do you remember discussing how the agency would handle training if Robin's position were eliminated?
A. Yes.
Q. What do you remember of that?
A. That we would do it electronically, put together PowerPoints, self-train.
Q. Do you remember some CIS rollout training occurring in the first week of October of 2008?
A. I don't recall that training.
Q. Do you recall directing Kathy Pixley to get sign-in sheets for the people that attended that training?
A. I don't recall the training, but if there was a training at that time, that's something we do. We take sign-in

Page 41

sheets. So if the training happened, then we got sign-in sheets.
Q. Would you typically review those sign-in sheets yourself?
A. Possibly.
Q. Do you recall a meeting among yourself, Kathy Pixley, Alyson Beck, and Robin in October of 2008, at which the subject of discussion was Robin repeating to some co-workers what she had been told about her position being targeted for layoff?
A. I don't specifically recall the meeting.
Q. Do you recall an occasion when Robin was criticized for telling others that her position was being looked at as one that could be eliminated?
A. I don't recall Robin being criticized.
Q. Do you remember being upset about that yourself?
A. No.
Q. Do you remember Robin being given 3 days paid time off work as a result of such an incident?
A. I don't remember that.
Q. Do you recall in early October of 2008, having a concern that Robin may have been critical of you to someone else in the organization?
A. I don't recall that.
Q. Do you recall accusing Robin in that time frame of creating a huge amount of chaos in the organization?

Page 42

A. I don't recall that.
Q. Do you recall telling Robin that you would have to do a lot of damage control because of the huge mess that she created?
A. I don't recall that.
Q. Do you remember telling her it only takes one bad apple to spoil the whole bunch?
A. I don't recall that.
Q. Do you recall trying to access Robin's e-mail in early October of 2008?
A. I never tried to access her e-mail.
MR. LAFLAMME: Could you show the witness Exhibit 26, please.
MS. PIPER: I intended to bring it, and I didn't bring it. I printed it and didn't bring it. I'm sorry.
MR. LAFLAMME: No problem.
Q. (BY MR. LAFLAMME) I'm showing you Deposition Exhibit 26. Do you remember Robin receiving this oral reminder?
A. No.
Q. Did you direct anyone to give her this oral reminder?
A. No.
Q. So who participated in the decision to eliminate Robin's position?
A. Well, Kathy, Eileen, myself.
Q. Anyone else?

Page 43

A. And ultimately Loren Brown at the end of it.
Q. So you, Kathy, and Eileen discussed each position, then specifically identified Robin's, and then one of you went to Loren Brown to get approval to eliminate her position?
A. It was part of a big plan, so it wasn't specifically -- and I don't know if I went or Kathy went, or Alyson and I went in with each other. I don't remember who went. But it would have been a discussion about the many millions of dollars we would have had to cut at that time. And we talked about the big plan so --
Q. This big plan, was it documented in some way?
A. I'm sure it was. I don't remember the document, but many of our budget plans have numbers attached to them and positions.
Q. So the first budget plan that would have analyzed the savings from eliminating Robin's position, would that budget plan also have included identification of other positions other than Robin's?
A. Surely.
MR. LAFLAMME: Could I have that back, please. Thank you.
Q. (BY MR. LAFLAMME) We know that Robin was formally notified of her position elimination on October 21st. That's in the documents. And we know that she was first told of the possibility of a layoff on September 29. Do

Page 44

you know when in that time frame the actual decision was made?
A. I don't recall.
Q. Do you know with certainty when the decision was made to eliminate Robin's position that simultaneously a decision was made to eliminate other positions?
A. Can you repeat that question? Too many words for me.
(Reporter read back)
A. No.
Q. (BY MR. LAFLAMME) So it could have been -- the decision could have been at that time just Robin's; is that correct?
A. It could have been.
Q. Was this elimination of positions that was being discussed at this time ever addressed in a document other than this various considerations of the budget plan?
A. Not that I'm aware of.
Q. Would there have been e-mails exchanged on the subject?
A. I don't believe so.
Q. Would there have been memos exchanged on the subject?
A. I don't believe so.
Q. Would there have been written minutes of meetings that occurred on the subject?
A. No.
Q. Would there have been reports on the board of directors

addressing the subject?
A. No.
Q. Did you ever attend board meetings?
A. Yes.
Q. Routinely?
A. Yes.
Q. Was there a discussion of specific positions to be eliminated at any board meeting?
A. No.
Q. At the time Robin was terminated as a result of her position being eliminated, was she eligible for rehire in the organization in another position?
MS. PIPER: Objection. Foundation.
MR. LAFLAMME: Go ahead.
A. I'm not sure. I would have to check the personnel records.
Q. (BY MR. LAFLAMME) Do you know of any reason that would have made her ineligible?
A. No.
Q. Did you become aware, following the elimination of Robin's position, that she was seeking a position as a social worker within the organization?
MS. PIPER: You mean at the time?
MR. LAFLAMME: Either at the time or shortly after she was notified of her position elimination.



A. Not at that time.
Q. (BY MR. LAFLAMME) Did you become aware of that at some point?
A. Just recently.
Q. In the course of this lawsuit?
A. Right.
Q. Okay. Were you aware back in the time frame of roughly September through December of '08, that Robin was seeking any position within the organization?
A. I wouldn't have been aware of that.
Q. Robin reports that she was attending TS training here at the Cracchiolo Center on November 18 of 2011. Do you know what TS training is?
A. Treatment specialist, maybe, training.
Q. She documents that while she was here for that training she saw you arrive in the parking lot and stopped behind her car for a period of approximately 20 seconds, shake your head back and forth several times and then enter the building. Do you have any recollection of that?
A. No, I don't.
Q. Do you recall being aware that she was here for some kind of training?
A. No.
Q. Would you have recognized her car?
A. No.



