# Exhibit 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBIN ALDRICH,

Plaintiff,

v File No. 1:10-cv-13515-MAG-MKM

BOYSVILLE OF MICHIGAN, INC. a Michigan corporation, d/b/a HOLY CROSS CHILDREN'S SERVICES,

Defendant.

______________________________/

D E P O S I T I O N

of

KATHY PIXLEY

8759 Clinton-Macon Road

Clinton, MI

June 22, 2011

11:25 a.m.

APPEARANCES:

Richard N. LaFlamme, P32641
Attorney for Plaintiff

Karen Piper, P31706
Attorney for Defendant

ALSO PRESENT:

Robin Aldrich
Alyson Beck

- - -

Roger D. Thome, CSR 2201

INDEX IS INSERTED AT THE END OF THE TRANSCRIPT



KATHY PIXLEY

Having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. LAFLAMME:

Q. Good morning.
A. Good morning.
Q. Have you ever given a deposition?
A. No.
Q. Let me run through the ground rules. If you keep in mind that the court reporter is going to try and get down everything that we say, it actually helps you remember the rules, which are only one person talking at a time. We step on each others' sentences in normal conversation, but that can wreak havoc with the court reporter, so I would ask that you wait until I get the whole question out before you start to answer, and I'll do my best to avoid stepping on your answers. Okay?
A. Uh-huh.
Q. And that brings us to the next rule which is, your answers need to be audible, yes, no, or whatever the answer is. Avoid shakes, nods, shrugs, uh-huh and uh-uhs, and things that are hard to spell; okay?
A. Okay.
Q. If I ask you a question that you don't understand, please



don't guess at what I'm asking. Tell me you don't understand it, and I'll try and fix it. Okay?
A. Okay.
Q. How old are you?
A. 52.
Q. And your date of birth?
A. 12/10/1958.
Q. And where do you currently reside?
A. 7955 Pixley Road, Palmyra, Michigan.
Q. How long have you lived there?
A. 18 years.
Q. Is it merely a coincidence that you live on Pixley Road?
A. No, the road was actually named after my husband's great-great-grandfather.
Q. What is your marital status?
A. Married.
Q. How long have you been married?
A. 33 years.
Q. Did you have children?
A. 3.
Q. How old are they?
A. 34, 32, and 30.
Q. I would ask you about your grandchildren, but I'm told we need to get done here by --
What year did you graduate from high school?



A. 1976.
Q. What school?
A. Blissfield High School.
Q. And do you have a college degree?
A. Yes.
Q. From what school? What year?
A. I have an associates 1977 from Siena Heights and a bachelor's from Siena Heights in 2002, both in business administration.
Q. Do you have any formal education beyond your bachelor's?
A. No.
Q. What was your first full-time employment after obtaining your bachelor's degree?
A. I obtained my bachelor's degree after I was in my current position: within a year of taking it.
Q. And your current position is?
A. IS director.
Q. For Holy Cross Children's Services; correct?
A. Yes.
Q. How long have you been IS director?
A. Since 2001.
Q. And what position did you hold before that?
A. IS hardware manager.
Q. Also at Holy Cross?
A. Yes.

calls while she was on medical leave?
A. I do not know. We didn't monitor her phone.
Q. Look at page 36, if you would, of Exhibit 17. Now, the last item on the page is a score of 1, "needs improvement to meet standards."
MS. PIPER: I'm sorry. We're on the wrong page.
A. Sorry. Okay. I got it.
Q. (BY MR. LAFLAMME) Okay. And the description is develops and coordinates IS department documentation.
Did you direct Eileen Parker to give Robin a 1 in this category?
A. No, not that I remember.
Q. And then if you would flip back to page 34, and item B-2, there is a score of 1 next to the comment "receives constructive criticism and suggestions in a positive manner." Did you give -- did you direct Eileen Parker to give Robin a 1 for this item?
A. No.
Q. Can you think of any reason why Eileen Parker would have told Robin that you instructed her to give Robin 1s in the 2 categories we have looked at?
MS. PIPER: Objection. Foundation. Mischaracterization.
A. No, I don't.
Q. (BY MR. LAFLAMME) Did you receive any direction from your



supervisor concerning the content of Robin's 2008 evaluation?
A. No.
Q. That was John Lemmer?
A. Yes, at the time.
Q. Look back on page 36, that item we discussed earlier: "Develops and coordinates department documentation." Do you know what Robin's deadline was for completing her documentation obligations?
A. No, I don't.
Q. Do you know whether or not she met her deadlines?
A. No.
Q. Do you remember a meeting among yourself, Eileen Parker, and Robin on September 29, 2008, at which Robin was given a revised job description?
MS. PIPER: Objection. Foundation.
A. I don't remember the meeting, but I can't say it didn't happen. I just don't remember the meeting.
Q. (BY MR. LAFLAMME) Do you remember a meeting on that date, among the 3 of you, where Robin was informed that Loren Brown and John Lemmer had targeted her position as one they can afford to layoff or eliminate?
MS. PIPER: Objection. Foundation.
A. Yes.
Q. (BY MR. LAFLAMME) Tell me what you remember about that



