# Exhibit 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBIN ALDRICH,

Plaintiff,

v File No. 1:10-cv-13515-MAG-MKM

BOYSVILLE OF MICHIGAN, INC. a Michigan corporation, d/b/a HOLY CROSS CHILDREN'S SERVICES,

Defendant.
_______________________________/

DEPOSITION

of

ALYSON BECK

8759 Clinton-Macon Road

Clinton, MI

June 22, 2011

3:00 P.M.

APPEARANCES:

Richard N. LaFlamme, P32641
Attorney for Plaintiff

Karen Piper, P31706
Attorney for Defendant

ALSO PRESENT:

Robin Aldrich

- - -

Roger D. Thome, CSR 2201

INDEX IS INSERTED AT THE END OF THE TRANSCRIPT



ALYSON BECK

Having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. LAFLAMME:

Q. Okay. I won't go through instructions because you have sat through several of these now, and you know the game rules.
A. I sure do.
Q. Would you state your full name for the record, please.
A. It is Alyson with a "Y", Mo Beck.
Q. And how old are you?
A. Thank goodness I could tell from Rick's. I'm 47 because I'm 2 years older.
Q. Date of birth?
A. 11/5/63.
Q. And where do you currently reside?
A. Tecumseh, Michigan.
Q. And how long have you lived there?
A. 14, 15 years.
Q. And do you have any plans on moving in the immediate future?
A. Not as long as I'm gainfully employed.
Q. What year did you graduate from high school?
A. High school, 1981.



Q. What school?
A. Governor Thomas Johnson High School.
Q. Where is that?
A. Frederick, Maryland.
Q. Are you married?
A. Yes.
Q. How long have you been married?
A. 26 years.
Q. And children?
A. 1.
Q. How old?
A. 21.
Q. And did you attend college?
A. Yes.
Q. Where?
A. 2 years at Frederick Community College, and I got an associates in business there. Then I went from there to Towson State University.
Q. Where is that?
A. Towson, Maryland.
Q. Did you get a degree there?
A. Bachelor's in business.
Q. What year?
A. January of 1985.
Q. And do you have any formal education after that?



A. Yes.
Q. What?
A. I took 4 or 5 classes toward a master's degree at Hood College.
Q. And where is that?
A. Frederick, Maryland.
Q. Anything else?
A. Not formal education. I mean, I have taken a lot of training and so forth but not formal education.
Q. Do you hold any certifications or licenses?
A. No.
Q. When did you come to Michigan?
A. The fall of 1996. December of 1996 we moved here.
Q. And what was the occasion that you moved to Michigan?
A. Change of employment for my husband.
Q. Where does he work?
A. Tecumseh Products.
Q. Still works for Tecumseh Products?
A. Yes.
Q. Where?
A. Ann Arbor.
Q. And when were you hired into Holy Cross?
A. March 1st, 1999.
Q. Where did you work before that?
A. A printing company in Tecumseh called Hamblin Company.

Page 5

Q. How long did you work there?
A. The fall of '96 until I started here in March of '99.
Q. And did you work in Maryland before moving to Michigan?
A. Yes.
Q. What was your last job?
A. I worked for a company called Vitro Corporation, V-i-t-r-o.
Q. What did you do there?
A. I worked in personnel; human resources.
Q. How long were you there?
A. Right after I graduated from college in February of '85, up until we moved like October of 1996.
Q. And what did you do at Hamblin?
A. Hamblin, primarily just customer service, admin, helping their sales department.
Q. And you have been continuously employed by Holy Cross since March of '99?
A. Correct.
Q. What position were you hired into?
A. Initially I was hired into a part time HR coordinator position.
Q. How long did you do that?
A. Probably until like 2002ish.
Q. Was Robin working in human resources then?
A. I think Robin transferred out right around the same time I

Page 6

hired in. She went to IS, over to the training position, right in March, I think. It was the exact same time frame.
Q. So you didn't actually work with her?
A. Not in HR. I mean, the building was small enough. We all knew each other, and so forth, but --
Q. And what was your next position after the HR coordinator?
A. HR supervisor.
Q. And was there an HR director when you were hired in as the coordinator?
A. Yes.
Q. Who was that?
A. Kim Hudgins.
Q. And when you became supervisor, was she still the director?
A. Yes.
Q. And how long were you supervisor?
A. Approximately 2 years.
Q. And what was your next position?
A. HR manager.
Q. And that occurred in '04?
A. Right, until early '07.
Q. Who was the prior HR manager?
A. They didn't have one. It was basically just an upgrade in the position at that time.

