# Exhibit 17

John Lemmer is the Chief Financial Officer (CFO) of Holy Cross Children's Services. He has been employed with the agency as of early 2008. He oversees the accounting and IS departments. The IS and Accounting Directors report directly to him.

I am an exemplary employee who has worked for the agency since January 13, 1997. I am female, overweight, and handicapped. I had foot surgery on May 23, 2008 and was on a medical leave for 10 weeks. I returned to work before my physician was ready to release me, continue to walk with a very uneven gait, work while in a great deal of pain, and have a handicap parking placard per my physician's order.

John Lemmer – February 2008
John scheduled 15 minute meetings with all Accounting/IS co-workers to introduce himself and uncover what it is that we do for the agency. My appointment was delayed due to a virus I contracted while attending the agency's annual meeting at a hotel in East Lansing. My virus turned into pneumonia and I missed a week of work. John explained that his background is in accounting. He has a Bachelor's Degree in Accounting. He states that he knows a great deal about IS and supervised those functions in a previous position. He asked me what I do for the agency and I explained my position. He continues to interject the word "crucial" as to my duties for the agency.

John Lemmer/Kathy Pixley – March 2008
Interview for the IT Manager position. Kathy Pixley told me a few days ago that she was not willing to consider anyone already working in the department. I reminded her that I meet both the educational and work experience requirements for the position. Since my in-house application was submitted within seven days, I am guaranteed an interview. Considering I am the only co-worker in the IS Department that has an information technology/computer science degree, I believe I deserve an interview. Kathy decides to interview both Steve Meyer and myself, but John Lemmer has to sit in on them. It was a standard interview, although John made a comment about my GPA for both my undergraduate degree as well as in my current MSW program at Eastern Michigan University. His comment is that I am "obviously highly intelligent and that is a very impressive grade point average." In the end they hire a "twenty-something" husband of a fellow co-worker. Mike has no management experience, no Microsoft server experience (four years was a prerequisite to obtain an interview), no familiarity with client information systems.

John Lemmer – CIS Meeting – April 1, 2008
John states in front of Lynne Alexander, Donielle Logan, Lisa Wollett, Eileen Parker, and Kathy Pixley that I am "not to extend an invitation to co-workers to call you because you will be inundated with calls." My reply to John was that I have done this job for a long time and know our co-workers well. These are social workers and they will not call about the issue or situation. Kathy Pixley glared at me as if to say I should have kept my mouth shut. John's body language and facial features express outrage at my empowering myself and defending my position. As of 09/25/2008 not a single co-worker has called me regarding the issues we spoke of that day.

John Lemmer – email April 2008
Beginning May 1, 2008 and extending through May 21, 2008, co-workers are to provide him with a list of daily activities. At Kathy Pixley's (IS Director) suggestion I created a spreadsheet

and emailed it to all Cracchiolo co-workers. John Lemmer emailed asking why I emailed the spreadsheet to all Cracchiolo co-workers. My response was that I was instructed to do so by the IS Director. His comment was that it was only intended for accounting and IS staff. I discovered later that Mike Grulke was not listed as a recipient and that Jack Perion, Kim Tiede, and Kathy Pixley were not required to comply.

As of 09/25/2008 there has been no feedback whatsoever on the time and task analysis data.

John Lemmer – 09/23/2008 – CIS Meeting at Domino Farms
Valerie Duffin, Regional Director, is espousing the CARF mandates for client case notes. They must include specific information; they must be signed by the worker entering the note; they must be locked from future edits. I raised my hand and asked of Valerie, "If those are CARF mandates, what are we supposed to do about JAIS case notes?" Since JAIS is owned by Wayne County we are not in any position to dictate what goes into a JAIS case note nor is the capability of locking them available. It is obvious that I am the first person to think of this issue. John Lemmer did not; neither did Kathy Pixley, IS Director or Eileen Parker, IS Manager, or Valerie Duffin, CARF Team member. Again, as on 04/01/2008, John's facial expression and body language clearly reflect his anger toward my speaking up.

