# Exhibit 26

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 2:10-cv-13515-AC

ROBIN ALDRICH,

Plaintiff, Honorable

vs. Avern Cohn

BOYSVILLE OF MICHIGAN, INC., a Michigan corporation, doing business as HOLY CROSS CHILDREN'S SERVICES,

Defendant.

______________________________/

The Videotape Deposition of ROBIN ALDRICH, the Plaintiff herein, taken pursuant to Notice of Taking Deposition before Linda McMullen Morelli, CSR-3349, Certified Shorthand Reporter and Notary Public for the County of Wayne, acting in the County of Washtenaw , State of Michigan, at 201 South Division Street, Suite 400, Ann Arbor, Michigan, on Wednesday, January 19, 2011, commencing at about 9:40 a.m.

APPEARANCES:

RICHARD N. LAFLAMME, ESQ. P32641
LaFlamme & Mauldin, P.C.
2540 Spring Arbor Road
Jackson, Michigan 49203
(517)784-9122

Appearing on behalf of the Plaintiff.

KAREN L. PIPER, ESQ. P31706
Bodman, LLP
201 W. Big Beaver Road, Suite 500
Troy, Michigan 48084
(248)743-6000

Appearing on behalf of the Defendant.

Also present: Alyson Beck
Joe Roche, Video Technician

- - -

Q How did you apply?
A Resume.
Q To whom?
A I believe I sent it to the human resources department.
Q Do you recall when that was?
A No. There were several resumes.
Q For family worker position?
A And other positions.
Q Okay. So, you applied for the family worker position at Holy Cross around the time of the layoff?
A Correct.
Q Can we establish that date is October 21, 2008?
A Or November; October, November 2008.
Q Okay. You got the notice of layoff because it's dated October 21, 2008 --
A Correct.
Q -- right?
A Correct.
Q Okay. What other positions did you apply for?
A Treatment Specialist.
Q Was that at Holy Cross?
A Correct.
Q And when was that?
A November 2008.
Q And how did you apply for that?



A I spoke to Rick Kruse.
Q Did you submit a resume?
A No.
Q Was there an opening posted that you applied for?
A No.
Q Had you talked to Rick Kruse about the family worker position, as well?
A Correct, yes.
Q But you also submitted a resume to H.R.?
A No.
Q "No," what?
A "No," I didn't submit a resume for the Treatment Specialist position to H.R.
Q If I misspoke, I apologize. I meant for the family worker position that you spoke to Mr. Kruse about.
A No, I did not submit a resume.
Q "Did not."
What other positions did you apply for?
A Temporary on-call.
Q Temporary on-call what?
A They just refer to it as temporary on-call. It would be a treatment specialist position, I believe.
Q And how did you apply for that?
A I believe I spoke to Bill Geddes.
Q And when was that?



A November of 2008.
Q What else did you apply for?
A No other positions with Holy Cross.
Q Well, I wasn't limiting it to Holy Cross. I meant other jobs you applied for.
A I applied for social worker positions, information technology positions.
Q Where?
A Numerous places. I sent out over 400 resumes.
Q Do you have records of that?
A Some records, probably. I might have cover letters for some of those.
Q Were you applying for jobs that were listed as available or they were seeking people or --
A Correct.
Q Okay. So, there were 400 places looking for workers?
A Correct.
Q Do you have a list of those?
A No.
Q Did you interview for any positions?
A No.
Q Did you interview for any positions other than the position that you got?
A No.
Q What did you do at the Alzheimer's Association?



A I was a program coordinator.
Q What does that mean?
A You coordinate programs, training programs.
Q Was this an I.T. position?
A No.
Q It was a --
A Social work position.
Q And you said you worked there for six weeks, from December 2008 to January 2009?
A Correct.
Q And you continued to look during that period?
A Correct.
Q And you voluntarily resigned to take a position at American Credit Union?
A Yes.
Q And why was that?
A It was a two-dollar increase in pay.
Q Okay. Perhaps you misunderstood.
Why did you continue to look? I mean, you didn't know you were going to get an offer for a two-dollar increase in pay. Why did you continue to look after you had the Alzheimer's Association position?
A Because $14 an hour does not us sustain my family budget.
Q Okay. What were you making at American Credit Union?
A Sixteen dollars per hour.

Q And that was forty hours a week?
A Correct.
Q And where is it you're making 14.75 an hour?
A Adrian Dominican Sisters.
Q Were you on unemployment between the time you left the credit union and the time you went to Adrian Dominican Sisters?
A Yes.
Q You said you talked to Mr. Kruse about a family worker position at Holy Cross in October, November 2008?
A Yes.
Q When did you talk to Mr. Kruse?
A In October or so of 2008.
Q What does "October or so" mean?
A I'm not sure of the date.
Q Do you have information on your journal about that?
A No, probably not.
Q Why not?
A I didn't feel it was important to note the date.
Q Do you even have a note that you talked to him about the job or what he said or what you said?
A I don't believe so.
Q Okay. And you didn't think it was important?
A No.
Q What did Mr. Kruse say, if you recall?



