# Exhibit 28

# In The Matter Of:

*Robin Aldrich v.*

*Boysville of Michigan et al*

---

*Eileen Parker*

*June 22, 2011*

---

ACRO

**Legal Support Services**

**Your Digital Link to the Spoken Word**

**210 W. Franklin St. - Suite 200**

**Jackson, MI 49201**

**(517) 787-4472**

*Original File 062211_1 Parker.TXT*

*Min-U-Script® with Word Index*

Page 17

was the final. That's on page 40.
Q. I guess I don't understand what you mean by that.
A. Well, everybody signs off on it at the end. When I do the review, Robin has a chance to respond to it, and then I get it back; I sign it; Robin signs it, and my supervisor signs it, and that means this is the final copy, with all the comments etcetera, since it goes back and forth a little bit. So this would be it, yes.
Q. This is the last review that you did?
A. Yes.
Q. When you presented this review to Robin, did you indicate to her that you had been directed by someone above you to change what you had originally had intended to give her? In other words, did you do a review, have it reviewed by someone above you, and they told you to make some changes to it before it was given to Robin?
A. No.
Q. That didn't happen, and you didn't tell Robin that that happened?
A. Correct. It didn't happen, and I don't remember saying that to Robin.
Q. Now, this particular evaluation gives Robin the score of 1, needs improvement to meet the new standards --
MS. PIPER: What page are you on, Rick?
Q. -- in 3 different places; correct?

Page 18

A. Let's see, there is one here on interpersonal skills, one under the addendum, develops and coordinates documentation, and I only see those 2.
Q. I misread my notes. There are two 1s not 3. Do you degree there are two 1s?
A. Yes.
Q. Did you tell Robin when you presented this to her that you were instructed by Kathy Pixley to score both of those items as 1s?
A. I don't remember saying that.
Q. Is it possible that you did?
A. I don't think so. The only thing I would say about that is I may have talked to Kathy about it, and said I feel strongly about these issues with Robin, and I'm going to give her a 1 on them, because that was not my practice to give 1s. So that would be the extent of that. Kathy did not instruct me to give her 1s.
Q. Now, the first 1 appears on page 34 under the category: "receives constructive criticism and suggestions in a positive manner." When you gave her a 1 in this category, were you referring to any incident other than the one you described with her tracking her comp time?
A. No, nothing specific.
Q. And then on page 36, why did you give her a 1 under: "develops and coordinates IS department documentation."?

Page 19

A. I can't remember this very well, but the documentation was an important piece of Robin's job, and as I recall I had been asking her to direct more of her attention and time to that task, and it wasn't getting done to my satisfaction at that point.
Q. Do you remember when the issue arose with her documenting her comp time, and you being upset that she had stopped doing that?
A. Uh-huh.
Q. I guess when you learned she had stopped documenting.
A. I really don't remember when it was. It had to have been during the review period.
Q. You don't remember specifically the proximity of that to your performing this evaluation?
A. I don't.
Q. Look at page 38, please, under supervisor's narrative. Now, the first sentence says: "Robin's role as trainer, document specialist, and support resource is very important within the IS department and to the agency as a whole." Was that a true statement?
A. I believe so, yes.
Q. Skip down to the third paragraph. The first sentence says: "This year has been a challenging one for Robin due to multiple days lost to illness and a FMLA leave." Do you see that?

Page 20

A. Yes.
Q. And in the last sentence of that paragraph you have indicated: "These absences have created an added burden on IS staff." Do you see that?
A. Yes.
MS. PIPER: Objection. Mischaracterization. That's only a part of the last sentence.
MR. LAFLAMME: Right. I didn't read the whole sentence.
MS. PIPER: Then I misunderstood the question.
MR. LAFLAMME: I'm directing her attention to it. I'll now ask the question.
Q. (BY MR. LAFLAMME) Do you see the language I'm pointing at?
A. Yes, the last sentence, uh-huh.
Q. Is it true that Robin's absences during the year created an added burden on the IS staff?
A. Yes.
Q. And you agree that that is part of the reason that she received a more negative evaluation than she had ever received in the past?
A. No.
Q. Going back to this incident when you confronted Robin about not tracking her comp time, you indicated to her at the time that someone had asked you about her comp time or