Q. Did she typically park in the handicap spot?
A. I'm not sure.
Q. She reports hearing a conversation between you and Loren Brown during which her name was mentioned on that occasion. Do you recall having a discussion with Loren Brown about Robin?
A. No.
Q. Do you recall calling Venus Lombrana out of that training session?
A. No.
Q. Do you recall sending Venus Lombrana into that training session to leave a message for Robin?
A. No.
Q. Do you recall having a conversation with Bill Geddes concerning why Robin might be in attendance at the training session?
A. No.
Q. Do you remember having a conversation with Bill Geddes about Robin seeking another position within the agency?
A. No.
Q. Did you ever have a conversation with Bill Geddes about Robin seeking a position within the agency?
A. Yes.
Q. When was that?
A. Recently, in the last month or 2.



Q. And is that a conversation that grew out of this lawsuit?
A. Yes.
Q. Tell me what you remember of that conversation, assuming counsel wasn't present. If counsel was present, I don't want you to tell me about. But if it was between you and Geddes separately, I want to ask you about that.
A. Yes, counsel -- well, actually.
MS. PIPER: Let's go out.
(Off the record at 10:54)
(Back on the record at 11:04)
MR. LAFLAMME: I don't have a lot more, so that session helped me to save some time.
Q. (BY MR. LAFLAMME) Did you have conversations with Bill Geddes about Robin's lawsuit outside of the presence of counsel?
A. I may have, yes.
Q. Can you tell me what you discussed with him?
MS. PIPER: I'm going to direct the witness not to answer any questions about discussions that took place in the presence of counsel.
Q. (BY MR. LAFLAMME) And I'm not asking you about -- I specifically do not want you to tell me about any conversation you had with Bill Geddes in the presence of counsel. I'm only asking about outside the presence of counsel.

Page 49

A. I don't recall exactly what we would have talked about, whether it was part of the meeting with counsel, or outside of the council meeting, quite honestly.
Q. The 2 of you did meet together with counsel to discuss the lawsuit?
A. Yes.
Q. Back in 2008, the September through December time frame, do you remember having any conversations with Bill Geddes about Robin?
A. No.
Q. Do you deny having any conversations with him about Robin in that time frame?
A. I don't recall.
Q. Did you ever direct Bill Geddes that he was not to place Robin in any other positions with Holy Cross?
A. No.
Q. Do you know of any reason that you would have told him such a thing?
A. No.
Q. Do you know of any reason why Bill Geddes would tell Robin "I can't use you?"
MS. PIPER: Objection. Foundation.
MR. LAFLAMME: She's just making an objection. We don't have a judge here to rule on objections so at some later date -- so what happens is, she states her

Page 50

objection, but we go ahead.
MS. PIPER: I think the question is deficient, and he understands it even if you don't.
A. Could you repeat the question, then.
(Reporter read back)
A. No, I don't know.
Q. (BY MR. LAFLAMME) Other than -- strike that.
Now, you know Venus Lombrana?
A. Yes.
Q. Did she work in your area of responsibility at any time?
A. No.
Q. Did you have any involvement in her placement in a social worker position in 2008?
A. No.
Q. Do you recall ever having any personal concerns about Robin's absences from work during 2008?
A. No.
Q. Do you remember ever having any personal concerns about Robin's weight?
A. No.
Q. Do you remember ever having any concerns about Robin being injured on the job?
A. Only when we knew that we were needing to lay her position off, that I was concerned about her surgery that she needed to have or had on her foot.

Page 51

Q. What was your concern?
A. That I didn't want to put somebody without medical care on the street.
Q. Did you have any concern for Holy Cross relating to Robin having an on-the-job injury or having the need for surgery? You expressed a concern for Robin. I'm asking about did you have a concern for Holy Cross: its exposure, its liability.
A. No, I didn't think about that. I was thinking about her.
Q. Were you aware that Robin suffered an on-the-job injury in October of 2008?
A. I didn't know that.
MS. PIPER: Did you say did or didn't?
A. I did not know that.
Q. (BY MR. LAFLAMME) Did you meet Loren Brown at any time before coming to work for Holy Cross?
A. No. Well, to clarify how the question is --
Q. Did you meet Loren Brown at any time before coming to work for Holy Cross, I mean other than in the process of hiring?
A. No.
Q. What's your current position?
A. CFO.
Q. Are you aware that the Holy Cross website identifies you as the director of business operations?

Page 52

A. Yeah, we had some recent change that I had forgotten about. So I think -- so yes, I'm aware of that.
Q. So what's your title, director of business operations or CFO?
A. They call me lots of things. Director of business operations I guess is my title.
Q. Do you know when you were given that title?
A. Probably sometime when Mr. Brown departed.
Q. Was that a demotion for you?
A. No.
Q. Is there a CFO?
A. I believe I'm the CFO.
Q. Do you know why Loren Brown is no longer here?
A. He had another opportunity.
Q. Do you know if he was invited to leave?
A. I don't know.
Q. Do you know if he was accused of any impropriety?
A. No.
Q. Do you know if there is any plan to close Holy Cross?
A. No.
Q. Is Holy Cross operating in the black?
A. No.
Q. I can't remember how I asked the question earlier so forgive me if I'm asking the same question again.
Did you interview any of the candidates for the