discussion.
A. Only that Eileen had asked that we give her some forewarning in case it happened, as Eileen knew that it might help her in her plans going forward.
Q. When did you first become aware that Robin's position was being targeted for layoff?
A. It was either that same day or the day before.
Q. How did you become aware?
A. In a discussion with John Lemmer.
Q. Tell me about that discussion. Was anyone else present?
A. I don't believe so. I was told that Loren had said there had to be layoffs again from the building, and one of them was to come from IS staff, that it could not be either of the 2 permanent evaluation employees. And we discussed which position we could possibly do without. And I was told that their recommendation or their thoughts were that it would be the training position.
Q. And when you say "they" you're referring to John and Loren?
A. Yes, John and Loren.
Q. Do you remember giving some push-back?
A. Not really push-back. I was advocating we shouldn't lose another person because of what we had going on at that time, and our workload, but we did discuss that there was a less -- lesser need for training because the staff we



were hiring were more computer literate now.
Q. So you were given specific direction by John Lemmer as to 2 positions that could not be eliminated? Is that what you said?
A. Yes.
Q. And those were?
A. We had recently hired 2 people into a program evaluation role, or one and a half actually.
Q. Who were they?
A. Lisa Woollet and Dawn Schroeder.
Q. And did Mr. Lemmer explain why he didn't want you to consider getting rid of either of them?
A. I don't think it really was an explanation, because they were really not a true part of IT. They were their own separate department, just under my direction at that time.
Q. So the idea that Robin's position is the one that your department could most easily do without came from either John Lemmer or Loren Brown; is that correct?
A. Yes. The layoff previous to this, it had been discussed with Loren, that that was the position that he felt could go.
Q. And which layoff was that?
A. Whichever layoff -- the layoff in 2007, possibly.
Q. Did John Lemmer, at the time that he informed you that Robin's position was being considered for elimination,

Page 29

office on October 8, 9, and 10. Thank you."
It looks like someone was in Robin's e-mail at 6:23 p.m. on October 8, '08. I guess my first question to you is, I mean, does that appear obvious to you from looking at this e-mail?
A. I'm trying to figure out if this is an auto reply, if someone had e-mailed her, and, you know, she had her auto reply on. In that case, it would send it out whenever the message came in. That would be the date on there.
Without testing to see what one of those auto reply messages look like, I don't know what these are.
Q. Robin's belief is she did have an auto reply message turned on for those 3 days, but this e-mail, and the next one on page 39, weren't sent out by the auto response, that those would appear in a different fashion, and that her auto response wouldn't have worked. It wouldn't have been on if somebody is actually in her e-mail at the time the message comes in.
Does that jell in your mind? I mean, does that make sense to you?
A. If your auto response is on, it's works whether you're in your e-mail or not. That I do know. But like I said, I don't know what an auto response one looks look like. I can't tell you what these are.
Q. Look at the next one, page 39. This forwarded message,

Page 30

the one that starts like 5 lines down, says it's from Robin to Susan Mohr, M-o-h-r, and it says it was sent Wednesday, October 8th, 2008, 4:42, 11:00 p.m. Do you see that?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. An auto response message wouldn't change the subject line of the auto response, would it?
A. I don't see --
Q. Look at the subject line on page 39.
A. Okay.
Q. It says subject colon, out of office colon, class tonight.
A. Right.
Q. Now look at page 38. Look at the subject line for the forwarded message. Subject colon, out of office colon, it's not much.
A. Again, I don't know without testing it to know whether it picks up the subject of the message that came in, like class tonight, or it's not much, and puts it after the out of office. I don't know.
Q. Were you in Robin's e-mail at either 4:42 p.m. on October 8, or 6:23 p.m.?
A. Definitely not 6:23 p.m. because I'm never here that late. 4:42 is even usually longer than I'm here.

Page 31

Q. Do you know of anyone else that was in Robin's e-mail on October 8th?
A. No, I don't.
Q. Who in the universe could have gotten into her e-mail? I mean, discounting any outside hacker: somebody from inside Holy Cross?
A. The only 2 people I know who knew how to do that would be myself or Mike Grulke.
Q. Do you know if John Lemmer could have done that?
A. No.
Q. No, you don't know, or no, he couldn't?
A. No, he couldn't. You have to actually have access to either the active directory or the exchange server.
Q. Okay. I'm done with those.
Do you remember meeting with Robin on October 24 of '08 when she turned in her door key, and network key, and some other items?
A. Yes.
Q. Do you remember a discussion at that time about whether or not Robin could keep her laptop?
A. No, I don't remember.
Q. Robin documents that at that meeting you asked her to return her laptop, and she told you that Marsha Rodakowski, R-o-d-a-k-o-w-s-k-i --
A. Uh-huh.