Page 7

Q. Okay.
A. Because of some changes we had going on in HR.
Q. And Kim Hudgins, she was still the director?
A. Yes.
Q. And then after HR manager, what was your next position?
A. HR director.
Q. And when did you get that promotion?
A. Like May of '07.
Q. And what became of Kim Hudgins?
A. She resigned.
Q. And you have been HR director ever since?
A. Correct.
Q. As HR director, who do you report to?
A. Now?
Q. Right now.
A. Right now, Paul Neitman.
Q. And his position is currently?
A. Director of programs.
Q. Who did you report to previously?
A. Loren Brown.
Q. How long has Paul Neitman been director of programs?
A. A long time. Most recently he probably -- probably just the last 6, 8 months, but from 2007 up until that point he was doing other things, and had been in that position from the time I came here until 2007.

Page 8

Q. So before your reporting assignment was changed to Paul Neitman you reported as HR director directly to the executive director?
A. Correct.
Q. Did you ever report to John Lemmer?
A. No.
Q. How would your position as HR director compare on a org chart to John Lemmer's position?
A. John is part of the executive team, and I'm not part of the executive team, so there is the executive director, CFO, director of programs. Right now they're on one level, and so I'm basically the same level as like the other directors of regions and the directors in the building here.
Q. How would your position compare on an org chart to the position held by Kathy Pixley?
A. Equivalent.
Q. Do you remember the first time any employment issues performance related concerning Robin Aldrich ever came to your attention?
A. I believe the first time that I ever became aware of any issues involving Robin was when I had received notification from the regional director in the north regarding some comments made by what she termed as a cracial (ph), or central services co-worker, about

spreading rumors about layoffs and so forth, and when I asked her about who it was, she shared with me that it had been Robin, and I addressed it.
Q. Who was this person?
A. Sharon Berkobien.
Q. What did she tell you?
A. Basically she was upset because she had not heard of anything but had called because there was rumors of layoffs, and it had set panic in her staff, and specifically like the Saginaw area, and so she called me, or contacted me to basically try to get verification or find out what was going on, and so I clarified -- obtained clarification from her who it was, and then approached Kathy about that situation.
Q. What did Sharon tell that you Robin had said?
A. That there were going to be layoffs.
Q. Is this the first time in your experience that anyone at a remote location had expressed concerns about layoffs?
A. I guess I'm not sure what you mean. There is a lot of ways that question could go so if you could clarify it.
Q. Well, looking at that specific situation, Sharon calls you, she's upset, Robin said something about layoffs?
A. Uh-huh.
Q. Had Sharon, or anyone else at a remote location, ever expressed concerns about impending layoffs?



A. Oh, I'm sure.
Q. This wasn't the first time that that concern had arisen; correct?
A. No, but I guess her concern at that point was that it was coming from central services, and that's being -- meaning this building here, this staff here, and usually that was considered the inside knowledge of what was going on, because this is where all the administrative staff is, and a lot of those decisions were made here for financial reasons, so the concern was because it came from here, and Sharon was not aware that there had been discussions.
Q. So did Sharon tell you she had spoken with Robin, or was she relaying information that someone else had relayed to her?
A. She was relaying information from staff, what staff had told her.
Q. Okay. So she really didn't know what, if anything, Robin had said; correct?
A. I can't speak for what she said. Somebody told her what Robin said. I don't recall what that was.
Q. What I'm getting at, she wouldn't have had firsthand knowledge of that. Whatever she reported was what somebody else reported to her?
A. Correct.
Q. She wasn't reporting what Robin had said to her; correct?