John Lemmer – 09/25/2008 at 8:15am
This meeting was held in his open office for all present to overhear. "Do you normally arrive to work late?" My answer was that I am always here before 8:00am and work the mandated hours of 8:00am-4:00pm. John inquires as to why I am arriving in his office at 8:15am when his note specifically stated to see him "first thing in ***the*** morning." His note was dated 09/25/2008 and I assumed he meant he wanted to meet me first thing the morning of 09/26/2008. I felt it was probably best to check with John so I went to his office. My answer to John's question was that I always obtain water and coffee prior to going to my desk so his note was not seen until arrival at my desk. I explained that the kitchen was quite crowded this morning and coffee had to be made as I don't like leaving a half cup because I am considerate of my co-workers and HCCS property (leaving a small amount of coffee in the pot burns it). I also logged into my computer prior to seeing his handwritten note so 8:15am is "first thing in the morning." This seems a fairly petty item to bring up but I say nothing to John. Also, I have to walk past John's office on the way to my office so he could have verbally invited me for this visit as early as 7:52am. In fact, I walked by his office two additional times that morning when I retrieved ice for the staff kitchen from the main kitchen up front.

My question is whether or not he is tracking any other Cracchiolo co-worker arrivals or departures throughout the day. Is he aware of Kim Tiede's arrivals and departures? She routinely arrives late, leaves early, and fails to use APL for time off. She also sleeps at her desk. Is he aware of the late arrivals and early departures of Mike Grulke, Eileen Parker, Kelli Clifford, or Dawn Amsdill. All of these staff walk past his office as well. If not, why is he tracking me?

John states, "I received a very disturbing email yesterday." I questioned what he was referring to. He replied that my email answer to Kathy was "extremely disturbing." I asked, "Why do you feel it was disturbing?" He went on to explain how disrespectful he found my response to Kathy. John had the email up on his monitor and it reflects that Kathy had forwarded to John my response to her. When I begin to explain that I disagree that my response is disrespectful,

he screams, "I don't care what you think! Your opinion doesn't matter!" He repeated these words several times. I then go on to explain that from the email it does not sound like Kathy was asking the question, rather Kathy was asking for someone else. He then shouted, "It does not matter who was asking, you disrespected your superior!"

The email from Kathy states, "I have been asked to find out why you were leaving with Marcus in a Holy Cross van a bit ago. Would you mind giving me a short explanation? Thanks." My response to Kathy was "I will be happy to answer the question directly to John." Rather than going through Kathy, it would save both time and agency resources. Also, Kathy has a reputation for lying and has misrepresented me to others in the past, so I prefer to speak for myself. John's comment to this was, "I don't have time to babysit you Robin." My reply was that he certainly did not, yet was. He quite heatedly stated that in the future I am to answer my "superior's questions without question." John made comment about following the chain of command and I pointed out that this failed because my immediate supervisor is Eileen Parker, IS Manager. The email question came to me directly from the IS Director so at that point the chain of command was broken. John again reiterated that he doesn't care what I think.

Since my riding in the HCCS van with Markus did not violate any agency policies, John demanded to know what I was doing leaving the building at 1:30pm. I responded, "Taking a lunch break." He demanded, "Where did you go?" My reply was that I went on my lunch break. I informed him that I am to receive a 30-minute lunch break each work day and rarely take one. I most often eat at my desk while working. He insisted on knowing where I went so I informed him that I went to my car to retrieve some HCCS mail that Markus (my son and co-worker) was going to courier to the campus Admin building for us. John clarified that Markus and I drove around the building to my car. I assured him that was correct. I also informed him that I was aware that he and Jack Perion were sitting in the glass conference room and could see me through the exterior windows. I could have easily left from the front doors and John would have never known about it, however, I am an honest and direct person and have nothing to hide. That said, I should not be questioned regarding my arrivals and departures unless other Cracchiolo co-workers are treated the same. Why am I under surveillance and why are my movements being questioned?

John then demanded to know why Markus would drive "all the way over here" to pick up mail. I asked him twice what he meant by "all the way over here." The campus is directly across the street so we are talking about a few yards. John never explained what he meant by "all the way over here."

John then asked, "Do you normally take lunch so late in the day?" My reply was that it was the first opportunity I had to take a break and in fact, I do not normally take the time for a lunch break. I completed a special project and handled many support calls and 1:30pm was the first opportunity for any type of break this particular day. His comment was that he would remedy that with a set time for my lunch breaks in the future.

Will all Cracchiolo employees will have a mandated lunch break or does this apply to me only.

John then stated in a very threatening manner that he "never expects to have to have another conversation like this with me or there will be consequences." My reply was, "Yes sir."