A He seemed very excited about the possibility of me joining the team.
Q Do you recall what he said?
A Not verbatim, no.
Q Okay. You said "he seemed excited." I had asked what he had said, so I'm making a distinction. Do you recall what he said?
A I believe we spoke about the fact that I was very close to graduation and he would write regarding a variance until I obtained my degree.
Q Did he know that you had been laid off or were going to be laid off?
A Yes, he did.
Q How did he know that, do you know?
A I told him.
Q What did you tell him, that you had been laid off or were going to be laid off or --
A I told him that I had been informed that my position had been targeted for layoff.
MS. PIPER: Again, I'm going to remind you, if I could, to wait until I finish my question. Okay?
THE WITNESS: Thank you.
BY MS. PIPER:
Q When did you learn that your position had been targeted for layoff?



A In September of 2008.
Q How did you learn that?
A My supervisor informed me.
Q Who was that?
A Eileen Parker.
Q What were the circumstances?
A She called me into the conference room and informed me.
Q Was anybody else present?
A Kathy Pixley.
Q And what did Ms. Parker say?
A I believe she told me that they were looking at my position for layoff.
Q Is that all you recall?
A Yes.
Q Did you say anything?
A Yes.
Q What did you say?
A I said that I believed that I was being discriminated against, that I was singled out and discriminated against.
Q What else did you say, if anything?
A I believe I mentioned I felt it was unfair.
Q Anything else you recall?
A No.
Q Anything else you recall Ms. Parker saying?



A I believe that she stated that she was very upset and she referred to the current climate at Holy Cross as "poisonous."
Q Anything else?
A I don't recall Eileen saying anything else.
Q Do you recall Ms. Pixley saying anything?
A Yes.
Q What did Ms. Pixley say?
A She had quite a few negative things to say about Loren Brown.
Q What did Ms. Pixley say?
A She didn't like his rigidity. She didn't appreciate his attitude, among other things.
Q What else?
A They were all very negative things.
Q Okay. What did she say?
A She didn't like his leadership style, the way he managed people.
Q Anything else you recall?
A I believe that she stated that she felt that if she laid off Steve Meyer instead of me they wouldn't have a hardware tech, and if she laid off Mike Grulke, who was the newest employee in the department, she would have to do his work.
Q What did he do?

Q You said you used the word "discrimination" in that meeting?
A Correct.
Q Did you record that?
A I made note of that.
Q Did you put it in your journal?
A I believe I did.
Q When did you put it in your journal?
A It would have been the evening of that meeting or close to it.
Q Have you edited the journal since you would have recorded it?
A For typographical errors.
Q Other than that?
A I don't believe so, no.
Q When did you edit it for typographical errors?
A As it happened, as I found the typos.
MS. PIPER: Can you get page 69 and 70, please?
And for the record, these are document numbers on documents submitted to me by Counsel as part of initial disclosures.
And I'm going to ask you to mark that.
(Aldrich Deposition Exhibit 1 was marked for identification; attached hereto.)



BY MS. PIPER:
Q Ms. Aldrich, I'm going to hand you what's been marked Exhibit 1, and I just want to tell you, there are page numbers in the bottom right-hand corner. It's a 69 and a 70. That's how I got it from your attorney.
Can you take a look at the entry at the bottom of page 69 that says "9/29/2008"?
A Okay.
Q Take a look at the top of page 70, as well, up through the entry that says "10/2/2008."
A (Examining document.) I'm sorry. Through what?
Q There is a journal entry on page 70 that says "10/2/2008."
A Okay.
Q So, there's two paragraphs above that.
A Okay. (Examining document.) Okay.
Q Do you see the word discriminate or discrimination?
A No.
Q But it's your recollection you said that?
A Correct.
Q Why didn't you record it?
A It's a mistake.
Q What do you mean, "it's a mistake"?
A I should have.
Q Your note says you documented this on 9/29/2008, correct?



A Correct.
Q And did you make handwritten notes of this?
A Yes.
Q And this would have been at home or at work?
A This would have been at home.
Q Okay. That evening?
A Correct.
Q And then you put it on the computer?
A Correct.
Q Why didn't you just put it directly on the computer?
A I'm not sure what you're asking.
Q You said you made handwritten notes --
A Correct.
Q -- and I wondered why you didn't just put it on your computer, if you were going to do that, anyway.
A I didn't trust Holy Cross Children's Services, so I preferred handwritten notes as to anything I would have put on their computer.
Q Right, but you said you made handwritten notes at home and then put it on your computer.
A I made handwritten notes when I got into the car after this meeting, before I left the parking lot.
Q Okay. Then I misunderstood before when you said you made them at home.
A I typed it at home.



Q I think you said before that you made handwritten notes at home.
A No. I usually made handwritten notes immediately after the meeting, and I typed at home.
Q When did you leave the meeting?
A After the meeting concluded.
Q Do you know what time of day that was?
A I have no idea what time of day that was.
Q Would you have gone out to your car in the middle of the day to record these?
A No.
Q Did you record them at your desk?
A No.
Q And then you shred the notes at home --
A Correct.
Q -- after you put them in the computer?
A Correct.
Q Oh, I'm sorry. If you want to look at the second paragraph on the second page of that exhibit, it says:
"This is unfair targeting, but that isn't anything new with this agency."
A Correct.
Q That was your opinion at that time?
A Yes.
Q That they targeted people?