Page 21

her time away from the office. Do you remember that?
A. I don't exactly remember that, but I don't argue with that.
Q. Do you remember being asked of someone above you in the chain of command to look into Robin's comp time?
A. I remember Kathy Pixley asking about comp time frequently when it would appear on time sheets, and that was just -- there was nothing unusual about that. Kathy took that as her responsibility to check on that.
Q. So Kathy was your immediate supervisor?
A. Yes.
Q. And who was her immediate supervisor?
A. At that time it was John Lemmer.
Q. Do you remember John Lemmer ever asking you about Robin's comp time?
A. No.
Q. Do you remember John Lemmer ever asking you about Robin's absences from work?
A. No.
Q. Do you remember him ever commenting to you about Robin's absences from work?
A. No.
Q. Do you remember Kathy Pixley ever telling you that John Lemmer was concerned about Robin's absences from work?
MS. PIPER: Could you ask the question again,

Page 22

please?
MR. LAFLAMME: Could you read it back?
(Reporter read back)
MS. PIPER: Thank you.
A. I don't really remember specifically.
Q. (BY MR. LAFLAMME) Do you have any memory of John Lemmer being concerned about Robin's absences from work?
A. You know, it would have been -- I didn't discuss this with John. John discussed things with Kathy. So I really had no -- I had very little contact with John, so I wouldn't have heard this from John. I may have heard it from Kathy, but I don't remember specific conversations. I mean, certainly we discussed it because we had to cover for her absences, so I mean certainly Kathy and I discussed it.
Q. Look back at page 36 of Exhibit 17 if you would, please, the next to the last item on the page dealing with phone system scripts etcetera has an N/A by it?
A. Yes.
Q. Was that a category that you first scored as a 1 and then changed after Robin complained about that?
A. I don't remember doing that.
Q. Do you have a memory of the meeting at which you presented the '08 evaluation to Robin?
A. Not very clearly.

Page 23

Q. Do you remember who was there?
A. I don't specifically. I mean, my practice is that it's just the person that I'm reviewing and myself, and I'm almost certain that that is the way it was on this occasion.
Q. Do you remember having a meeting with Robin concerning her performance evaluation for '08 at which Kathy Pixley was present?
A. About her performance evaluation?
Q. Yes.
A. I don't remember.
Q. Do you remember that Robin's job description was changed following the completion of this evaluation?
A. I remember that her job description was changed at some point, but I don't remember when it was.
Q. Robin has documented a meeting on September 29, 2008, which is the same date -- strike that.
Look at page 37.
A. Okay.
Q. There is a comment in bold caps, "Robin maintains the Knights of Columbus website, and this is not represented in her job description." I didn't read the whole thing. I'm not trying to hide anything from you. I just want to focus your attention. Then just below that there is a handwritten comment that says: "See attached for change

Page 24

9/29/08."
Does that help you remember whether or not Robin's job description got changed in connection with this evaluation?
A. No, it doesn't help me remember.
Q. So Robin has documented a meeting on September 29, 2008, with you and Kathy Pixley at which the new job description was explained to her. Do you have any recollection of that?
A. No. Is that new job description here? Maybe that would help me remember.
Q. Actually take a look at page 41, 42, and 43.
A. I'm guessing this line about helping with website administration was added at that point. Frankly I don't remember but --
Q. I guess I'm more interested in focusing on the meeting, whether you remember that the new description was given to her then or not. Do you remember a meeting with Robin and Kathy at which Robin was told that Loren Brown and John Lemmer had targeted her position as one they could afford to layoff or eliminate?
MS. PIPER: Objection. Foundation.
MR. LAFLAMME: You can answer.
A. I remember that Kathy and I did meet with Robin to let her know that we were concerned that her job was on the