Page 32

Q. -- told me to keep it to use for my Ann Arbor field placement.
A. That's very possible.
Q. And that you told her no, that she could not keep it.
A. Correct, because we don't provide laptops for interns for field placement. If anything, we provide a desktop.
Q. During that meeting did you say to Robin that you hoped they could give her something across the street?
A. Yes.
Q. And what would you have been referring to?
A. Being she was working on her MSW, there had been discussions perhaps she could get a job on Clinton Campus.
Q. Across the street meaning?
A. Clinton Campus.
Q. And what's the Clinton Campus?
A. Residential facility.
Q. So on October 24th, you were aware that Robin had been seeking placement in a social worker position?
MS. PIPER: Objection. Foundation.
A. I'm not sure if I was aware that she had applied, or if that was because in talking about laying off, or layoffs, we had talked about hopefully it would help maybe she could get a job across the street, because that was the area of education she was in.
Q. (BY MR. LAFLAMME) Are you aware of a written budget plan

Page 33

or some other document that specifically identified Robin for layoff or position elimination that existed prior to Robin being informed of that?
A. No.
Q. Would you take a look at Deposition Exhibit 18, please.
A. Okay.
Q. Do you recognize this letter?
A. Yes.
Q. This is Robin's formal notification of her position elimination; correct?
A. Yes.
Q. In the next to the last paragraph, it says: "You are also eligible to apply for other positions within the agency. Attached please find a current list of the in-house postings."
Do you know where that list is?
A. I know what it is or where it is?
Q. Does it -- do you have a copy of that list that was enclosed with this --
A. Not from that date. They're produced twice a week and put on a bulletin board here and distributed to the sites.
Q. Robin's position is there was no list enclosed despite the reference that there was one.
Do you know with certainty that that list was included in this letter?

Page 34

MS. PIPER: Objection. Foundation.
A. No, I don't believe I mailed it. I believe it was prepared by HR and I signed it.
Q. (BY MR. LAFLAMME) So you wouldn't have actually stuffed the envelope that this letter went out in; correct?
A. Correct.
Q. Do you know if the specific list referenced in this letter still exists today?
A. HR may keep them. I, don't know, electronically or on paper. I don't know.
Q. And could you look at Exhibit 13, please.
Do you recognize this e-mail exchange?
A. Yes, I do.
Q. Your e-mail to Robin states: "I have been asked to find out why you were leaving with Marcus in a Holy Cross van a bit ago. Would you mind giving me a short explanation? Thanks." Who asked you to find that out?
A. John Lemmer.
Q. Do you remember what all he said in that conversation?
A. No, I just believe we were having a meeting in the back room, and he noticed that she got in the van and left in the agency vehicle with her son.
Q. So at the time her son was working for Holy Cross?
A. Yes.
Q. And where did he work?

Page 35

A. Across the street at Clinton Campus.
Q. So were you with John Lemmer when he made this observation?
A. Yes.
Q. Did you see the same thing he did?
A. Yes.
Q. Who else was in that meeting?
A. I don't remember.
Q. Would you take a look at Exhibit 16.
Do you recognize this?
A. Yes.
Q. Do you know who prepared it?
A. I would have done it.
Q. Do you remember when you did it?
A. Hum, no, I don't.
Q. Do you remember why you did it?
A. I believe it is one that I created listing tasks within the agency to try and justify positions, or I may have been asked to show what everyone did shortly after John hired in.
Q. Why are there 3 question marks after IS trainer?
A. Because I was trying to get them to change her position to an analyst position so she wasn't tied into only performing training duties, because like I said, I already knew that the position of trainer was something that

Page 36

people thought could go away. So I tried to keep the people in my department. We were working on trying to get her a different job title.
Q. Did that ever happen?
A. No.
Q. Now my understanding is that at the time of her termination she was classified as a senior trainer?
A. Correct.
Q. But that's not reflected on this. Does that mean anything to you?
A. No, just because there was only one trainer for many years, we had just gone to calling it the IS trainer position.
Q. And I also noticed that some of the other positions that were in the department at the time Robin -- Robin's position was eliminated aren't on this list.
A. The PE positions aren't on there. This is just IS staff.
Q. Do you have any personal knowledge as to whether or not Robin was ever placed on an on-call list following her position elimination?
A. No.
Q. Is that something you would have had any involvement in?
A. No, I wouldn't have known.
Q. Do you have any personal knowledge about why Robin was never placed in a social worker position?