A. Correct.
Q. So as a result of your conversation with Sharon -- strike that.
Did Sharon report anything else that was attributable to Robin other than impending layoffs?
A. No, not to me anyway.
Q. What did you do upon receipt of this information from Sharon?
A. I don't really recall. I assume that I talked to Kathy who would have been her director at that time, to find out how that information had even gotten out by Robin, because Robin wouldn't have been somebody who was involved in those decisions, so I wasn't sure.
Q. Do you remember what Kathy told you?
A. No.
Q. Do you remember meeting with Robin about this subject on October 8 of 2008?
A. I don't recall the specific date, but I do recall meeting with Robin.
Q. Robin documents a meeting on that date among you, John Lemmer, Kathy Pixley and herself occurring in the staff kitchen. Does that ring a bell?
A. No.
Q. Do you remember the meeting when Robin was confronted about whatever it is she had said up at the Saginaw



campus?
A. I don't remember specifically where we met or when we met, but I do remember that we had a discussion about -- to verify with her whether that had been communicated to other staff.
Q. Do you remember what Robin said?
A. No.
Q. Do you remember who chaired the meeting? Was there somebody who took charge of the meeting?
A. I don't recall. I would assume it would have been Kathy or John as her direct reports, and the only reason I was in that meeting was because I had received the call or gotten the information.
Q. Do you remember that Robin acknowledged during that meeting that she had mentioned her possible layoff to a few co-workers.
MS. PIPER: I'm sorry, could I have that again?
(Reporter read back)
A. I do recall she acknowledged she had -- she did talk to co-workers at Saginaw. I can't remember exactly how she said it.
Q. (BY MR. LAFLAMME) Do you remember Robin saying during that meeting that when she was informed about her possible layoff she was not told that she was not to discuss it with others?

Page 13

A. I don't recall that.
Q. If she had not been directed not to talk about this with others, would it be fair to criticize her for talking about it to others?
MS. PIPER: Objection. Calls for speculation. Go ahead.
A. As an employee or co-worker in this building we have a lot of information about sensitive subjects, and the expectation is that things are kept confidential for everybody that works in this building. We deal with finances, HR, you know, different issues, and those issues should not be shared with other staff regardless of whether we agree or disagree, and so that is more -- you know, my concern from the HR perspective is that there was information that was shared regarding -- so, yes, I would say that, you know, if somebody shared information that should not have been shared with others, that they would have been consulted about it. I don't know if criticized is the right word but consulted about it.
Q. (BY MR. LAFLAMME) So your expectation would be, whether Robin was told not to say anything about it or not, that it would be inappropriate for her to tell anyone else in the organization that she had been told that her job was in jeopardy?
A. Can you repeat the question again? I'm sorry.

Page 14

(Reporter read back)
A. I don't believe it would be inappropriate for her to tell people that her job may be in jeopardy, but I think there was more to that communication at that time, and that was my concern.
Q. (BY MR. LAFLAMME) Your concern was that she had said that there were layoffs coming that would affect others?
A. Uh-huh, yes.
Q. Do you know whether or not that is what she said?
A. I don't recall.
Q. Do you remember that during this meeting, when she was first confronted about it, that Robin said the only thing she said about a layoff was about her own; that she didn't say anything about anyone else?
A. I don't recall.
Q. Do you remember John Lemmer asking her at that meeting whether she had said anything negative about him?
A. I don't remember that.
Q. Do you remember hearing from Sharon, or anyone else for that matter, whether Robin had said anything negative about John Lemmer?
A. I believe she shared a conversation about -- or shared information about a conversation she had with John Lemmer. I don't know that it was negative.
Q. What do you remember that she shared or she said she

Page 15

shared?
A. It was, I believe, relating to when John questioned her about leaving at the back door with her son, and Robin shared that conversation when he spoke to her, that day or the next day, with other staff.
Q. Do you remember mentioning to Robin -- I'm sorry. Do you remember Kathy Pixley mentioning to Robin during that meeting on October 8th, that she was aware that Robin had been working with Rick Kruse to get a variance for the social worker position?
A. No, I don't recall that.
Q. Do you remember there being any discussion during the meeting when she was criticized about talking about her layoff, that there was any discussion about her seeking a variance for the social worker position?
A. No.
Q. Do you remember when you first became aware that Rick Kruse was trying to get a variance for Robin?
A. I believe Rick -- you know, I really don't remember. I believe he consulted me for my opinion on whether -- because once somebody obtains, or applies for a job, interviews, and it looks like they potentially could be selected for a position, get the variance from licensing, we have an internal process that they are required to get an exemption from our job description requirements, from

Page 16

our minimal requirements. So I believe Rick contacted me at that time to find out if he got the approval from licensing, you know, what would be the next step in the process, but it never went beyond that.
Q. So your recollection is he contacted you before seeking a variance from the state?
A. Or as he was doing it, sending the letter in.
Q. What do you remember of that conversation?
A. Just that he was -- he had conversation with Robin and was trying to seek approval, and wanted to find out my opinion on granting an internal exception (sic).
Q. Did you give him your opinion?
A. I don't think it ever got that far.
Q. Well, it got far enough for him to seek an exemption from the state.
A. Right.
Q. You're telling me you never gave him an answer to whether or not an exemption would be granted from the internal requirements?
A. No, because I would look to see who else applied, and I would not grant an exception if there were qualified candidates internally that would have applied, and so he never sent anything over to request an internal exception. He was trying to get the external first to see how that went before he requested an internal exception.