I must state that John's tone throughout this meeting was extremely threatening, stern, condescending, demeaning, and in a loud voice. It sounded as if he were berating a naughty pet who had just soiled the floor. I was incredibly embarrassed as it was obvious that everyone in the executive office or surrounding areas could overhear the entire conversation. I was not treated with any level of human dignity. This is the third instance of John's discrimination toward me.

I have been an exemplary employee of this agency for nearly 12 years. I am thoroughly insulted to have my integrity questioned in this manner. It is belittling to have my arrivals and departures tracked. I have been singled out by John for a reason that is unknown to me.

John then asked me to supply "your CIS meeting minutes" but rather than emailing them to him, he insisted on following me to my office and having me print them out for him. He was viewed speaking with IS Director, Kathy Pixley prior to my providing him with the meeting minutes.

I gave John the program contracts that have been sitting on my desk since early 2008, inquiring whether there was additional work he needed on them. I mentioned that Eileen Parker (my immediate supervisor) stated something about creating a spreadsheet when we first began this project. He indicated he did not want any further work on them at this time and asked if the foster care program was included in them. It is too long ago for me to recall precisely. I also asked him if he could sign Sharon Berkobien's JAIS Security Agreement in Loren's absence. He did so.

**Since the meeting with John Lemmer on 09/25/2008 I have experienced extreme headaches, dizziness, chest pain, severe stomach ailments, diarrhea, constipation, vomiting, and significant hair loss. I have an appointment with my family physician on 10/08/2008.**

The conversation between John Lemmer and me was relayed to my immediate supervisor, Eileen Parker. Her statement is that she disagrees with John's attitude and behavior towards me, both today and in the past. She recommends that I have as little immediate contact as possible with John Lemmer and Loren Brown (Executive Director). All issues will go through her in the future.

Immediately after the meeting with John, I was called in for my yearly performance review by my immediate supervisor, Eileen Parker. I do not believe it is coincidence that this review takes place immediately after the meeting with John as it is several weeks late.

There are three 1's on my review this year. My scores in previous years have always been 3's and 2's. I cannot recall ever receiving a 1 in my nearly 12 years of service to Holy Cross Children's Services. Eileen Parker, IS Manager and my immediate supervisor, explains that she discussed these items with Kathy Pixley, IS Director, and she was instructed to score these items as a 1. It does seem more than coincidental that this occurs immediately after the issue and resultant conversation with John Lemmer. I requested the previous four year's performance reviews from the HR Department and they are all exemplary.

Eileen's explanation for the 1 on "receives constructive criticism positively" was a single instance several months ago when I challenged being required to track my compensatory time when others in my department were not. While she replied that the score was not vindictive in anyway, I disagree, but say nothing. I inquire of Eileen about credit for the scores of times throughout the year when I did receive constructive criticism positively and stated that I felt it unfair that I receive a low score because of a single incident. Everyone has bad days and we all behave out of character at times. I am human after all.

1's were also applied to two areas of my job description: phone duties and IS documentation. Neither of these items was known to me as part of my job description. I have been working from the "Systems Analyst" job description Kathy Pixley, IS Director, provided to me in March 2008. Eileen Parker informs me that particular job description was never approved by HR. This was never explained to me by my supervisor or the IS Director. Eileen agreed to apply an "N/A" to the telephone duties, but feels that I was aware of the IS documentation. I informed her that I did complete all of the documentation in my area of computer training and was waiting for IS co-workers to provide me with documentation for their areas. She assumed that I would take the lead in this endeavor. I inquired as to why she would assume that. It is not my place to insist they accomplish any task and doing so would also place me in an awkward position with my co-workers. I am not in a management position in the department so it would be presumptuous of me to assume any type of leadership role. I am unwilling to step on anyone's toes or extend into another co-worker's boundaries. Eileen insists that the score on this are will stand. NOTE: I have a copy of both job descriptions.