A Yes.
Q And you thought they were targeting you?
A Absolutely.
Q Based on what?
A The fact that I was being laid off.
Q Okay. Did you think it was based on your job performance?
A No.
Q What did you think it was based on?
A I felt it was based on John Lemmer's feelings about me.
Q And what were those?
A Negative, in my opinion. He did not like me.
Q Anything else?
A No.
Q Okay. So, you thought John Lemmer didn't like you?
A Yes.
Q Did you express to Ms. Parker or Ms. Pixley that you thought you were being targeted by Mr. Lemmer because he didn't like you?
A Yes.
Q Did either of them respond?
A I'm sure that they responded.
Q Do you recall if they responded?
A Yes.
Q What do you recall they responded?



A That they weren't aware of that.
Q They were not aware that you thought Mr. Lemmer didn't like you?
A Correct.
Q Did you give them any examples or any reason for your statement?
A Yes.
Q What did you tell them?
A On this date I had had a meeting with John, on September 25, that was very unpleasant.
Q You're referring to something on the document in front of you?
A I'm just referring to the date. This date of this meeting was 9/29. My meeting with John Lemmer was 9/25.
Q Okay. So, you told them about that?
A The meeting?
Q Yes.
A Yes.
Q Hadn't you already told Ms. Parker about that meeting?
A She was aware of the meeting, yes.
Q Hadn't you already told her about it?
A I reiterated it.
Q At the time, right?
A Correct.
Q Did you tell her at that time you thought it was



discrimination?
A Yes.
Q On 9/25, after the meeting with Mr. Lemmer, you told Ms. Parker you thought that Mr. Lemmer was discriminating against you?
A No, not on that date; on 9/29.
Q On 9/29, was the first time you used the term "discrimination"?
A I believe so, yes.
Q What did you tell Ms. Parker on 9/25, after your meeting with Mr. Lemmer?
A Our meeting consisted of a performance review and I told her that it had been a very unpleasant meeting.
Q Did you tell her anything else about the meeting with Mr. Lemmer?
A I probably told her what took place in the meeting.
Q Do you recall?
You said, "I probably." I don't know --
A Correct. I probably did.
Q But you don't recall whether you did or you didn't?
A I'm sure that I said it was an unpleasant meeting and maybe stated some facts about the meeting.
Q Do you recall that you stated some facts about the meeting?
A No.



Q Were you on medication at that time that might interfere with your ability to recall things?
A At that time, yeah.
Q What medication?
A An anti-depressant.
Q What was that?
A Paxil.
Q What were you on Paxil for?
A Depression and anxiety.
Q How long were you on Paxil?
A Maybe a month.
Q And when was that?
A It started the end of August, beginning of September.
Q And you stopped in September?
A I stopped probably in January of 2009.
Q Did you go on something different than Paxil then?
A No. I just had been relieved of my stress.
Q Sorry. I'm confused. I think you said you were on Paxil for about a month.
A From September -- late August, early September on until January of 2009.
Q So, you were on Paxil from -- during that entire period?
A Correct.
Q Were you on something else for depression and anxiety for a month during that period?

Q Did you record that?
A No.
Q Why not?
A I didn't know that it was important.
Q Do you think it's important now?
A No.
Q Okay. Anything else you recall?
A No.
Q The meeting with Mr. Lemmer on the 25th took place in the morning?
A Correct.
Q First thing in the morning?
A 8:15 in the morning.
Q And what was first thing in the morning?
A First thing in the morning was getting coffee and ice for the kitchen because no one else had done it.
Q That wasn't part of your job, though, was it?
A Well, it was part of whoever's job found the ice empty. And I found the ice empty, so I went to get the ice.
Q Okay. And that was before you started work that day?
A Correct.
Q Do you recall anything else Ms. Parker or Ms. Pixley may have said at the meeting on the 29th?
A No.
Q And you said it was after this meeting that you contacted



Mr. Kruse?
A I contacted Rick sometime in October. I cannot give you an exact date.
Q Was it before you got the letter of your layoff?
A Correct, yes.
Q And what was your reason for contacting Mr. Kruse?
A I believed I was going to be laid off.
Q Based on this conversation on the 29th?
A Correct, and John Lemmer's conversation with me on the 25th.
Q So, you believed on the 25th you were going to be laid off?
A Yes. I believed John Lemmer was looking for a way to get rid of me.
Q When did you believe that?
A I believed that prior to going off on my FMLA leave.
Q You believed that Mr. Lemmer was looking to lay you off?
A Dismiss me one way or another.
Q Why is that? What was your belief based on?
A His attitude towards me.
Q What was that?
A Negative, degrading.
Q Anything else?
A No.
Q Did you discuss that with anybody?



A I believe I mentioned that to both Eileen and Kathy in that meeting on the 29th.
Q How about before then?
A I may have mentioned it. I'm not positive.
Q You may have mentioned it to whom?
A My supervisor.
Q Ms. Parker?
A Correct.
Q You don't recall?
A No.
Q Would you have made a note of that?
A No.
Q Wouldn't you think that would be important?
A I guess I didn't believe it was at the time.
Q Do you recall how long before your FMLA leave that you believed Mr. Lemmer was looking to dismiss you?
A I believe it was right prior to that.
I had a field placement that I was attempting to do for the gerontology degree, and Kathy Pixley attributed the non-flex time to John. John would not allow me to flex time to complete that field placement for the agency.
Q You mean with the agency, for your degree?
A Correct.
Q And the field placement, when did that come about?