Page 17

Q. But in the initial conversation you had with him, as he was seeking the state exception, did you indicate to him that that is something that likely you would give?
A. I don't recall saying I would likely give it to him. I mean, basically, like I said, we will look at the other applicants, not just internal but external as well, to see who met the minimal qualifications.
Q. You would agree that you certainly didn't tell him no, you wouldn't consider that?
A. Correct, right.
Q. What are the internal requirements?
A. For the family worker, and the reason I remember this is because Paul Neitman, who was the director of programs prior to 2007, had changed the family worker and foster care worker position requirements, because they were truly therapists. He required -- we changed the minimal requirements to a master's in social work, psychology, or professional counseling, with certification licensure.
Q. Social work, psychology, or professional counseling?
A. Yes.
Q. And then you said with certification?
A. With the appropriate -- like the first MSW, they would have like a license, LMSW; professional counselor would have an LPC licensure, and the psych. would have LP.
Q. And the licensing comes from the State of Michigan?

Page 18

A. Yes. Typically there is an amount of professional experience required post degree.
Q. So even if Robin got an exemption from the state requirements, that wouldn't automatically mean that she meets your requirements?
A. Correct.
Q. Robin couldn't have been a licensed social worker prior to getting her degree and taking the licensing exam; correct?
A. Correct. That process usually takes about 2 years to get that.
Q. Are these internal requirements in writing?
A. For the family worker position?
Q. Yes.
A. Yes, it's on the job description.
Q. Have those requirements changed since October of 2008?
A. Because -- yes, because of the difficulty in recruiting staff, especially in the master's level co-workers, we do allow bachelor degrees with paid-related experience, and it would typically be a bachelor's degree in the same disciplines with 2 years paid experience in the social work environment.
Q. How long has it been the case that you have had difficulty recruiting?
A. Oh, probably the past year or so because of the state hiring a number of staff.

Page 19

Q. I don't follow you.
A. The state has done a lot of hiring in the past year, the State of Michigan, and so we have been in competition with them, and we do not have the same pay and benefits with the State of Michigan, so it been hard. And they actually recruited people away from us as well.
Q. Where do these folks go who have been recruited by the state? Is there a facility nearby?
A. They go to work for DHS, department of human services, or child protective services. There is a lot of different the places that they can obtain positions.
Q. So do you have open social worker positions today?
A. Yes.
Q. Is there any reason that Robin would not be considered for one of those open positions?
A. If she would re-apply. She's not re-applied. She would be eligible for consideration against the opening.
Q. Has the pay or benefits for those positions decreased since October of 2008?
A. Yes.
Q. So you have done a pay cut?
A. 5 percent.
Q. Has there been any benefit reduction since October of '08?
A. Yep.
Q. What has changed in that regard?

Page 20

A. We have totally moved away from Michigan Catholic Conference. We no longer offer a pension. Our health, dental, vision, short-term disability, long-term disability, and life have all changed.
Q. A lot of benefits available has been reduced?
A. Yes.
Q. The amount of -- has the deductible been increased?
A. Yes, significantly.
Q. Has a portion of the premium been shifted to employees?
A. Not -- co-workers pay all the dental now. The agency used to pay for the co-workers' portion. And the health went from like a 250 to 5 hundred deductible up to it's like 25 hundred, 5 thousand dollar deductible, and co-workers do not have to pay for the health. Because of the significant increase in deductibles we were able to maintain that.
Q. And has this same reduction of pay and diminished fringe benefits impacted all employees of Boysville?
A. Yes, we offer the same benefits to everyone.
Q. How about the pay cut, the 5 percent pay reduction?
A. Yes, that was across the board.
Q. Could you take a look at Exhibit 26, please.
MS. PIPER: I don't have 26. Is that one from John?
MR. LAFLAMME: I'm sorry. You didn't bring