Below are the narrative comments with my notations interjected in bold print:

*Robin's role as a trainer, documentation specialist and support resource is very important within the IS Department and to the agency as a whole.*

*Robin brings a variety of strengths to her job as IS Trainer. She is an accomplished trainer. She is able to quickly assess the learning style and training needs of individual staff and puts trainees at ease. Robin has developed an excellent realtionship with co-workers throughout the agency. Robin is a good writer and a logical thinker; with these skills she is able to produce excellent , user-friendly documentation and training materials. Robin provides second tier Help Desk support and first tier Help Desk support when Mark Huff is absent or on the road.*

*The past year has been a challenging one for Robin due to multiple days lost to illness and an FMLA leave. In addition, Robin attends school and tries to align her internships to benefit the agency as she completes her MSW program. Though we understand that the health related absences are beyond Robin's control and we have tried to be supportive of her educational goals, these absences have created an added burden on IS staff.* **Prior to my medical leave I had accumulated nearly 300 hours in All Purpose Leave time. What does it matter if I take time off to donate hours to the agency in a field placement capacity or if I take vacation time? To date I have donated over 600 hours in field placement time to HCCS. There is no added burden for IS staff since no one completes my work during my absence, where if Eileen Parker or Mark Huff is absent, their work defaults to me. The later part of Eileen's statement is simply untrue.**

*Because of her skills in a variety of areas, Robin is frequently asked directly to take on special projects. Additionally, Robin takes on more of the Help Desk burden than she should by encouraging co-workers to contact her directly instead of the Help Desk. I'm sure that Robin does these things in the spirit of providing the best customer service possible, but it infringes on the time she needs to complete her other duties and circumvents the workflow that we have established in the department. Robin should focus her attention on the areas of responsibility defined in her job description. As her supervisor I take partial responsibiliy for not insisting to Robin and to others that all requests for special projects come through me. The scoring of a 1 and an N/A on Robin's Job Desciption addendum reflect the fact that these areas have not been treated as priorities and should be in the case of the 1 and expectations were unclear in the case of the N/A. Robin is more than capable of completing these tasks.* **First, I do not encourage co-workers to contact me directly. They contact me because the Helpdesk does not return calls and they have immediate need for resolution of their issue. I have repeatedly shared my concerns regarding this issue with both Kathy Pixley, IS Director, and Eileen Parker, IS Manager (and my immediate supervisor). If the managers of the IS Department are concerned about workflow, it appears that they should direct their concerns to the Helpdesk. If the Helpdesk co-worker would do his job, I would be able to do my job. Instead, he is forwarding calls to me because he doesn't get along well with the person or he just doesn't want to bother answering their question or resolving their problem. This has been an ongoing problem for 10 years and one that I have brought to the attention of department supervisors on many occasions. Prioritizing is another area of concern for me as several people delegate their work, and the work of others, to me. This "dumping" comes from those in positions higher than mine and I am not in a position to say "no" to them. It is unfair to downgrade my score because of another's insistence in my completing work they delegate to me.**

*Training and IS Documentation should be a major focus for Robin in the coming year. Robin and I need to work together to make sure that all requests for special assistance and special projects are reviewed by me so that she is not overburdened and has clear direction regarding her work load and how it should be prioritized. A clear understanding of expectations should allow Robin to excel in her essential job duties.* **I met my deadline of 10/02/2008 to complete the entire CIS manual documentation. This is in spite of being asked to cover the Helpdesk for several days, experiencing the Helpdesk co-worker forwarding his calls to me, a special project for John Lemmer, and several special projects for Kathy Pixley. Even when I attempt to lock myself away to get my work done, they call me back to the office to cover the Helpdesk.**

09/29/2008 – Meeting with Eileen Parker and Kathy Pixley – documented on 09/29/2008. Pretense of this meeting was to explain new job description to me. However, what was presented to me is the fact that Loren Brown and John Lemmer have targeted my position as one they can afford to "layoff" or eliminate. Kathy Pixley wants me to know that she is not picking on me, there is no vendetta at play here, and the decision is one that she has not been given a choice of. She mentions that if they lay off Steve, because she has had several complaints about him, we won't have a hardware tech. She would not consider Mike (who joined the department on 03/30/2008) because then she would have to manage the network and "do all that work."

Kathy vows to continue to fight to keep my position because no one else is capable of conducting computer training and she has informed Loren that if my position is eliminated, the regions will have to conduct their own computer training. In the meantime, that is the reason given for John tracking my arrivals and departures – the guise of trying to "protect" me. She spent a significant amount of time bashing Loren Brown (Executive Director) and his beliefs and policies, his rigidity, and his bad decisions. Eileen Parker describes the current climate of HCCS as "poisonous."