A That would have been, I believe, April through August of 2008.
Q And where did you do that, then?
A Catholic Charities of Monroe, with Paul Neitman.
Q Do you not understand that that's part of Holy Cross?
A Yes, it is part of Holy Cross. Holy Cross was managing Catholic Charities of Monroe County.
Q So, you did do your field placement through Catholic Charities of Monroe?
A Correct.
Q But you were not allowed to use flex time for that?
A Correct.
Q Were there others in the department that used flex time for educational pursuits?
A I don't believe we had anyone else attending school at that time.
Q So, is that a "no," that nobody else in the department was using flex time for education?
A Correct.
Q Were there other people in the department using flex time for other reasons?
A Yes.
Q Who?
A Everyone used flex time for other reasons.
Q So, they weren't working a forty-hour week?

opinion, of all people, a comment such as that should not come from someone in a professional position.
Q Did you talk to one of the agencies that's charged with investigating --
A No.
Q -- discrimination?
No?
A No.
Q Why not?
A I was too afraid for my job.
Q Why?
A Well, I thought I would be dismissed.
Q Why?
A Because she had the power to do that.
Q And had you seen her exercise it with somebody?
A No.
Q So, what made you think that she would do that?
A Because she was my supervisor.
Q So, you think that all supervisors would do something like that?
A They can.
Q That doesn't mean they do.
Is there a reason you thought Ms. Hudgins would?
A I took from the comment that she didn't like me.



Q Okay.
A So I was in fear for my job.
Q So, you thought because she didn't like you she would dismiss you?
A She could. I felt she could.
Q Right. I'm not asking whether she had the authority or the power to do that. I'm asking why you thought this individual would exercise that power.
A Because she was in a position above me.
Q And that's the only reason?
A Correct.
Q Did you fear Ms. Parker would dismiss you?
A No.
Q Why not?
A We got along very well.
Q But she could, right?
A She could.
Q But you didn't think that about her?
A She never made rude comments to me.
Q Okay. How about Ms. Pixley?
A Ms. Pixley I was intimidated by, yes.
Q So, you were in fear that she was going to fire you?
A Correct.
Q For the entire time you worked for her?
A It's a fear, yes.



Q Right. And you had it during the entire time you worked for her?
A Not the entire time, no.
Q When did you have it?
A Probably throughout 2008.
Q Why 2008?
A Many circumstances. The FMLA leave was a good example.
Q Okay. What does that mean?
A It means that I don't feel that she was happy that I took an FMLA leave.
Q Didn't it leave the department short-staffed?
A Yes.
Q Did they replace you while you were gone?
A No.
Q Did someone fill in?
A I'm assuming so.
Q You don't know?
A No, I don't.
Q Okay. Wouldn't it be logical that a manager, you know, would not like someone being on leave because they were short-staffed?
A I believe that a manager should understand that employees have things, medical issues, that need to be taken care of.
Q Okay. What about the manager's feelings about trying to



get along without staff? Aren't they entitled to have feelings about that?
A Absolutely.
Q And so, you thought that she was going to fire you?
A I knew that she wasn't happy. I was aware that at any point she could let me go.
Q But you were aware of that the entire time she was your supervisor, right?
A Yes.
Q But you thought, beginning in 2008, she might act on it?
A Correct.
Q With the FMLA leave?
A Correct.
Q Any other reason?
A No.
Q Did you ever talk to Ms. Beck about your concerns that you might be fired?
A No.
Q You know who Ms. Beck is?
A I do.
Q She's the Director of Human Resources?
A Correct.
Q And there's a policy that Holy Cross has about reporting concerns about discrimination to Ms. Beck?
A I'm not aware of their policy, no.

A Correct, yes.
Q -- three days?
When had you completed the TCI training?
A The previous summer, I believe, summer of 2007.
Q Summer of 2007, okay.
So, you were not at training on the Wednesday, Thursday, Friday?
A Correct.
Q Did you submit paperwork to somebody about that training?
A About what training?
Q The training that you did complete.
A There are sign-in sheets that you have to get signed off on.
Q Were you present for the training at the rest of the week, on Wednesday, Thursday, Friday?
A No. I had already completed that training. There was no need to take it again.
Q Did you have a discussion with someone about not having to take that again?
A Rick Kruse.
Q When did you have the discussion with Mr. Kruse?
A When we set up the training for Monday and Tuesday.
Q When was that?
A That would have been beginning of November.
Q Was there paperwork on that?



A No. These would have been verbal conversations.
Q Where did they take place?
A I believe, over the phone.
Q Where were you when you had the conversation?
A At home.
Q And where was Mr. Kruse, do you know?
A I don't know.
MS. PIPER: Do you want to refer to pages 77 and 78 that you provided me?
Do you want to mark that, please?
(Aldrich Deposition Exhibit 3 was marked for identification; attached hereto.)
BY MS. PIPER:
Q Do you want to take a look at what's been marked as Exhibit 3?
A (Examining document.)
Q Have you had a chance to look at Exhibit --
A Yes.
Q -- 3?
I'm confused because it seems like there was a notation here, on November 19, 2008, where it says:
"T.S. training full day. Left at 4:15 to attend class at DMU."
A That's an error.
Q You did not attend on the 19th?