Page 21

those with you.
It's at page 24 of plaintiff's documents.
MS. PIPER: Okay.
Q. (BY MR. LAFLAMME) Robin was given an oral reminder, disciplinary action form, concerning the incident of her telling about her layoff; correct?
A. Yes.
Q. And that's what we have marked as Exhibit 26, and it's your page number 24 of plaintiff's documents. Do you have that in front of you?
A. Yes.
Q. Did you prepare this?
A. I do not typically prepare disciplines. They typically are prepared by the supervisor. So I don't recall if I did, but the normal course of action would have been the supervisor prepares it.
Q. Robin recalls at the meeting in which she was presented with this document that she was told that if -- that it would not go into her personnel file unless a similar occurrence happened within the following year. Do you remember her being told that?
A. That is our standard practice. I don't remember that being communicated to her but -- usually the supervisor would keep that in their files.
Q. In paragraph 1 there is a sentence next to the last

Page 22

sentence, it says, 4th line down, near the end of that line: "During these conversations, she also shared details of a recent incident between herself and another central services co-worker." Do you know what that is referring to?
A. I would assume that is relating to the incident or the conversation between her and John Lemmer regarding when she left the building and he questioned where she was going when he was in the back conference room.
Q. During the meeting in which Robin was given the exhibit you have in front of you, Exhibit 26, she recalls being told that from that time forward either Kathy Pixley or Eileen Parker would need to accompany her on any training trips. Do you remember that?
A. I have heard mention of that today, but before that I was not aware of that.
Q. Do you remember there being any concern raised about Robin's on-the-job injury that occurred on October 6 of '08?
A. Do I recall if there was any concern about it?
Q. Right. I mean, other than just a concern for Robin's well-being, but a concern about Robin making a comp claim.
A. No. I mean, I know I specifically worked with Robin on that one to make sure she had the information of where to go and what to do about it, but I don't remember -- I

Page 23

mean, typically that information doesn't go out of HR unless a co-worker has restrictions to come back to work or something, we may talk to the supervisor at that point, but I don't recall anybody addressing any concerns.
Q. So you weren't a part of any directive given to Kathy Pixley or Eileen Parker to make sure that somebody is with Robin whenever she is away from the office on one of these training trips?
MS. PIPER: Objection. Foundation.
A. No.
Q. (BY MR. LAFLAMME) Do you recall Robin getting sent home for 3 days following the meeting when she was confronted about whatever it is she told the people at Saginaw?
A. Yes.
Q. What was the reason for that?
A. Typically when we have a situation where there may be concerns, and there is a variety of factors, we would ask a co-worker to go home and not work, and they would be paid while off. We call it just a paid leave, or a paid suspension, whatever the case may be, and in that case I think we just wanted additional time to kind of look into it to see if the concerns communicated by the regional director, Sharon Berkobien, were valid and whether there was more to it than what we initially received. So that was -- that was the intent. I mean, nothing more than

Page 24

that.
Q. So between when she was first confronted, and then sent home for 3 days, and when she returned and received the oral reminder, was there some kind of investigation that occurred?
A. I believe we just tried to get more information from Sharon Berkobien at that time to find out the extent of what was going on, and that's all I recall of it.
Q. Who did that?
A. Most likely it would have been me or Kathy contacting her and getting additional information.
Q. Do you have any memory today of doing that?
A. No. I mean, I don't recall specifically talking to her, or documenting it in any way, or anything like that. It was a --
Q. If you had spoken to her during these 3 days that Robin was off, would you have documented it?
A. I would have to look back. If I did, I typically keep a file on those things. So if I had kept anything -- and I think when the decision was made, it was -- I don't even know what day of the week, but it was like a Wednesday or Thursday, and basically we just said why don't you come back Monday. I'm not sure what the communication -- I can't remember if I was there when she left or what the situation was. We kept it confidential, and just

basically said she was, I think, working from home. I don't think anybody else in the building even knew what was going on.
Q. Okay. But my question is very specific. If you had done a follow-up investigation after sending her home, and had spoken to Sharon Berkobien, would you have documented that?
A. I would have if I had done that myself, yes.
Q. And if you had documented it, can you think of any reason why you wouldn't still have that documentation today?
A. No, I would still have it.
Q. So if you indeed were the one to follow up and do an investigation, it would be documented?
A. Yes.
Q. So if there is no documentation, would that lead you to believe you didn't do it?
A. Correct.
Q. Do you know, as you sit here today, whether or not there is any such documentation?
A. I don't remember.
Q. Do you have any memory as you sit here today as to whether or not there was ever any more information gathered from Sharon between the time that Robin was sent home and when she returned to work the following Monday?
A. I don't recall.