Besides Kathy and Eileen, I have the most seniority in the department, the highest level of pay, and the highest APL accrual. Mark Huff had a break in employment with the agency so his APL accrual began from his rehire date. This is unfair targeting, but that isn't anything new with this agency. They eliminated Debra K. Matthews position while she was on a worker's compensation leave – Bob Best sued HCCS and received a nice settlement for Debra. Gregg Wilkes worked as our Network Administrator. He severely injured his back while lifting a server and server rack. They eliminated his position while he was on his worker's compensation leave.

10/02/2008 – Email to Eileen Parker – documented on 10/02/2008
Sent an email to Eileen requesting a definitive answer and timeframe on the layoff. This will allow me time to prepare financially and emotionally if I am set to lose my job. The radiator in my 2000 Malibu is leaking and the replacement will cost several hundred dollars. I'm wondering if I should hold off on this and keep that amount in my savings. Eileen responded that "nothing has been finalized yet" but recommended that I hold off on the car repair. Sounds like a definitive answer to me.

10/07/2008 – Kathy Pixley – Documented on 10/07/2008
Requested copies of all sign-in sheets for CIS Rollout Training. She reports she wants to check to see who is attending. Wonder if this has anything to do with the fact that I passed John Lemmer on Platt Road coming home from Ann Arbor SIL at 7:15pm last evening.

10/07/2008 – Snippet of Conversation Overheard Between Kathy Pixley and Eileen Parker – Documented on 10/14/2008
Initially didn't think anything of this conversation until after the meeting on 10/13/2008. Eileen Parker is overhead saying, "I don't really think she would do that, do you?" Kathy Pixley is overheard responding, "I don't know, but we will find out."

10/08/2008 – Meeting with John Lemmer, Kathy Pixley (IS), Alyson Beck (HR) – 8:02am – Documented on 10/08/2008
Met Kathy Pixley in the staff kitchen and she informed me "as soon as you put your stuff down we need to meet in Alyson and John in his office." I went back to my desk and put my stuff down as instructed. Kathy was waiting for me near the staff kitchen. We walked to John's office and were met by Alyson Beck, HR Director. We walked to the conference rooms at the front of the building to find them occupied so we trouped back to the glass conference room at the rear of the building. Co-worker heads were turning as they watched the procession. Jack Perion's eyes looked shocked since a conference with John Lemmer, Alyson Beck, and a department director are usually not good news. I was the last to arrive in the room and closed the door. It should be noted that it appears this day may have been chosen because my immediate supervisor, Eileen Parker, is out of the office today and tomorrow, and she would be

a strong advocate for me in this meeting. It must be further noted that there was no one present to listen to the conversation on my behalf.

After I sat down, John Lemmer asked me what had taken place at the training sessions over the last few days. Aware that Kathy Pixley had emailed a training evaluation yesterday to all attendees regarding my performance, I replied that CIS Rollout training was conducted. He inquired as to whether anything besides training was discussed. My reply was that nothing personal was spoken about during the training sessions, but I had mentioned my possible layoff news to a "few" co-workers that I have personal friendships with. According to John's next statements, "you have created a huge problem, absolutely huge, throughout the agency." I am puzzled by what he means and he goes on to say I've "created a huge amount of chaos" and practically incited a riot by speaking to anyone about layoffs. I informed everyone in the meeting that my intention was to prepare co-workers for the fact that their number one support person may not be available in the future and to seek prayer regarding the situation. I did share the fact that at least two weeks prior to my 09/29/2008 meeting with Kathy Pixley and Eileen Parker, layoff news came to me from the Detroit Region. They spoke of program closings and layoffs at the end of October. I added that this concern has been rampant throughout the agency all summer as always happens when our enrollment numbers are dwindling. John Lemmer nodded his agreement that this was accurate information.

John Lemmer states that he prefers to believe the best about people. He made this statement several times throughout the meeting, which causes me to wonder if he truly believes the best about me. Kathy Pixley interjects that they heard from one regional director on Monday and another on Tuesday. I assured everyone present that my intentions in mentioning a possible layoff for myself was to help co-workers prepare in case I would no longer be available and that I did not speak about anyone except myself personally. John Lemmer then inquired whether I had said anything negative about him. I assured him that I did not say anything negative to co-workers about him. He then made a statement that perhaps I did say something about him and it was construed negatively by those I said it to and that they then repeated the negative comments to others. He says that he understands how this happens. When I inquired where the information was coming from, he would only say it was from a regional director and that it was the third or fourth degree of hearsay. I assured him that I did not speak negatively about him or HCCS. I assured him that I conducted myself in a professional manner, as I always do. What may be occurring here is a backlash that Robin Aldrich may be laid off and perhaps co-workers are advocating with their regional directors to retain my position. I didn't get the impression that John Lemmer felt this was the case. He appears to be insistent that my approach was negative and I have created great chaos across the agency. I assured John Lemmer this was not my intent and that I didn't approach any conversations with negativity.