A Correct.
Q When did you record this?
A It would have been at that time frame. November 19th just should have been removed.
Q Okay. So, you're saying the description, the "T.S. training full day, left at 4:15," occurred on the 18th?
A Yes. If you just remove the November 19th from the document, everything else would be correct.
Q What about the November 20, 2008?
A That is a correct date.
Q Okay. On the second page of Exhibit 3, you said you had a conversation with Bill Geddes that day?
A Correct.
Q And he said, "I can't use you"?
A That's verbatim.
Q When did you record that?
A That would have been written right after the phone conversation and then recorded later that evening.
Q Is this Exhibit 3 part of your journal that you have at home?
A Yes.
Q Okay. About significant events of --
A Yes.
Q -- discrimination?
A About significant events.



Q Well, you said before it was discrimination and upset, right?
A Anything I consider important.
Q Okay. Did you think Mr. Geddes was discriminating against you?
A I'm not sure.
Q Okay. You wrote down that:
"He acquiesces and says he can put me on the on-call list." And you write, "I agreed that that was a great idea. Told him how much I appreciated his efforts on my behalf."
A Yes.
Q And you have reason to think you were not on the on-call list?
A I've seen the on-call list. I was not on it.
Q Where do they keep the on-call list?
A In the administration building.
Q Okay. Is that Cracchiolo?
A No.
Q What's the administration building?
A It's the Clinton Administration Building.
Q Is that across the street?
A Yes.
Q And where do they keep that, on a bulletin board or --
A I don't know.

Q Did you talk to them about why they didn't list these other issues?
A I trusted them to do their job.
Q Yes. Did you talk to them about why they didn't list these other issues?
A No.
MS. PIPER: The Complaint is your Number 94, Mr. LaFlamme.
Would you mark that, please?
(Aldrich Deposition Exhibit 10 was marked for identification; attached hereto.)
BY MS. PIPER:
Q I want to show you what's been marked Exhibit 10.
Is that your signature?
A Yes.
Q And you signed that at the Michigan Department of Civil Rights' office?
A Correct.
Q Would that have been on April 22nd?
A Yes.
Q 2009?
A Yes.
Q Do you see the paragraph in the box that's in the middle of the page that says: "I'm a woman who is 5 feet 7, 350 pounds who has a medical condition"?



A Yes.
Q It doesn't say anything there about FMLA, does it?
A No.
Q It doesn't say anything there about your not being Catholic, does it?
A No.
Q It doesn't say anything about your age, does it?
A No.
Q And you didn't raise this with the Michigan Department of Civil Rights?
A No.
Q But it was your belief in fall of 2008, that you were discriminated against on these bases?
A Yes.
Q Have you complained about height in the present lawsuit?
A Not height.
Q Why not?
A Because I don't think I was discriminated against because of my height. I believe it was my weight.
Q Okay. So, you did in the fall of 2009 but you no longer do?
A I think what may have happened is, you know, these are the issues that she listed and, yes, I signed that.
Q Well, and you told me a minute ago that height was one of the issues that you had raised.



A Well, height and weight would be proportionate to each other; in other words, if you're five foot seven and you weigh 120, I don't think anyone is going to discriminate against you. If you're five foot seven and you weigh 350, then you're considered overweight.
Q This says that you were discriminated against or that you were laid off on November 4, 2008 because of your sex or gender, because you're a woman, correct?
A Correct.
Q And you believed that in fall of 2009?
A Yes.
Q And you haven't asserted that in the litigation. Why is that?
A I'm resting on my attorney.
Q Okay. Do you believe that you were discriminated against on the basis of your gender?
A I do, yes.
Q Do you believe you were discriminated against on the basis of the fact that you were not Catholic?
A Yes.
Q You haven't alleged that in the lawsuit, either, but you still believe that?
A Yes.
Q And your civil rights complaint that you signed in April of 2009 doesn't mention age, either, but you believed



that in the fall of 2009?
A Yes.
Q And you didn't sue on that in this present lawsuit?
A Well, when I initialized the Complaint, I mentioned all of these things.
Q You're talking about the Complaint with Civil Rights?
A Correct. These were the things that she said could be included in it. I did not question that.
Q But you haven't included that in the lawsuit, either, the religion or age?
A Okay.
Q You're aware of that?
A Yes.
Q But you still believe that those were factors?
A Yes.
(Aldrich Deposition Exhibit 11 was marked for identification; attached hereto.)
BY MS. PIPER:
Q I hand you what's been marked Exhibit 11; ask you to take a look at that.
This was not numbered. I assume you have it because you've got stuff in the Civil Rights file but just in case.
A (Examining document.) Okay.
Q Have you seen this before?

A I'm 51.
Q Did you just have a birthday last week?
A I did.
Q Okay. I was just thinking for a minute. Okay.
And so, he's older than you and you thought that he thought that you were inappropriate because you were young?
A I don't know that he --
I think he just took exception that I didn't agree with him.
Q Because of your age?
A And I'm a woman, yes.
Q But not the other categories, though, at that time?
A Not at that time.
Q Let me ask this. On page 67 -- and I don't know if it's in front of you or not but we can get it.
I'm not going to mark that because you have it, I have it.
On page 67 -- this is also part of your notes that your attorney gave me -- at the very top paragraph, the last line says:
"This is the third instance of John's discrimination towards me."
A Yes.
Q And I believe that that's the 9/25 meeting.