Q. Do you recall how it was that Robin was informed she was in fact being laid off?
A. It was by a telephone call.
Q. What do you remember about that telephone call?
A. I believe Robin, for whatever reason, wasn't at work that day, and Kathy and Eileen had planned to meet with her and talk to her about the layoff, and since she wasn't here they made the decision to call, and had asked me to sit in on the call in the event Robin had any questions pertaining to benefits or anything that would relate to something I might answer, so I did sit in on the call.
And we basically informed Robin that her position was one that had been eliminated in central services.
Q. Did you have any conversation with -- strike that.
Was there any discussion during that conversation about Robin's eligibility for placement in another position at Holy Cross?
A. I don't recall any specific conversation about that.
Q. Was she eligible to move to another position?
A. There was no reason she would not have been eligible to apply for one of the in-house postings, and to go through that process, and to be hired for a position within the agency.
Q. Can you look at Exhibit 18, please.



A. Okay.
Q. This is a formal notice to Robin of her position elimination; correct?
A. Yes.
Q. And this follows the phone call in which she was informed by telephone?
A. Chances are this letter had been prepared that day or the day before to give to her, and since she wasn't there, like I said, Kathy and Eileen made the decision to call.
Q. Okay. And the next-to-the-last paragraph tells her in fact that she's eligible to apply for other positions within the agency; correct?
A. Correct.
Q. And then it says: "Attached please find a current list of the in-house postings." Do you have a copy of the list that was included with this letter?
A. We should have it. We keep those.
Q. Now, you were here when Kathy Pixley testified that even though she signed it, she believes that this probably was prepared and handled by HR. Do you have any comment on that?
A. I would agree with that. We prepare all the layoff letters.
Q. So someone in human resources would have also been responsible for putting this letter, and whatever



enclosures were included, in the mail to Robin?
A. I'm not sure if it was mailed or handed to Robin. I mean, I can't -- the layoff -- we typically give the layoff the unemployment attachments, which gives information about how to apply for unemployment, as well as the job posting. But whether that was mailed or handed to her, I don't know.
Q. Robin's position is that despite this reference in the letter, that there was not a current list included when this letter was given to her. Do you have any reason to believe that is not true?
A. It could have been an inadvertent mistake, but typically they're given with all of the letters. We leave that to the managers. I give them the letters, and that type of information to hand out with it. I don't personally hand it out. Each of our facilities have the postings posted in it. At that time it was probably weekly. We have gone back to twice-a-week postings, so they're available for co-workers. They're updated every Tuesday and Friday now. They're posted in each facility, in usually the main mail room, or lobby, or lounge, or wherever co-workers tend to congregate.
Q. During the telephone conversation when Robin was informed of her layoff, do you remember Eileen Parker telling her that the layoff was not in any way retaliatory or any type

Page 33

Q. Sorry.
A. There were 3 division managers at the Clinton Campus at that time, and she had only been in the position about 5 months when -- because of low enrollment, and the decreased number of groups, the decision was made by either George Birkam or Bill Geddes, because George was retiring and Bill was coming in, to eliminate the 3rd division manager position.
Q. Robin relates a conversation with Bill Geddes around November 19 or 20, I can't remember, maybe it was the 18th, in which she had a discussion with Mr. Geddes about being placed in a position at Holy Cross, and was told by Mr. Geddes "I can't use you." Obviously you weren't present for the conversation. Have you had any conversation with Mr. Geddes asking him about that exchange?
A. Not that I recall.
Q. Do you know of any reason why Mr. Geddes would have told her that he couldn't use her?
MS. PIPER: Objection. Foundation.
A. No, I would only assume at that time it was because of changes and cuts on the Clinton Campus as well.
Q. (BY MR. LAFLAMME) So what you're saying is the only thing that you could think of that would cause him to say I can't use you is because he didn't have anything for her?