Alyson Beck mentioned that anyone from Central Services needs to be mindful of what they say to the regions because what we say carries a lot of weight. Kathy Pixley mentioned that she has mentioned to me several times in the past that I need to be careful what I tell co-workers. I replied that I've been very good about this in the past two years. She agreed that I have but wonders why I would speak of the layoff to others when I knew that meeting was confidential. I replied that in the first place, the meeting on 09/29/2008 with she and Eileen Parker was not mentioned as confidential – neither woman told me to keep quiet about what was said. Therefore, since confidentiality was not mentioned, I told co-workers who are personal friends. It was mentioned by me as a "prayer request."

Kathy Pixley mentioned that they are aware that I am working with Rick Kruse to try to get a variance for a position across the street. NOTE: the ONLY way that they would know this information is if Kathy Pixley has been reading my emails. All Clinton co-workers involved in this assure me that they have not said "a word to anyone." John Lemmer then mentions that they "will have to do a lot of damage control because of the huge mess that you've created" and made mention that he "certainly would not want it to affect my ability for another position elsewhere in the agency, but it could if we can't get it straightened out." John Lemmer then stated that "it only takes one bad apple to spoil the whole bunch" so I am to take the next three days off – "call it a study break if you will." He states, "I don't normally ask co-workers to lie, but we don't want you to tell them why you aren't here. Do not make any phone calls. Do not check your voice mails. Do not log into email or CIS or anything else." John told me to take "Wednesday, Thursday, and Friday, with pay." John Lemmer states, "Now you will want to tell your best friend, but don't do it." Kathy Pixley reports that the Alpena training sessions will be rescheduled from Monday. I am to report to work in the IS Department on Monday at 8:00am. NOTE: If I am to report to work on Monday, why is Kathy rescheduling the Alpena training sessions? Also, if John Lemmer is working hard toward "damage control" how is my disappearing for three days going to help with this goal? I inquire as to whether I should put a message on my voice mail greeting informing co-workers that I will be out of the office and put an outgoing message on my email. Alyson Beck suggests that I simply say that I will be out of the office. All agree that this is what I should do. The meeting adjourns.

I packed up my laptop, food I brought with me today, grabbed my food from the staff refrigerator, and left the building. On the way home, I changed my outgoing voice mail greeting to state that I would be out of the office October 8, 9, and 10, and that callers could contact the Helpdesk. Upon arriving home, I attempted to log into email to place an out of office message there, but I was unable to log into email. I called Kathy Pixley and left her a voice mail stating that I must have locked my account (three password tries that are unsuccessful will lock an account) and asking her to unlock it, let me know, and I will place an outgoing message on my email. I did check to see if I could still access CIS and I was able to. This is likely because Kathy Pixley does not know how to delete a user in CIS and Eileen Parker is out of the office today and tomorrow.

10/08/2008 – Robin Johnson/Payroll – Documented on 10/08/2008
I left a voice mail for Robin Johnson requesting that she call me on my cell phone. She returned the call and I informed her that I no longer wanted my payroll direct deposited to CPFCU. I inquired as to whether she could do this without my signing something. She asked me where I was and I told her "on the way home." She states that she will stop the direct deposit immediately and will issue paper checks until she hears different.

10/08/2008 – Kathy Pixley – Documented on 10/08/2008
Kathy returned my call regarding my inability to access my HCCS email account. When Kathy is uncomfortable or not telling the truth she hesitates, giggles, or stutters. Her statement to me is "ahhhhh, yeah, you locked your account. I unlocked it for you so you can get into your email now." I informed her that I would log in and create an outgoing message to inform co-workers that I will be out of the office October 8, 9, and 10th. For the record, I entered the correct user name and password when I tried to log into my account. This means that Kathy Pixley or Mike Grulke, IT Manager, had disabled or deleted my account.