A I believe so, yes.
Q What was the first and what was the second?
A The first would have been on April 1st.
Q The one you just described?
A And the comment at that lunch break about the "big green shirt."
Q Can you -- when you said "April 1st," that's the thing that you just described, right?
A Correct.
Q Okay. So, that was discrimination.
And you said there was the "big green shirt"?
A Correct.
Q And that was part of one, as well?
A Then that would have been counted as two.
Q So, that was the second time?
A Correct.
Q And then the third time was in September?
A No, actually -- I'm sorry. April 1st would have counted as one. The second instance would have been his refusal to allow me to use All Purpose Leave time or flex a Friday, specifically, to complete my field placement. And then the third was described here.
Q Okay. When you said the second was refused to allow APL time or flex, for one Friday or Fridays generally?
A It would have been Fridays for, I believe, at the most,



16 weeks.
Q During what time frame?
A This would have been May.
And I wouldn't have needed that time while I was on FMLA leave in August and, possibly, September.
Q And did you submit a request in writing?
A For the All Purpose Leave time?
Q To use the Fridays.
A No. We typically just send an email to our supervisor.
Q And, so, did you send an email to Ms. Parker?
A I believe so, yes.
Q And Mr. Lemmer was the one who said no?
A Kathy Pixley was the one who informed me that Mr. Lemmer had said no.
Q So, you were asking for Fridays off from sometime in May until sometime in September?
A Correct.
Q But you already knew that you were going to be off for your surgery from May till July, right?
A Well, we anticipated -- we were hoping it would only be two to four weeks initially.
Q When did we anticipate this?
A That's what I had initially spoke with my doctor about and initially what I told Eileen Parker.
Q But when you submitted the FMLA paperwork, it said that



you would be off until sometime in July, right?
A That's probably what my doctor noted.
Q So, by the time the doctor submitted the note, it had become May to July, correct?
A Yes.
Q And then it extended into August?
A If that's what the paperwork said, yes.
Q Well, you returned on August 4th, right?
A Correct.
Q Did you save the email where you requested to use APL or flex a Friday?
A I doubt it. I don't think so.
Q Are those the same thing, "use APL or flex a Friday"?
A No.
Q That's what I thought.
APL is time that you get every pay period or every month?
A Correct.
Q It's All Purpose Leave, in lieu of vacation, sick and personal time?
A Correct.
Q And the flex, you said, is?
A Accumulated extra hours.
Q Okay. And when did you ask Mr. Lemmer about this?
A I didn't speak to Mr. Lemmer about it.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 2:10-cv-13515-AC

ROBIN ALDRICH,

Plaintiff,

Honorable Avern Cohn

vs.

BOYSVILLE OF MICHIGAN, INC., a Michigan corporation, doing business as HOLY CROSS CHILDREN'S SERVICES,

Defendant.

______________________________________/

The Continuation of the Videotape Deposition of ROBIN ALDRICH, the Plaintiff herein, taken pursuant to Notice of Taking Deposition before Linda McMullen Morelli, CSR-3349, Certified Shorthand Reporter and Notary Public for the County of Wayne, acting in the County of Washtenaw , State of Michigan, at 201 South Division Street, Suite 400, Ann Arbor, Michigan, on Wednesday, June 8, 2011, commencing at about 9:45 a.m.

APPEARANCES:

RICHARD N. LAFLAMME, ESQ. P32641
LaFlamme & Mauldin, P.C.
2540 Spring Arbor Road
Jackson, Michigan 49203
(517)784-9122

Appearing on behalf of the Plaintiff.

KAREN L. PIPER, ESQ. P31706
Bodman, LLP
201 W. Big Beaver Road, Suite 500
Troy, Michigan 48084
(248)743-6000

Appearing on behalf of the Defendant.

Also present: Alyson Beck
Brian Kelly, Video Technician

\- - -

Q What did it say?
A That they were terminating my employment due to absences.
Q I know you said last time you haven't taken any action against them. Have you since then?
A No.
Q Do you consider yourself blessed to be a part of the team at the Adrian Dominican Sisters?
A Yes.
Q Have you applied for any position there that you didn't get?
A Yes.
Q Was that the network administrator's job?
A I did not apply for the network administrator's job.
Q Is that because you didn't have the skills required?
A I guess I didn't.
Q What did you apply for?
A Two positions in finance.
Q What were those positions?
A I don't know the exact name.
Q What were the duties for the job?
A One would have handled the sisters' house accounts and budgets, and the other one would have been accounts payable.
Q When did you apply for those?
A Since January.



Q Since January 2011?
A Yes.
Q And what happened?
A I didn't get any interviews for those positions.
Q What were the requirements for the sisters' house accounts and budgets job?
A I don't recall what the requirements were.
Q But you feel you met them?
A Yes. My resume was passed on.
Q Same thing with the accounts payable; you thought you met the requirements?
A I did.
Q And didn't get an interview?
A Correct.
Q Were you told why?
A With the house accounts budget person, they hired within someone who had formerly worked in the department, and with the second position, the other person had more accounts payable experience.
Q When you were working at Holy Cross in the I.T. Department, did you have regular contact with other people that worked in the building, like Alyson Beck and Mr. Lemmer and Mr. Brown?
A "Regular contact"?
Q Yes.