Page 34

A. Correct.
Q. As far as you were concerned, there wasn't any reason that Robin couldn't have been placed in a position for which she was qualified if it was open at that time period?
A. There was no reason that Robin would not have been considered or could not be considered for a position.
Q. Do you have any information that Robin was offered the opportunity to work for Holy Cross either, in an on-call capacity or any other capacity, between November of 2008 and March of 2009?
A. I would have no knowledge of that. I'm not involved in the scheduling. Each of the managers of the programs do that on their own, so it's not coordinated through HR, other than we would have received paperwork moving her, you know, to a TOC or temporary-on-call position.
Q. In fact -- let me find it.
Look at Deposition Exhibit 19, if you would.
A. Okay.
Q. Could you identify this, please?
A. It's a report of TOC staff in the south region.
Q. Who would have generated this report?
A. I don't know. I mean, it could have been a report that was generated out of our HR payroll system. I'm not sure. There is a number of people in IS, accounting, and HR that would have access to running a report like this.

Page 35

Q. This is a report that human resources had access to and made changes on from time to time?
A. Yes, as well as accounting or IS.
Q. So this list would indicate that Robin, at least as far as human resources was concerned, was, as of February 5, 2009, a temporary-on-call treatment specialist 2.
A. Correct, according to this report I would agree with that.
Q. There has been some discussion, in fact some testimony from Mr. Kruse earlier today, about there being a different list called an on-call list. Have you seen the on-call list that Mr. Kruse described, that has telephone numbers on it?
A. No, I would -- I mean, I wouldn't have need to see that list. I know the administrative assistant over at the campus puts together a list by program of all the staff and then has a list -- which includes TOCs on that as well. That's updated. I don't know how often she updates it, but it's updated periodically.
Q. Do you have one of the versions of that on-call list that Mr. Kruse described that existed between November of '08, and March of '09, that in fact has Robin's name on it?
A. You're referring to the list that Rick testified to earlier?
Q. Right.
A. That would have been their own document across the street.

Page 36

That would not have been used by HR, so I have not seen that.
Q. Have you made an inquiry as to whether or not there is still existent today an on-call list for the time -- that covers any parts of that time period?
A. No, I have not.
MS. PIPER: Could I have a moment with my client, please?
MR. LAFLAMME: Certainly. It's a good time for a break anyway.
(Off the record at 4:12)
(Back on the record at 4:19)
Q. (BY MR. LAFLAMME) Looking at --
A. Before we get started, could I make a clarification on the comment that we were discussing about the on-call list?
Q. Yes.
A. I just want to clarify. The list you had asked about, a list with phone numbers, I do not know of, and I'm not aware of any list with numbers. The list that I am aware of that they have across the street that they posted over time, is one that lists by program the staff from the program coordinator, the family worker, TS that work on those particular groups, and off to the side -- then it was the education staff as well -- and then off to the side or the bottom it has a list of the TOC staff, and

Page 37

that's updated occasionally, so I just wanted to clarify that for the record.
Q. And that list doesn't have phone numbers on it?
A. It does not have phone numbers on it, no.
Q. Does any list of the nature you just described show Robin's name on it between November of '08, and March of '09?
A. I have seen a list that does have her name on it between that time.
Q. Do you have that?
A. I don't have it with me, but I can get it.
Q. Here we go. Just referring you to Exhibit 28. That's the one we marked today. Rick Kruse says in Exhibit 28 that he got a letter from licensing dated November 19, 2008. He also testified that his normal practice, when he would get such a letter, would be to send it or a copy on to personnel -- to human resources rather. Do you have the letter that he's referring to?
A. No.
Q. Do you remember ever seeing it?
A. No.
Q. Do you know what positions Venus Lombrana has held over the course of her employment at Holy Cross?
A. I don't know the exact order of them. She was a treatment specialist, a family worker, a program coordinator, a

Page 38

division manager at Clinton, and then again a quality manager in Detroit, and the family worker she went -- was at 2 different -- I believe at 2 different times.
Q. Does she still work for the agency?
A. No.
Q. Do you know when she left?
A. January of this year, early 2011.
Q. What position did she hold at the time she left?
A. Quality manager for the Detroit programs.
Q. Do you know why she left?
A. For a job with the state.
Q. Did her position as quality manager in Detroit get filled?
A. They actually had 2 quality managers, and they basically just retained one and did not fill Venus's position.
Q. Do you know how long she served as a family worker when she most recently held the position?
A. I'm trying to think when she -- because there was a reorganization, the quality manager position, which was the same level as her division manager position became available. It was probably the fall of 2009, I would guess.
Q. So she would have served less than a year as a family worker?
A. Yes, just right around a year.
Q. Do you have Rick Kruse's school social work certificate?