10/08/2008 – Suzanne Mohr – Documented on 10/09/2008
Suzanne asked me about my "strange email" during class. I asked her what email she was referring to. She reports that she received an email from me earlier that afternoon that just said I was out of the office until Monday. She was wondering why I would bother to alert her of that fact. I informed her that I didn't send the email. Who did?

10/08/2008 – John Lemmer – Documented on 10/09/2008
Passed John Lemmer at the corner of Willis and Platt Roads. John was turning east on Willis Road from Platt Road. He was on his cell phone, I believe he saw me, and he looked away as soon as he knew it was me.

10/09/2008 – Debbie Matthews – Documented on 10/09/2008
Debbie telephone me at 10:00am to ask me about the strange email I send her last night at 6:23pm. I informed her that I was instructed by John Lemmer not to log into email, CIS, or any other HCCS system and I have not done so. She reports the email has the title "Out of Office: Not Much" and it only states that I will be out of the office on October 8, 9, and 10. Suspect it was John Lemmer who sent the email since it was emailed to Debbie at 6:23pm and I passed him at the corner of Willis and Platt Roads approximately 6:45pm. I believe he saw me but looked away – he was on his cell phone.

10/10/2008 – Voice Mail from Alyson Beck, HR Director – Documented on 10/14/2008
Alyson left a voice mail stating that she was aware that I was to report to work on Monday at 8:00am, but she and Kathy Pixley need to meet with me. They need to leave for "Flint" at 8:15am and wonder if I would be willing to come in at 7:30am. She will assume that I am amenable to that if she doesn't hear from me. I did not return Alyson's call because John Lemmer had instructed me not to have any contact with my co-workers during the meeting on 10/08/2008.

10/13/2008 – Left Voice Mail for Alyson Beck – Documented on 10/14/2008
Alyson Beck's outgoing message states that she will be "working out of the Mt. Morris location on Monday." I left a voice mail informing Alyson that I would be attending the meeting at 7:30am and asked her to bring an accident report so that I may document my knee injury on 10/06/2008.

10/13/2008 – Meeting with Kathy Pixley, Eileen Parker, and Alyson Beck – Documented on 10/14/2008

Eileen Parker arrived in the parking lot the same time as me and she stopped by the car, gave me a very sympathetic look, and advised me that John Lemmer was likely to attend the meeting this morning and that I should "just remain very calm." I informed her that I have a new policy to trust no one and keep my mouth shut.

We met in the front conference room – Alyson Beck shut the doors. John Lemmer is in the building but is noticeably absent. I asked the ladies if any of them had noticed mood swings or personality changes in me during the past 1.5 to 2 years. Eileen Parker agrees that she has noticed a personality change. Neither Alyson Beck nor Kathy Pixley commented or answered my question. I described my conversation with my nutritionist friend on 10/08/2008 where she

believes there is an adverse interaction going on between one of the medications I take daily, an herbal remedy I take for anxiety, and a homeopathic remedy that I take for anxiety and depression.

Alyson Beck led the meeting by explaining that I was receiving an "oral" discipline for informing breaking Central Services confidentiality by informing co-workers of my possible layoff. The written oral reminder also includes a reference to my providing "details of a recent incident with a fellow co-worker" that I relayed to "an HCCS regional co-worker." Basically I am receiving an oral reminder for talking to my co-workers but the verbiage of the discipline makes it sound like I blabbed trade secrets to everyone in the agency.

Alyson Beck seemed concerned about how I was receiving the news. I replied, "I thought I was being dismissed so this is fine." The three ladies relaxed at this point. Alyson Beck stated that this "oral reminder" would NOT be place in my HR file unless another similar incident happened (the verbiage within the document states 365 days).

The meeting concluded and I went to work. Kathy Pixley and Alyson Beck went to Corcoran House in Mt. Morris. Eileen Parker mentions to Mike Grulke that they had to attend a "CARF meeting." The CARF meetings have always been held at Cracchiolo Center.

10/13/2008 – Steve Meyer – Documented on 10/14/2008
Steve came up to obtain keys from the file drawer next to my desk. He patted me a couple of times on my right shoulder. I looked up and smiled at him. He looks quite angry, but obviously not at me since he just patted me on the shoulder. I asked him if he was OK and he shook his head. I asked if he wanted to talk about it and he walked away. He shook his head all the way back to my desk. Something must have been said or occurred while I was out of the office for three days last week. I am certain he will tell me what transpired when we have some privacy.