A What do you mean by that?
Q Well, would you have answered the phone if they called in for a service or something like that?
A Oh, certainly.
Q And you would see them, perhaps, in the kitchen or the hallway or the bathroom, anything like that?
A Sure.
Q Would you have been someone who would have provided training to each of those persons?
A I don't know that I -- I don't think I ever provided any training to Loren or John. Alyson may have attended some training sessions.
Q Did you have a good relationship with Mr. Brown?
A I can't really answer that. I don't know if I did or not.
On my end, I thought I did. I can't speak for him.
Q Do you think you had a good relationship with Mr. Lemmer?
A No.
Q Why not?
A He always seemed very negative and acerbic to me.
Q From the time he was first hired?
A No.
Q When?
A After April 1st of 2008.



Q Did you have negative feelings about Mr. Lemmer before you met him?
A No.
Q Did you know how much he was making?
A I did, yes.
Q How did you know that?
A I saw it on a spreadsheet when I was helping someone in Accounting.
Q Who was that?
A Kim Tiede, T-i-e-d-e.
Q And, I'm sorry, you were helping her?
A Correct.
Q Do what?
A I can't remember what the instance was. She was having an issue with her computer.
Q And what was Mr. Lemmer making?
A It was over a hundred and six thousand dollars.
Q And you had an issue with that?
A No, I didn't have an issue with that.
Q It wasn't a concern for you how much he was making?
A I thought, for a non-profit, it was a lot of money but I don't make those decisions.
Q So, that didn't effect how you felt about him?
A No.
Q Did you know how much Mr. Brown was making?

Q You're indicating that one person said that she would investigate, and you feel that she didn't, correct?
A Correct.
Q And that that effects how the entire agency is going to respond?
A In my opinion, yes.
Q Did you talk to Ms. Parker about it?
A No.
Q Why not?
A She wasn't my supervisor at that time.
Q Who was?
A That was Kyla Seale.
Q Did you talk to Ms. Seale?
A I believe she was aware of the issue, yes.
Q Did you talk to her?
A Yes.
Q What does that mean, "she was aware of the issue"?
A Well, Mark was pretty blatant about the comments that he would make to women. He made them in front of everyone. So, Kyla certainly overheard his comments on more than one occasion.
Q So, it wasn't targeted at you?
A It was often targeted at me; yes.
Q But he made them about other people and --
A Correct.



Q -- just in general?
A Yes.
Q It was just his way?
A Sexual harassment, yes. He has a habit of that.
Q Did you talk to Ms. Pixley about it?
A No.
Q Why not?
A I don't think she was the director at that time.
Q And we're talking about 2000 or 2001?
A Or maybe 2001, yes.
Q So, from that time on you didn't take any questions or concerns or issues to Human Resources or anybody else?
A No.
Q Because you didn't expect anybody to ever do anything about it?
A Correct.
Q Up through the time that you left the agency because you got laid off?
A Correct.
Q And I just want to be clear on this. Subsequent to the time that you talked to Ms. Hudgins about Mr. Huff, you never raised a concern.
Your experience that you talked about before that they wouldn't being responsive, is based on things before that time?



A Correct.
Q With regard to your foot condition that you said that you've always had, does it have a name?
A I have bunions, hammer toes.
Q Those are separate conditions?
A Correct. And I have ankles that both lean in.
Q Is there a name for any of these conditions?
A I don't know what the medical term would be. And I also have fallen arches.
Q And you've had hammer toes ever since you were born, did you say?
A Yes, all my life that I can recall.
Q And the bunions, as well?
A Yes.
Q And the ankles that lean in?
A Correct.
Q And the fallen arches?
A Those probably were picked up by my physical in 2002.
Q That's the first time you became aware of it?
A Correct.
Q Did you ever discuss any of these conditions with your supervisor?
A Yes.
Q Who did you discuss it with?
A It would have been Eileen Parker and Kathy Pixley.



Q You didn't discuss it with Ms. Parker's predecessor?
A No.
Q Or Ms. Pixley's predecessor?
A No.
Q When did you discuss your hammer toes with Ms. Parker?
A Probably prior to my surgery.
Q Which was in?
A 2008.
Q Correct. But did you discuss it in 2007, 2006, or just prior to the surgery?
A I can't tell you that.
Q You have no recollection?
A No, not for dates, no. I just know it was brought up and discussed.
Q Right, but was it shortly before the surgery or was it a long time before the surgery or something in between?
A It would have been something in between.
Q And what would you consider "something in between;" six months, a year, two years?
A Probably two years.
Q And what did you tell Ms. Parker about your hammer toes?
A I didn't say anything specific. I just said, you know, my feet bother me.
Q Oh, okay. So, you didn't discuss your hammer toes with Ms. Parker?

A No.
Q And didn't discuss it with Ms. Pixley?
A Not in specifics, no; just that, you know, I was having a lot of problems with my feet.
Q And you didn't discuss it with Ms. Pixley, either?
A I would have said the same thing to Ms. Pixley.
Q That you were having problems with your feet?
A Yes.
Q But you didn't discuss your hammer toes?
A No.
Q Did you discuss your bunions with either of them?
A No.
Q How about your ankles leaning in?
A No. I don't think -- I don't think I said anything specifically about what the conditions were.
Q How about your fallen arches?
A No.
Q Did you ever ask for an accommodation?
A No.
Q When you had your bunion surgery in 2008, was that considered reconstructive surgery?
A I don't know.
Q Well, what did they do for you, in laymen's terms?
A They removed the bunion and released the nerve for the hammer toe.