Page 39

Is that something you keep in human resources, a copy of it?
A. Yes, and we run updates on those. We can run them off the state system, so as they expire we can go through and obtain updates on them.
Q. Does Holy Cross ever place people in open positions without going through the interview process?
A. You know, back in 2007, '8, '9, we had so many layoffs, and we tried to encourage managers to have people, when they were laid off, go through the application process, but I would say we laid off probably 2 hundred people in that time frame, and I can't say that every position that was posted, you know, was essentially applied for and filled that way, but we tried to really watch that, and make sure people do apply for positions, and go through the posting system, and that they're filling a valid budgeted position for that reason primarily.
Q. I'm not sure I heard an answer to my question. The question was, does the agency ever place people in positions without going through the interview process?
A. Without going through the interview process?
Q. Right. You got an open position, people apply for it, you interview applicants, you make a choice among the applicants. That's the normal process, isn't it?
A. Yes.

Page 40

Q. Do you ever not follow that?
A. There are managers who do not follow that, or there have been, I should say.
Q. Why don't you give us a short break here.
(Off the record at 4:27)
(Back on the record at 4:31)
Q. (BY MR. LAFLAMME) Would you pull out pages 81 and 82 of our documents.
A. Okay.
Q. I'll have you look at pages 81 and 82 of the documents that plaintiff has produced in this lawsuit.
A. Okay.
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. It's a list of co-workers that were laid off in the fall of 2008.
Q. Okay. Other than Robin, can you tell me which of these people did not get placed in another position after they were laid off? And I mean another position at Holy Cross.
A. I could go through and pick, you know, pick out a few, but I'm not going to get them all right. I don't believe Elaine Ryles got a job; Darrell Rich I'm not sure about; Benny Harris, I don't recall if we were doing some splitting of secretarial positions. I don't remember if

Page 41

that is when she was split into another position or if that is when her split position was eliminated.
Q. Let me -- what I want you to tell me is those who you know with certainty were not placed in another position at Holy Cross.
MS. PIPER: Objection. Foundation.
A. John Torosian, Kevin Trickey, Leona Webb, Keith Frank, Sue Simon, Joe Rocha, Keith Cerchau, Steve Meyer, Kim Tiede, Tonja Rajala, and Cathy Schmidt, and Linda Pizana. Linda was on there twice because it was 2 different positions. The first one she was split between HR and payroll, and the second time she was laid off.
Q. (BY MR. LAFLAMME) So going back, then, you identified John Torosian.
A. Uh-huh.
Q. Do you know why John Torosian wasn't placed in another position. Did he not seek one?
A. I do not know. I do not recall.
Q. How about Kevin Trickey, do you know why he wasn't placed in another position?
A. No.
Q. How about Leona Webb?
A. No, I don't recall.
Q. Keith Frank is easy. It says he retired.
A. Yes.

Page 42

Q. Sue Simon?
A. I don't recall.
Q. Were there still cooks after she was laid off, just fewer of them?
A. We still have cooks throughout the agency. I don't remember where Sue Simon worked but --
Q. Joe Rocha, do you know -- can you remember why he may not have been placed in another position?
A. I don't -- I would assume we were cutting maintenance positions as well, downsizing maintenance positions, and there was no other maintenance positions, but I don't know for sure. I don't recall.
Q. The same would you true of Keith Ferchau?
A. Correct.
Q. And Steve Meyer, do you know why he wasn't placed in another position?
A. We didn't have any other IS positions at that time.
Q. The ones on this page 82, in the second box on the page says they were notified of layoff in early 2009. Do you know when these layoffs were effective?
A. I don't recall the specific dates.
Q. When it says notified of layoff, would they have been notified of the layoff in advance of it actually occurring? Was that typical?
A. Yes, we typically tried to give at least 2 weeks notice.

Page 43

Q. I mean, other than 2 weeks, I mean these aren't people that would have been told you're going to be laid off in 6 months?
A. I can't speak for -- I mean, they didn't all work for me. Only one of them worked for me.
MR. LAFLAMME: I have no further questions.
MS. PIPER: No questions.

Page 44

I N D E X


| WITNESS | PAGE |
|---|---|
| ALYSON BECK | 2 |
| EXAMINATION BY MR. LAFLAMME | 2 |