10/13/2008 – Emails in my Inbox – Documented 10/14/2008
During the late morning hour, I was answering the emails that piled up during my three day forced vacation. There are several emails from Kathy Pixley, Gerald Williford, and others, from November 2007. The email discussions between Gerald and me are negative about the agency and a couple of co-workers not doing their jobs. Who is looking and why?

10/13/2008 – Eileen Parker
Eileen calls me into a private meeting to explain that she and/or Kathy Pixley will be accompanying me on the remaining CIS training sessions. This is, she says, in response to my knee injury on 10/06/2008. They will help me carry things. I told her that even though the knee hurst, I am quite capable of carrying my own equipment, manuals, etc. She insists on accompanying me. I called my family physician in front of her and they informed me that the x-ray showed nothing but some arthritis. Eileen continues to insist that she and/or Kathy will accompany me on the remaining training sessions.

10/16/2007 – Kathy Pixley drives me to CCMC where I conduct Computer Orientation and CIS training with a new co-worker. 10/16/2007 – Kathy drives me to Moreau Center, where we are joined by Eileen Parker (two difference vehicles make this trip yet the agency is so strapped for cash that I may be laid off) for CIS training. Eileen makes the comment that there is a nursery she wants to visit during lunch. I explain that Jeri Bacarella normally coordinates lunch when I

visit there and has been doing so for years. As it turns out, none of the ladies are available for lunch and we missed lunch in the cafeteria. Eileen insists we go to lunch together and we do so. At this point, I'm fairly certain that I am not to be left unattended and alone because they are worried about what I may say to fellow co-workers. This behavior was not unnoticed by CCMC or Moreau Center staff as I had several calls/emails during the following days asking what was up. 10/17/2007 – Eileen Parker accompanied me to Grand Rapids to conduct Computer Orientation and CIS training for several staff.

10/21/2008 – Eileen Parker, Alyson Beck, Kathy Pixley
Telephone call on speakerphone with Eileen speaking. Eileen prefaces the conversation by stating that I am being laid off and this is not in any way retaliatory or any type of vendetta (why was she told to say this?). My layoff is effective immediately and she is so very sorry. Alyson Beck comes on to say that because of my many years of dedication to the agency, they will provide severance pay until the end of November and continue medical benefits until February 2008. The severance pay and benefits are null and void if I accept another position with the agency. I'm not sure why the benefits would not continue if I accept another position with the agency, but I don't inquire about this. Alyson states that she has a packet of information she will put in the mail. Eileen makes some comment about getting together once she returns from vacation week after next and we end the conversation.

10/24/2008 – Kathy Pixley
Submit my AD1 door key and AD7 network key to Kathy Pixley, along with my Safety Systems Security Card (0138). She provides me with a receipt for the security card. I spent 30 minutes cleaning out my desk. She requested return of my laptop and I explain that Marcia Rodakowski told me to keep it to use for my Ann Arbor SIL field placement. Kathy states in a rather annoyed tone of voice that she doesn't have an extra laptop that I can use for field placement. I explain that the one I've had for the past few years would work just fine. She simply said she couldn't let me keep it. I turned it over to her and she went through all the pockets and I signed off on the property receipt that it was returned in good condition. Kathy made the comment that she "hopes they can give you something across the street." She failed to give me the documentation that I requested from my H: drive. This documentation is my portfolio and will assist me in obtaining another position.

10/30/2008 – Alyson Beck
Request via telephone and email that I receive a copy of my personnel file. Also discussion of obtaining an appointment at Occu-Health for my knee, which continues to bother me.

10/30/2008 – Kathy Pixley
Email stating that she forgot to give me the CD of my H: drive documents. She informs me that she put it in the mail. Responded that it is amazing that 92mb of data fit on one CD. She does not comment regarding this.

10/31/2008 – Kathy Pixley, Marcia Rodakowski
Kathy reports in an email to Marcia that per John Lemmer, interns will no longer receive cell phones or computers in order to complete field placement duties. Kathy reports instructs Marcia to inform me that this is a new policy and is in no way directed at me personally. We have always provided equipment to interns in the past and I believe have a few interns working

in the agency at the moment who have cell phones and computers. Leaving an intern to work in the field without a cell phone is unsafe. I'll inform EMU of this to see if they can intervene.