Q Okay. And you were scheduled for additional surgery like that?
A It was not scheduled.
Q You were -- okay.
A It was recommended.
Q Did they do one foot or the other?
A They did the left foot.
Q And it was recommended for the right; is that what you're saying?
A Correct.
Q And did you have a discussion with Ms. Parker about having the surgery on the right foot?
A Yes.
Q And when was that?
A What date did we have that discussion?
Q Yes.
A That would have been after I returned from the FMLA leave.
Q And did you discuss that with Ms. Pixley?
A Yes.
Q And did you discuss it with Human Resources?
A No.
Q Did you discuss it with anybody else at Holy Cross?
A No.
Q Was the discussion with Ms. Parker and Ms. Pixley



together?
A I don't recall that.
Q Okay. You said it was after your return from your FMLA leave?
A Yes.
Q What do you recall about the discussion?
A Well, I told them that Dr. Lavitski (phonetic spelling) had recommended it would have been three surgeries total on each foot, and he didn't want to do them together.
So, there would be a surgery on the foot, then a second surgery on the foot, then a surgery on the ankles, and then that would be for each foot. So, conceivably, that would have been another five FMLA leaves, which I would have to take one a year.
Q That's what you said to Ms. Parker and/or Ms. Pixley?
A Correct.
Q To both of them?
A Correct, yes.
Q But you don't recall if it was together or separately?
A No, I don't recall that.
Q Were you taking classes while you were on your FMLA surgery leave?
A Yes.
Q Those are your Master's of Social Work classes?
A Correct.



Q Were you doing any field training at that time?
A Field placement, yes. It was things I could do at home.
Q And what kinds of things were those?
A I was doing program evaluation and curriculum development for Paul Neitman.
Q And were those on computer or how did you do those?
A They were on computer, yes.
MS. PIPER: Can you mark that?
(Aldrich Deposition Exhibit 16 was marked for identification; attached hereto.)
BY MS. PIPER:
Q Do you recognize Exhibit 16?
A No.
Q Do you recall giving it to your attorney?
A Not this one. I don't remember one that says "IS Trainer," with three question marks.
Q That's what he gave me. It's got his number on the bottom.
A Okay. I don't remember the question marks.
Q Okay. Other than that, do you recognize the document?
A Yes.
Q What is it?
A It is an outline of job duties.
Q Do you recall when you received this?
A No.

Q It's marked "Draft." Do you see that?
A Yes.
Q Do you know if the original of the marking of -- legend of "Draft" was in a different color?
A I have no idea.
Q Do you know where you got this document from?
A Most likely, from Kathy Pixley.
Q Do you have a recollection of her giving it to you?
A No. It would have more than likely been at a team meeting.
Q Okay. But you have no specific recollection of her giving this to you?
A No.
Q And you don't know when she may have given it to you?
A No.
Q You don't even know that she did give it to you?
A I'm fairly certain that it would have come from her.
Q But you don't know that?
A Well, she's usually the one that handled job descriptions and disseminated them during a team meeting. That's why I say her.
Q Would you regard this as a job description or organizational chart?
A No.
Q "No" what?



A I wouldn't regard it as anything that was in practice because it says "Draft."
Q Okay. So, you don't recall Ms. Parker -- strike that -- Ms. Pixley giving it to you, correct? You don't recall that she gave it to you? You're assuming that?
A Correct.
Q So, you don't know that she gave it to you, you don't know when she gave it to you and you don't what the circumstances were? You're guessing at all of that, correct?
A No. I'm fairly certain that Kathy Pixley gave it to me.
The only time I got one of these was from -- from Eileen Parker, was the date of my last review in September of 2008.
So, if I received one of these on any other date, it would have come from Kathy Pixley. And these were disseminated always through team meetings.
Q Who else was present at the team meeting when you got this?
A Whoever was in attendance that day that was on the team.
Q Do you know if this was in 2008, 2007, 2006, 2005; any idea?
A Kathy didn't date it, so I have no idea.
Q And you have no recollection?
A No.



Q Do you know who the I.S. Director -- strike that.
Who was the I.S. Director when you were laid off in 2008?
A Kathy Pixley.
Q And who was the I.T. Manager?
A Prior to my layoff, Mike Grulke.
Q Is there somebody different now?
A I have no idea who is there now.
Prior to Mike Grulke, that would have been Scott Vanderbosch.
Q And who was the I.S. Support Tech at the time of your layoff?
A That would have been Mark Huff but I thought his job title was Office Support Technician. So, this would be a different job title for him.
Q Who was the I.S. Hardware Tech?
A At the time of my layoff, that would have been Steve Meyer.
Q Okay. And who was the I.S. Manager?
A Eileen Parker.
Q And who was the I.S. Trainer, question mark?
A That would have been me.
Q Okay. Looking at the I.S. Trainer box, there's several duties mentioned.
Computer training, did you do that?



A Yes.
Q Track I.S. training --
A Yes.
Q You did that, as well?
A Correct.
Q And the prepare training materials, you did that?
A Yes.
Q Did you do the phone systems scripts?
A No.
Q Did you do the I.S. newsletter?
A No. We didn't have one of those.
Q Did you do CIS administration?
A Yes.
Q Was that as a backup?
A I actually did a lot of the CIS administration, not just as a backup.
Q Was that one of your primary responsibilities?
A I would say so, yes.
Q Was that something that you did that was more than the computer training?
A Correct.
Q More than the tracking the I.S. training?
A Yes.
Q More than the preparing training materials?
A Yes.